UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-173-01 (WMW/DTS)

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

ANTON JOSEPH LAZZARO,
a/k/a Tony Lazzaro,
a/k/a Tony,

        Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER**

The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Angela Munoz, Emily Polachek, and Laura Provinzino, Assistant United States Attorneys, hereby submits its response in opposition to Defendant Anton Joseph Lazzaro's motion for review and revocation of the order detaining him in federal custody.  ECF No. 68.  As set forth below, this Court should deny Lazzaro's motion and uphold the detention order issued by Magistrate Judge Bowbeer (ECF No. 28) because the Government met its burden of showing that no condition or combination of conditions could reasonably assure Lazzaro's appearance and the safety of the community, particularly the minor victims in this case.

## BACKGROUND

### I.  FACTUAL BACKGROUND

From approximately May 2020 through December 2020, Anton Lazzaro conspired with co-defendant Gisela Castro Medina to recruit minor girls to engage in sexual acts with Lazzaro in exchange for cash and other things of value such as cellular telephones, vaping pens, alcohol, and accommodations in the Hotel Ivy in Minneapolis, Minnesota.

On August 11, 2021, a grand jury returned a 10-count indictment against Lazzaro, with seven of those counts also naming Medina as a co-defendant.  The indictment charges:  conspiracy to commit sex trafficking of minors (Count 1); sex trafficking of a minor (Counts 2–6); attempted sex trafficking (Count 7); and sex trafficking—obstruction (Counts 8–10).

### A.  Overview of Conspiracy To Commit Sex Trafficking of Minors

As set out in the Indictment, the Government has identified six minor victims of this sex-trafficking conspiracy.  The FBI and Minnesota Bureau of Criminal Apprehension (BCA) have interviewed each of the six victims.  Their reports have been corroborated through the forensic examination of digital devices, social media accounts, collateral interviews, commercial receipts, and geolocation evidence.  As presented through the testimony of Minneapolis Police Office Brandon Brugger and in the affidavit of Special Agent Richard Waller, which was admitted at the detention hearing as Government Exhibit 1 (ECF No. 19-1), in general, this evidence has shown that

Lazzaro used Medina to identify girls on social media where Lazzaro could act as their "sugar daddy." Hr'g Tr. 18. Once Medina identified the girls, she would share their photographs with Lazzaro. Hr'g Tr. 19. If Lazzaro approved, Medina would continue to recruit and entice the girls on Snapchat to have sex with Lazzaro in exchange for money. Hr'g Tr. 18, 20. Thereafter, Lazzaro would communicate with the girls on social media and invite them to his penthouse condominium located at the Hotel Ivy. Hr'g Tr. 19. Lazzaro often provided transportation to the girls and instructed them to tell the desk clerk they were there to see "Tony in room 1920." *Id.* Once the girls arrived at Lazzaro's residence, they were enticed with alcohol and cash to engage in sexual acts. Once the sexual acts were completed, they would be paid in alcohol, cash, cellular telephones, vaping pens, and accommodations in the Hotel Ivy. Hr'g Tr. 13. Medina would receive cash, alcohol, hotel accommodations, and travel for her role in the sex trafficking conspiracy. Hr'g Tr. 30.

### B.   Sex Trafficking — Obstruction

At the detention hearing, Magistrate Bowbeer heard evidence of the defendant's obstruction of Victim A and Victim C. On July 29, 2020, Victim A told Lazzaro that he owed her additional money because Medina would "pimp out" Victim A to him. Lazzaro refused to pay Victim A any additional money. Instead, and as charged in the indictment, he hired a law firm to draft a Non-disclosure/Non-disparagement Agreement (NDA) to be signed by Victim A, her father, Lazzaro, and Medina. Gov. Ex. 3 (ECF No. 19-3). In brief, the NDA required Victim A to agree that the sexual

activity she had with Lazzaro was a "consensual interaction in the recent past" and she would not disparage him publicly.  In exchange, Lazzaro would give Victim A $1000. Victim A and her father refused to sign the NDA.

At some point after having sex with Victim C and paying her multiple times, Lazzaro told her that he had learned she was only 15 years old.  Hr'g Tr. 21.  Lazzaro previously believed she was 16 years old—even though her Snapchat profile indicated that she was 15 years old at the time they met.  In October 2020, Lazzaro subsequently offered to pay Victim C if she promised not to tell anyone that she had sex with him. *Id.*  In March 2021, Medina went to Victim C's place of work and gave her alcohol and cash from Lazzaro.  Hr'g Tr. 22.  Medina warned Victim C that Lazzaro had good lawyers and also told Victim C not to text Lazzaro anymore. Medina also told Victim C not to answer questions of law enforcement.  *Id.*

## C.    Execution of Search Warrants

In December 2020, the FBI obtained and executed search warrants at Lazzaro's apartment in the Hotel Ivy and Medina's dorm room at the University of St. Thomas. The search of Lazzaro's residence yielded vaping pens and a significant amount of cash, foreign currencies, and various precious metals (*e.g.*, palladium, rhodium, platinum, and silver).  Hr'g Tr. 14.  The FBI also seized more than 20 digital devices from Lazzaro, including multiple external storage devices.  Hr'g Tr. 14–15.  The phones Lazzaro had, including a new Google Pixel, provide for end-to-end encryption.  Hr'g Tr. 28–29.

At the time the search warrants were executed, the United States also served target letters on Lazzaro and Medina.  Hr'g Tr. 16.  The U.S. Attorney's Office has become aware that Lazzaro used these target letters to investigate the prosecution team, including learning where members of the prosecution team live.  Hr'g Tr. 27.  Then, when Lazzaro was arrested, he told law enforcement that Assistant United States Attorney Laura Provinzino "will regret doing this."[1]  Hr'g Tr. 24.

## II.   PROCEDURAL BACKGROUND

Defendant was arrested on August 12, 2021, and made his first appearance that afternoon.  ECF No. 7.  At the initial appearance, the Government moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(A), which carries a rebuttable presumption that no conditions or combination of conditions will ensure the defendant's appearance and safety of the community.  ECF No. 7 (noting that the Government moved for detention and the Court ordered temporary detention pending the detention hearing).  At the hearing, the United States specifically identified the rebuttable presumption, the

---

[1]  Lazzaro's motion describes a meeting his attorneys had with the Government prior to his arrest. ECF No. 68 at 8.  As a preliminary matter, this meeting has no bearing on detention and was not considered by Magistrate Judge Bowbeer in either her verbal order at the detention hearing or in her subsequent written order.  The Government, however, addresses this meeting in order to correct the inaccuracies in Lazzaro's motion.  At the request of Lazzaro's attorneys, his legal team of more than half-a-dozen lawyers met with one Assistant United States Attorney from the Criminal Division and two Assistant United States Attorneys from the Civil Division on August 10, 2021 to discuss the forfeiture of the property seized from Lazzaro in December 2020.  The purpose of the meeting was not to "try and resolve the ongoing investigation" as represented in Lazzaro's motion.

recommendation of U.S. Probation and Pretrial Services, and the views of the victims as the basis for its request for detention.  On August 13, 2021, the Court scheduled Lazzaro's detention hearing for the afternoon of Monday, August 16, 2021 via Zoom. On Sunday, August 15, 2021, Lazzaro's attorneys requested that the Zoom hearing be cancelled and that the hearing be rescheduled to a later date when the hearing could be held in-person.  The defense requested a hearing on either August 23 or August 24, 2021.  On August 16, 2021, the Court scheduled an in-person detention hearing for Lazzaro on August 24, 2021.  ECF No. 14.  In advance of this hearing, the Government submitted a written motion for detention outlining its detention argument on August 23, 2021.  ECF No. 19.  On the morning of the detention hearing, the Defendant filed a motion for release and submitted his proposed release plan, which had been drafted in February 2021.  ECF No. 22.  Both an initial bond report and a subsequent addendum prepared by U.S. Probation and Pretrial Services recommended pretrial detention.  ECF Nos. 9, 20.

A detention hearing was held in person before Magistrate Judge Bowbeer on August 24, 2021.  The Government was represented by AUSAs Angela Munoz and Laura Provinzino.  ECF No. 24.  Lazzaro was represented by retained counsel Zachary Newland, Jeremy Gordon, and Hillary Parsons.  ECF No. 24.  U.S. Probation and Pretrial Services Officer Melissa Perez, who authored the bond report and addendum report recommending detention, was also present.  The minor victims and their families joined the hearing by teleconference, as permitted by the Court.

The hearing included testimony from Minneapolis Police Department Officer Brandon Brugger (one of the case agents in the Government's investigation), Lazzaro's friend and business colleague Yele-Mis Yang, and James Douglas Kouns, a consultant hired by the defense to provide a security assessment of Lazzaro's condominium in Hotel Ivy. ECF No. 24. Officer Brugger provided detailed testimony about the nature of the joint FBI and BCA investigation into Lazzaro's sex trafficking, the execution of search warrants in December 2020, Lazzaro's attempts to obstruct his victims, and research Lazzaro had conducted into the prosecution team and the Honorable Judge Bowbeer. Hr'g Tr. 11–24. Mr. Yang, a long-time friend and employee of Lazzaro, testified that he knew nothing about the sex trafficking of minors allegations against Lazzaro and confirmed various facts about Lazzaro's extravagant lifestyle. Hr'g Tr. 54–73. Mr. Kouns testified regarding the release plan he was retained to author for Lazzaro. Hr'g Tr. 74–115. During cross-examination, the Court heard testimony regarding the numerous limitations in Lazzaro's proposed release plan, including: the focus of the plan was on physical security; the release plan did not account for access to internet in the Hotel Ivy; Lazzaro narrowed the scope of Mr. Kouns analysis and controlled who Mr. Kouns was permitted to interview in preparing the report; and the decision by defense not to consult with U.S. Probation and Pretrial Services regarding the feasibility of implementing the proposed release plan. Hr'g Tr. 74–115.

In addition to the testimony of the three witnesses, the Court also had before it three Government exhibits and one Defense exhibit. *Id.* The hearing lasted 4 hours

and 23 minutes, and included a nearly forty-five minute mid-hearing break while the parties and the Court awaited the arrival of defense witness James Douglas Kouns.

After considering the parties' exhibits, the testimony of witnesses, the statements of the minor victims and their families, and the arguments of counsel, Magistrate Judge Bowbeer ordered that Lazzaro be detained pending trial.  ECF No. 28.  Magistrate Judge Bowbeer first found that Lazzaro had presented sufficient evidence to rebut the presumption in favor of detention under 18 U.S.C. § 3142(e)(3)(E).  *Id.* at 4.  The Court noted that, despite being rebutted, the presumption remains a factor for the court's consideration.  *Id.*; *see also United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).

In addition to the presumption, Magistrate Judge Bowbeer carefully weighed the factors enumerated in 18 U.S.C. § 3142(g).  Looking at the first two factors, the Court found that the nature and circumstances of the charged offenses and the weight of the evidence supporting those charges weighed in favor of detention.  ECF No. 28 at 5.  The Court reasoned that these factors demonstrated both dangerousness and, in light of the possible penalties in the event of conviction, Lazzaro's incentive to flee the jurisdiction.  *Id.*

The Court then methodically considered evidence regarding Lazzaro's history and characteristics.  *Id.* at 5–6.  Magistrate Judge Bowbeer found that several factors weighed in favor of Lazzaro's release, including his lack of prior offenses, his ties to the community, and the fact that he did not flee upon learning of the Government's investigation.  *Id.*  But the Government countered these facts with evidence that

Lazzaro has "tremendous financial resources" that could not be fully ascertained or monitored. Magistrate Judge Bowbeer found that these resources provided Lazzaro "with a greater ability to flee the jurisdiction, to avoid detection after he flees, and to contact the six charged victims and potential new victims." *Id.* at 6.

Finally, the Court found that the detention factor weighed in favor of detention because Lazzaro presents a serious danger to the community, especially the minor victims and their families. ECF No. 28 at 6. Magistrate Judge Bowbeer stated,

> The risk of the Defendant being able to commit new offenses similar to those charged in the indictment, using similar means to those alleged in the indictment, and/or attempting to influence or interfere with the charged victims or other potentially unknown victims or otherwise attempt to obstruct the prosecution of this matter is both significant and serious.

*Id.* at 6–7.

After weighing the detention factors under § 3142(g), the Court determined that the release plans and conditions that Lazzaro proposed were not sufficient to mitigate Lazzaro's risk of flight and danger to the community. The Court explained that Lazzaro did not address his "ability to continue to use the internet and cellular technology to exploit or contact alleged prior victims or potential new victims." ECF No. 28 at 7. The proposed plan was also "incompatible with the ability of U.S. Probation and Pretrial Services to effectively supervise the Defendant." *Id.* Based on this thorough analysis, Magistrate Judge Bowbeer granted the Government's motion for detention. *Id.* at 8.

9

On September 10, 2021, Lazzaro filed a one-paragraph motion seeking review and revocation of the detention order and requesting a hearing to receive additional evidence. ECF No. 44. This Court denied Lazzaro's motion for an evidentiary hearing and ordered the parties to submit supplemental briefs regarding revocation of the detention order. ECF No. 56. For the reasons set forth below, the Court should deny Lazzaro's motion and uphold Magistrate Judge Bowbeer's order of detention.

## ARGUMENT

### I. STANDARD OF REVIEW

Lazzaro seeks review of Magistrate Judge Bowbeer's detention order under 18 U.S.C. § 3145(b), which permits a defendant to move for the amendment or revocation of a detention order issued by a magistrate judge. This Court reviews a magistrate judge's detention order de novo. *United States v. Maull*, 773 F.2d 1479, 1482 (9th Cir. 1985). Although the Court's review is de novo, it "is not required to start over in every case[] and proceed as if the magistrate's decision and findings did not exist." *United States v. Goree*, No. 19-cr-266 (NEB/KMM), 2020 WL 490995, at *3 (D. Minn. Jan. 30, 2020) (quoting *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990)). The Court should uphold the detention order if it finds that Lazzaro presents "either danger to the community or a risk of flight" as either prong "is sufficient to authorize detention." *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Because the record shows that Lazzaro is both dangerous and a flight risk, and no condition or combination of

conditions can mitigate these risks, the Court should deny Lazzaro's motion to revoke the detention order.

## II. The Government Met Its Burden of Showing That Lazzaro is Both a Flight Risk and a Danger to the Community.

The Court should uphold the detention order in this case because, as the Government has shown, Lazzaro presents both a flight risk and a danger to the public. A sex trafficking case "involving sexual victimization of a minor is unusual in that it includes a presumption in favor of pretrial detention, reflecting the significant harm caused by such a crime." *United States v. Epstein*, 425 F. Supp. 3d 306, 313 (S.D.N.Y. 2019); *see also* 18 U.S.C. § 3142(e)(3)(E). Even if this Court, like the magistrate judge, finds that Lazzaro produced sufficient evidence to rebut that presumption, it "remains a factor to be considered among those weighed by the district court." *Abad*, 350 F.3d at 797. Along with the presumption of detention, the Court must consider (1) the nature and circumstances of the charged offense, (2) the weight of the evidence against the person, (3) the person's history and characteristics, and (4) the nature and seriousness of the danger that the person poses. *Id.* § 3142(g). As demonstrated in Magistrate Judge Bowbeer's well-reasoned order, the evidence presented at the hearing establishes that each of these factors weighs in favor of detention. As such, a preponderance of the evidence shows that Lazzaro is a flight risk and clear and convincing evidence demonstrates his dangerousness to the community.

## A.    The Nature and Circumstances of the Offense Involve Serious Offenses Against Minors

Lazzaro faces charges under the Trafficking Victims Protection Act of 2000 (TVPA) for soliciting sex with minors.  Individuals, like Lazzaro, who violate the TVPA are part of a "particular class[] of offenders [who] should ordinarily be detained prior to trial." *Epstein*, 425 F. Supp. 3d at 315 (citing *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).  The severity of these offenses is evidenced by the fact that Lazzaro faces at least ten years and as much as life in prison if convicted on just one of the six sex trafficking counts.  18 U.S.C. § 1591(b)(2).  The fact that sex trafficking is a serious offense with a lengthy custodial penalty is evidence that Lazzaro is dangerous and has incentive to flee the jurisdiction.

## B.    Weighty Evidence of Guilt

Second, the weight of the evidence counsels in favor of detention.  18 U.S.C. § 3142(g)(2).  As demonstrated in the search warrant affidavit submitted at the detention hearing as Government Exhibit 1 and the testimony of Officer Brugger, the victims' accounts of their encounters with Lazzaro have been extensively corroborated. The victims' reports are consistent with one another, they were able to accurately identify Lazzaro's vehicles and penthouse condominium, and the timing of their encounters matches receipts, social media posts, cellular records, and geolocation information.

**C.      Lazzaro's Personal History and Characteristics Include Extensive Resources and Contacts that Would Enable Flight from Prosecution**

Third, Lazzaro's personal history and characteristics show that he presents a flight risk, and therefore weigh in favor of detention.  18 U.S.C. § 3142(g)(3).  The Government agrees with Magistrate Judge Bowbeer's conclusions that Lazzaro has no criminal history and he presented evidence of ties to the community, which includes his condominium at the Hotel Ivy where the charged sex trafficking of minors occurred.  And while the Government acknowledges that Lazzaro did not flee upon learning that there was a federal investigation involving him, there was no evidence presented to suggest he knew the nature of the charges, the number of charges, and the penalties that he was facing, as he now does.  Additionally, the Court can fairly consider the actions that Lazzaro did take while remaining in the jurisdiction after learning of the charges—namely conspiring with his co-defendant to obstruct Victim C.

Moreover, the Government presented ample evidence that Lazzaro possesses vast financial and personal resources that would facilitate flight.  According to the bond report prepared by U.S. Probation and Pretrial Services, Lazzaro has a net worth of more than 2 million dollars, including money offshore.  The Government notes that these calculations do not appear to include Lazzaro's extensive cryptocurrency holdings, which are difficult to trace and readily accessible anywhere in the world.  Hr'g Tr. 72.  Additionally, at the time the search warrant was executed on his penthouse, Lazzaro was found to be in possession of multiple types of foreign currency, cash, and

precious metals. Hr'g Tr. 14–15. And the fact that Lazzaro was not truthful in disclosing his assets demonstrates that Lazzaro has both the incentive and means to flee.

Lazzaro also has a history of international travel, including transportation by private jet. Hr'g Tr. 33. From 2017 through 2020, Lazzaro travelled internationally at least 10 times to locations like Costa Rica, Amsterdam, London, and Ukraine. *Id.* In short, Lazzaro's personal history and characteristics demonstrate he has sufficient financial and social resources that he could easily flee the jurisdiction and avoid prosecution.

### D.   Lazzaro Presents a Significant Danger to the Community if Released

Finally, regardless of his financial resources, Lazzaro presents a serious risk to the victims and the general public. 18 U.S.C. § 3142(g)(4). Under the Bail Reform Act, a defendant should be detained if there is "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." *Id.* § 3142(f)(2). Here, the best evidence of the danger that Lazzaro poses to witnesses comes from the victims themselves. At the detention hearing, the Government read into the record statements from the victims and their families. Hr'g Tr. 125–35. Each of those victims expressed fear and requested that Lazzaro be detained.

Lazzaro is already charged with three counts of obstruction in relation to different victims. *See United States v. Savader*, 944 F. Supp. 2d 209, 214 (E.D.N.Y. 2013) (detaining a defendant after considering both his "capacity to threaten or intimidate the victims, both identified and unidentified" and the fact that his previous intimidation of victims shows a willingness to cause further harm). Two of the charged acts involved Lazzaro sending others to intimidate victims, Hr'g Tr. 22, showing that he presents a danger to victims and witnesses so long as his means of communication are unfettered—something that can only be addressed through pretrial detention. "Even a single incident of witness tampering has been a 'traditional ground for pretrial detention by the courts.' " *Epstein*, 425 F. Supp. 3d at 318 (quoting *United States v. LaFontaine*, 210 F.3d 125, 132 (2d Cir. 2000)). Lazzaro's *three* attempts to buy his victims' silence, then, certainly justify pretrial detention.[2]

Lazzaro has also investigated and made threats against members of the prosecution, including a statement at the time of his arrest that AUSA Provinzino "will regret doing this." Hr'g Tr. 24. And, in addition to conducting open-source research on the prosecution team, Lazzaro looked for information on the magistrate judge. Hr'g Tr. 27. These actions demonstrate that Lazzaro is not beyond efforts to intimidate,

---

[2] The Government believes the record before the Court is sufficient to uphold Lazzaro's detention order. If, however, the Court finds to the contrary, the Government would request an evidentiary hearing to present additional, newly discovered information that is relevant to Lazzaro's dangerousness.

bribe, or threaten individuals—including the victims and witnesses in this case—who pose a threat to his way of life.

Lazzaro's motion wholly ignores this fourth—and arguably most important—factor in the Court's detention deliberation. But Magistrate Judge Bowbeer correctly noted "several serious concerns" regarding the danger to any person or the community if Lazzaro were to be released. The clear and convincing evidence of Lazzaro's danger to the victims and their families, as demonstrated in the preceding paragraphs, is alone sufficient to justify pretrial detention.

Considering the evidence presented at the detention hearing and the factors set out in 18 U.S.C. § 3142(g), each of the four factors weighs in favor of detention. The Government showed by a preponderance of the evidence that Lazzaro is a flight risk and showed clear and convincing evidence that Lazzaro is a danger to the community, particularly the minor victims and their families. For these reasons, the Court should uphold the detention order.

## III. LAZZARO HAS NOT PRESENTED A RELEASE PLAN THAT CONTAINS CONDITIONS OR COMBINATION OF CONDITIONS THAT WOULD ENSURE HIS APPEARANCE AND THE COMMUNITY'S SAFETY.

Lazzaro relies on a release plan that is inadequate to ensure his future appearance or the safety of the community. Magistrate Judge Bowbeer, who sits and makes determinations on detention routinely, looked at all the evidence before her and held that no condition or combination of conditions of release will reasonably assure the appearance of the defendant or reasonably ensure the safety of the community.

16

Notably, Magistrate Judge Bowbeer heard and observed the testimony of Mr. Kouns, the consultant retained by Lazzaro to conduct a physical security assessment of the Lazzaro's condominium in February 2021.  Mr. Kouns testified that his job was simply to perform a security assessment, and "it really didn't matter" what the potential charges were faced by Lazzaro. Hr'g Tr. 94.  Even knowing that Lazzaro ran a website called "Only Tiny Teens" did not affect the assessment. Hr'g Tr 100 ("Again, it's a physical security assessment. It wouldn't have mattered what the underlying crime was."); *see also* Hr'g Tr 114.

In preparing the report, Mr. Kouns only spoke with Lazzaro and his attorney. Hr'g Tr 95.  He was instructed not to do a thorough assessment. Hr'g Tr 98. Mr. Kouns did not know if the internet was password protected. Hr'g Tr. 102. "The internet security was not part of the scope" of the physical security assessment. Hr'g Tr 102. Mr. Kouns did not assess whether the hotel rooms, restaurants, spa, or fitness centers had password-protected wifi. Hr'g Tr 104, 105. Mr. Kouns did not review anything recorded by Lazzaro's Haicam cameras stored in the Haicam cloud. Hr'g Tr 109.  To access the cameras, one would need the Haicam application. Hr'g Tr 111. Despite spending significant time visiting the property and writing the assessment, Mr. Kouns never consulted with U.S. Probation Officers Michael Alberts or Brad Smith. Hr'g Tr 111. Although Mr. Kouns knew that U.S. Probation's access to applications would be limited on government-issued devices, Mr. Kouns did not ascertain whether the Haicam app could be used by the Probation Officers.  Hr'g Tr 112.

Lazzaro's allegation now that Magistrate Judge Bowbeer clearly erred in her assessment of the evidence presented at trial, including his plan for release, is not true on the record.  The excerpt below shows that the Court carefully weighed *all* evidence presented at the detention hearing:

> The Court carefully considered the Defendant's Motion to Release Defendant On Bond Pending Trial (ECF No. 22), the Defendant's proposed conditions of release, and Mr. Kouns's plan for release outlined in Defense Exhibit 1.  The Court concludes that the proposed release plan will not reasonably ensure the safety of the community or the Defendant's appearance at future court proceedings  The release plan and assessment authored by Mr. Kouns' was solely focused on physical access to the Defendant's residence at the Hotel Ivy and did not adequately address other significant areas of concern, most notably the Defendant's ability to continue to use the internet and cellular technology to exploit or contact alleged victims or potential new victims.  Even as to physical access, the Defendant's proposed release conditions did not address physical access to other parts of the Hotel Ivy complex, as Mr. Kouns was not asked to conduct and therefore did not conduct an assessment of physical access for the entire complex, which includes other condominiums, hotel rooms, and common areas.
>
> Moreover, the proposed release conditions are incompatible with the ability of U.S. Probation and Pretrial Services to effectively supervise the Defendant. *Inter alia,* due to the nature of access to the Hotel Ivy and Defendant's residence, the release plan would not permit a supervising Probation Officer to conduct unannounced visits to supervise the Defendant at his residence. Furthermore, in addition to fundamental concerns about having U.S. Probation and Pretrial Services reliant on a monitoring and security system owned and operated by the Defendant, the release plan also failed to take into account whether U.S. Probation and Pretrial Services personnel could access the applications necessary to monitor the security cameras proposed by the Defendant, or the practical feasibility of expecting U.S. Probation and Pretrial Services personnel to monitor the cameras and security systems around the clock. Finally, the release plan does not take into account that "geofencing" and GPS monitoring would not prevent the Defendant from moving *vertically* without detection within the 19-story building.

In this regard, the Court gave weight to the U.S. Probation and Pretrial Services' recommendation that the Defendant should be detained.[3] U.S Probation and Pretrial Services has significant expertise in supervising defendants accused of or on supervised release after incarceration for crimes similar to those at issue here, and in tailoring appropriate and feasible release conditions. While a decision about detention is the Court's alone, the considered conclusion by U.S. Probation and Pretrial Services that there are not conditions of release that would permit effective supervision of this Defendant under the existing circumstances was an additional important consideration for the Court.

ECF No. 28 at 7.

Nonetheless, Lazzaro claims error, alleging that there were no facts in the record to support certain conclusions. These concerns principally appear to be that (1) U.S. Probation could not make unannounced visits at Lazzaro's residence; (2) U.S. Probation may not have access to the security cameras proposed by Lazzaro; (3) U.S. Probation does not have the personnel for 24-hour around-the-clock monitoring; and (4) the "geofencing" does not account for vertical movement in Lazzaro's building. ECF No. 68 at 13. Lazzaro also alleges that the finding he would be more likely to flee given his personal wealth was also erroneous. *Id.* at 12. As demonstrated below, these arguments find no basis in the record now before the Court.

---

[3] Notably, while the Pretrial Risk Assessment found Lazzaro to be in the lowest category, that assessment is not applicable to sex offenders and was one of many factors used by U.S. Probation and Pretrial Services in its record. Lazzaro's argument that Magistrate Judge Bowbeer entirely disregarded the finding, ECF No. 68 at 9, should not be given any weight. *See also* Hr'g Tr 145–46 ("The PTRA score, the pretrial empirical evidence, as this Court knows, isn't applicable to those who commit sex offenses or have a history of sexual offenses. So I think we can sort of throw that out the window.")

First, there was evidence in the record regarding the limitations of U.S. Probation to do necessary unannounced visits. Mr. Kouns testified that visitors have to go to the front desk to get access to the elevators that go up to the condos. Hr'g Tr 81. Visitors then proceed down a hallway, and a Ring doorbell outside Lazzaro's residence will activate upon sensing motion and will provide a notice to Lazzaro that someone is there. Hr'g Tr. 82. In summary argument, Government counsel argued: "I think this Court also knows some of the reasons why U.S. Probation and Pretrial Services can do its job and be the eyes and ears of this Court is that it can make unannounced visits. That just simply isn't something that's possible at Hotel Ivy." Hr'g Tr. 146. Magistrate Judge Bowbeer agreed and found that Lazzaro's proposal was "in tension with the needs of Pretrial Services, the supervising officers to do their job. The essential impossibility of unannounced visits to Mr. Lazzaro, the very access controls get in the way of an important obligation and important tool for Pretrial Services." Hr'g Tr. 153.

Second, as Magistrate Judge Bowbeer found, Lazzaro's release plan was inadequate because it did not "take account of the ability or lack thereof of somebody to watch those cameras 24/7 or the ability of Pretrial Services to even have access to the apps that would be required to do so, even if one assumed that somebody would be watching them 24/7." Hr'g Tr. 154. The information in the record is that U.S. Probation likely would not have access to the Haicam app or data in Lazzaro's cloud account. As the Court knows, U.S. Probation does not have capacity to actively monitor

someone twenty-four hours a day, seven days a week as they reside in their personal residence.

Finally, Lazzaro's own plan did not consider whether ankle monitoring, which is required under the Adam Walsh conditions, would even work in his 19-floor building, which includes private residences, hotel, and businesses, including those with wireless internet.  Lazzaro's own witness could not provide an answer to whether GPS works vertically, meaning if someone goes up and down in the same footprint of a building. Hr'g Tr. 113.  As Magistrate Bowbeer correctly identified, the plan did not "take account of the fact that Mr. Lazzaro is in a high-rise and that ankle bracelet monitors don't address the ability to move vertically within that space and potentially to access other rooms, other units, and therefore other potential victims." Hr'g Tr. 154.

The Government demonstrated that Lazzaro is both a risk to public safety and a risk of non-appearance.  The Government further showed that the release plan offered at the detention hearing was insufficient to address these risks. Magistrate Judge Bowbeer so found.  A de novo review of the facts in the record as they apply to the detention statute will result in the same finding.

## IV. LAZZARO'S SIXTH AMENDMENT RIGHTS ARE NOT VIOLATED BY PRE-TRIAL DETENTION.

The Sixth Amendment provides, in part, that the accused shall have the assistance of counsel for his defense. Lazzaro's detention does not violate his Sixth Amendment rights.

Lazzaro alleges that the current COVID-related limitation on in-person visitations at the Sherburne County Jail violate his Sixth Amendment rights and require his release. ECF No. 68 at 14–17. Lazzaro fails to articulate why his current access to legal counsel through video and phone visits, along with communication by legal mail, is inadequate. Unlike many defendants, Lazzaro has multiple attorneys[4] representing him and significant access to them and his legal materials under the protective order. ECF No. 63. Further, Lazzaro speculates about a last-minute dump of evidence. ECF No. 68 at 15. That is not discovery practice in District of Minnesota. Much of the Jencks Act or 18 U.S.C. § 3500 material referenced by Lazzaro has already been disclosed.

The District Court has held that detainees at Sherburne County Jail have had more than adequate access to legal counsel and to participate in their defense despite the measures that the Jail has instituted to combat the COVID-19 pandemic. For example, in *United States v. Keegan Jamaal Rolenc*, 20-cr-137 (NEB/ECW), 2021 WL 211253 at *8 (D. Minn. Jan. 21, 2021), concerns about the defendant's ability to prepare his defense did not constitute a compelling reason for his pretrial release. The Court based this finding on Rolenc's representation by counsel and his ability to consult confidentially and privately with counsel by video.

---

[4] As of the date of this filing, Lazzaro has retained six attorneys.

The Court in *Rolenc* cited to *United States v. Taylor*, No. CR 5:19-192-KKC, 2020 WL 4529810, at *3 (E.D. Ky. June 24, 2020) in its decision.  In *Taylor*, the court said:

> As to Taylor's argument that he is unable to perform legal research on his own due to restrictions caused by COVID-19, a criminal defendant has the right to retained counsel or to appointed counsel if he is indigent. The Court has appointed counsel to represent Taylor. Thus, Taylor has no need to do his own legal research, nor is the Court obligated to ensure that he is able to conduct such research. Taylor complains that he has not been able to review discovery "independently." It appears that he has been able to review discovery with his lawyer during video conferencing sessions Taylor does not explain why it is necessary to his defense that he review discovery without his lawyer present or why reviewing discovery via video conferencing is inadequate.

*Id.* Lazzaro has even more access to counsel and the ability to prepare his own defense. Not only can Lazzaro independently review all unprotected materials, he can also review protected materials once counsel has redacted out all protected information.

Even early in the COVID pandemic, the Sherburne County Jail put in place sufficient safeguards to allow inmates to consult with defense counsel.  Indeed, courts within the District have reviewed these measures and repeatedly refused motions for pretrial release and release pending sentencing.  *See, e.g.*, *United States v. Miller*, No. 20-cr-41 (PJS/BRT) (D. Minn. Oct. 23, 2020), ECF No. 55 at n.1 (denying release pending sentencing and noting that "the Sherburne County Jail has to date done an outstanding job of protecting its inmates from infection"); *see also United States v. Brandon Richard Blegen*, No. 19-cr-304 (SRN/TNL), 2020 WL 1619282, at *4 (D. Minn. Apr. 2, 2020) (denying pretrial release and discussing favorably an affidavit submitted by Jail Administrator Brian Frank that outlined all of the steps taken to combat COVID-19).

The current measures for consulting with counsel did not present an exceptional reason warranting the defendant's release in *Blegen*, 2020 WL 1619282, at *5. Nor do they here.

Lazzaro does not show how he is being denied access to the legal resources afforded to pretrial inmates under 28 C.F.R. § 551.117. These requirements include "(a) The Warden shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis; (b) Staff shall provide pretrial inmates with access to legal materials in the institution; and (c) Staff shall allow the pretrial inmate, upon the inmate's request, to telephone the inmate's attorney as often as resources of the institution allow." 28 C.F.R. § 551.117. While the COVID pandemic has necessitated some reasonable limitations on in-person visits, there do not appear to be limitations on virtual inmate-attorney visits or telephone access.

And the Government would note that a complex sex trafficking case was just tried before the Honorable Patrick J. Schiltz, *United States v. Darnell Stennis*, 20-cr-19 (PJS/HB), while Stennis remained incarcerated. He had sufficient access to counsel and the ability to participate in his defense. Lazzaro's unfounded speculation is an insufficient basis to find a Sixth Amendment violation. None exists.

## CONCLUSION

For the foregoing reasons, Lazzaro's motion for review and revocation should be denied and he should remain in federal custody pending trial.

Respectfully submitted,

Dated:  October 15, 2021

W. ANDERS FOLK
Acting United States Attorney

*s/ Emily Polachek*
BY: EMILY A. POLACHEK
Attorney Reg. No.0390973
ANGELA M. MUNOZ
Attorney Reg. No. 0389207
LAURA M. PROVINZINO
Attorney Reg. No. 0329691
Assistant United States Attorneys