# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF
HOTEL IVY, 201 SOUTH 11TH STREET,
UNIT 1920 IN MINNEAPOLIS, MINNESOTA

**FILED UNDER SEAL IN ACCORDANCE WITH 18
U.S.C. § 3509(d)(2) AND LOCAL RULE 49.1(c)(1)(G)**

Case No. 20-mj-913 (KMM)

## SEARCH AND SEIZURE WARRANT

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the State and District of Minnesota:

**See Attachment A, incorporated here.**

The person or property to be searched, described above, is believed to conceal:

**See Attachment B, incorporated here.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before        December 28, 2020
                                                                                                                    *(not to exceed 14 days)*

X        in the daytime 6:00 a.m. to 10 p.m.                        _ at any time in the day or night as I find reasonable
          cause has been established.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to the current United States Magistrate
Judge on duty.

Date and Time issued:   Dec. 14, 2020, 5:25pm

                                                                                                    *Judge's Signature*

City and State:  Minneapolis, MN                        The Honorable Katherine M. Menendez
                                                                             United States Magistrate Judge
                                                                             *Printed Name and Title*

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF
HOTEL IVY, 201 SOUTH 11ᵀᴴ STREET,
UNIT 1920 IN MINNEAPOLIS, MINNESOTA

**FILED UNDER SEAL IN ACCORDANCE WITH 18
U.S.C. § 3509(d)(2) AND LOCAL RULE 49.1(c)(1)(G)**

Case No. 20-mj-913 (KMM)

## APPLICATION FOR A SEARCH WARRANT

I, Richard A. Waller, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

| X | evidence of a crime; |
|---|---|
| X | contraband, fruits of crime, or other items illegally possessed; |
| X | property designed for use, intended for use, or used in committing a crime; |
| | a person to be arrested or a person who is unlawfully restrained. |

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 1591 | Sex Trafficking |
| Title 18, United States Code, Section 1594 | Conspiracy to Commit Sex Trafficking |
| Title 18, United States Code, Section 2251 | Production and Attempted Production of Child Pornography |
| Title 18, United States Code, Section 2252(a) | Distribution and Possession of Child Pornography |

The application is based on these facts:

**See Affidavit, incorporated here**

| X | Continued on the attached sheet. |
|---|---|

_____
*Applicant's Signature*

SUBSCRIBED and SWORN before me by reliable
electronic means (FaceTime and email) pursuant to
Fed. R. Crim. P. 41(d)(3)

Date: ___Dec. 14, 2020___

City and State: __Minneapolis, MN__

Richard A. Waller, Special Agent
Federal Bureau of Investigation
_____
*Printed Name and Title*

_____
*Judge's Signature*

The Honorable Katherine M. Menendez
United States Magistrate Judge
_____
*Printed Name and Title*

| Return | | |
|---|---|---|
| Case No.:<br>20·mj·913(kmm) | Date and time warrant executed:<br>12/15/2020 @ 6:10a | Copy of warrant and inventory left with:<br>Anton Lazzaro |
| Inventory made in the presence of :<br>Anton Lazzaro | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>See attached FD-597. | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime and email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: 1/13/2021

_____
*Executing officer's signature*

RICHARD A MUELLER
SPECIAL Agent
*Printed Name and Title*

_____
United States Magistrate Judge

1/13/2021
Date

STATE OF MINNESOTA

COUNTY OF HENNEPIN

Case No. 20-mj-913 (KMM)

**Filed under seal pursuant to Local Rule 49.1(c)(1)(G) and 18 U.S.C. § 3509**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

I, Richard A. Waller, a Special Agent with the Federal Bureau of Investigation, being duly sworn under oath, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the seizure of property described in Attachment B.  Specifically, I seek authorization to search the residence of Anton Lazzaro (hereinafter Lazzaro), (DOB xx/xx/1990), which is located at the Hotel Ivy, 201 South 11th Street, Unit 1920, in Minneapolis, Minnesota and his person.  The applied-for warrant would authorize the seizure and forensic examination of electronic devices for the purpose of identifying and seizing electronically stored data and other evidentiary items particularly described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 1996.  I am currently assigned to the Minneapolis FBI Field Office.  I have worked multiple investigations involving sex trafficking, child pornography, and money laundering offenses and have also supervised agents in such investigations.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that Lazzaro has committed violations of Title 18, United States Code, Sections 1591 and 1594 (sex trafficking and conspiracy to commit sex trafficking), 2251 (production and attempted production of child pornography), 2252(a)(2) (distribution of child pornography), and 2252(a)(4) (possession of child pornography). There is also probable cause to search the property described in Attachment A for evidence of these crimes, as further described in Attachment B.

5. Sex trafficking of a minor occurs when, in or affecting interstate or foreign commerce, an individual recruits, entices, harbors, transports, provides, obtains, maintains, patronizes, or solicits by any means an individual knowing or in reckless disregard or with a reasonable opportunity to observe that the individual has not attained the age of 18 and will be caused to engage in commercial sex acts.

6. Production of child pornography occurs when a person employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

7.    Distribution and possession of child pornography occurs when a person knowingly distributes or knowingly possesses matters which contain any visual depiction that has been transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, when the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

8.    Over the last two months, I have interviewed witnesses and reviewed Snapchat communication and other records. Based on my investigation, I believe Lazzaro has conspired with Gisela Castro Medina (DOB xx/xx/2002) to recruit, entice, harbor, transport, obtain, and patronize girls to engage in sexual acts with Lazzaro in exchange for cash and other things of value such as cellular telephones, vaping pens, alcohol, and accommodations in the Hotel Ivy. Based on my knowledge of this investigation, Lazzaro conspired with Medina by directing her to identify girls on social media. Once identified, Medina would share images of the girls with Lazzaro via Snapchat and if he approved, Medina would recruit and entice the girls via Snapchat to have sex with Lazzaro in exchange for money. Thereafter, Lazzaro would communicate with the girls on social media and invite them to his residence located at the Hotel Ivy. I know that Lazzaro lives in the Hotel Ivy based on a review of property records and because victims were provided his address and instructed to tell the hotel's desk clerk they were there to see "Tony in room 1920." I have also seen videos and photographs taken by victims from inside Lazzaro's

residence in the Hotel Ivy. Once the girls arrived at Lazzaro's residence, they were enticed with alcohol and cash to engage in sexual acts. Medina would receive cash, alcohol, hotel accommodations, and travel for her role in the sex trafficking conspiracy. Lazzaro has posted videos of himself running large amounts of cash through a digital money counter which had a bar of gold placed on top of the money counter. The victims interviewed stated that Lazzaro always paid them in cash in exchange for sex with him.

9. According to Lazzaro's website, www.antonlazzaro.com, he is the CEO, founder, and Director of Big Tent Republicans PAC. Lazzaro's website describes the PAC as "a unique group dedicated to broadening the appeal of the Republican Party. The group looks to redefine the Republican Party specifically to minority, LGBT, and women who [Lazzaro] feels have been misinformed by the Democratic Party as well as neglected by [Lazzaro's] own party." Lazzaro has owned the Gold River Group, LLC, for nine years, which is a global consulting firm in online marketing. Lazzaro was born in Los Angeles, California, and attended Brigham Young University. Lazzaro currently lives in Minneapolis, Minnesota. Lazzaro's Twitter account is twitter.com/goptony. Lazzaro is also part-owner in Nonna Rosa's Ristorante Italiano located at 4168 West Broadway Avenue in Robbinsdale, Minnesota.

10. Gisela Castro Medina (hereinafter Medina) is a 2020 graduate from Delano Senior High School where she lived with her parents at 49XX Klaers Drive in Loretto, Minnesota. Medina, eighteen years of age, is currently a freshman at the University of St.

Thomas in Saint Paul, Minnesota, and lives on campus in the Brady Residence Hall in dorm room 621.

**Interviews of Victim 1**

11.     On or about July 29, 2020, V-1 (DOB xx/xx/2003) was interviewed by an investigator with the West Hennepin Police Department. Sometime in May 2020, V-1 was contacted by her friend, Medina, to see if V-1 wanted to make money by having sex with men.     Medina and V-1 initially contacted Lazzaro through a website called "SeekingArrangement."     SeekingArrangement is an American "sugar daddy" dating website founded in San Francisco, California in 2006.  I know that this website is often used by older men advertising themselves as a "sugar daddy" who offer to buy gifts and provide a "lavish lifestyle" to another person—often in exchange for sex.

12.     V-1 and Medina went to Lazzaro's penthouse at Hotel Ivy where Lazzaro provided them with alcohol.  V-1 and Medina got drunk and had sex with Lazzaro.  Lazzaro paid V-1 $600 for the commercial sex acts, which was split with Medina.  V-1 said Medina set up other meetings between V-1 and Lazzaro through Lazzaro's Snapchat account, "tonygop." V-1 told the West Hennepin Police Department that V-2 and V-3 were other girls who had sex with Lazzaro in exchange for money.

13.     On November 3, 2020, I observed the FBI CAFI interview of V-1.  V-1 said that she was 14 years old and Medina was 16 years old when they first met.  In May 2020, V-1 moved from Duluth, Minnesota, to Loretto, Minnesota, to live with Medina in

Medina's parents' farmhouse. At some point, V-1 and Medina decided that they needed money and discussed the SeekingArrangement website. V-1 created her own account on the website using her telephone number and school email address. V-1 said she used her cell phone and her school laptop to communicate with individuals on the website. Medina also created an account on the website using Medina's cell phone number. V-1 recalled for investigators a portion of Medina's cell phone number, which matches the phone number that I have identified as Medina's in this investigation. After Medina and V-1 set up their accounts, Medina told V-1 she had found a "sugar daddy" who wanted them to send him a picture of themselves. V-1 said they sent a "selfie" of themselves smiling. In return, they were sent $50.00. Based on Snapchat records, I know that the Medina and V-1 sent the "selfie" to Lazzaro on May 12, 2020.

14.     V-1 said they believed the man they were communicating with lived in downtown Minneapolis and his name was "Tony." On or about May 13, 2020, Medina told V-1 that they were going to Lazzaro's apartment in downtown Minneapolis. V-1 said they went to Lazzaro's apartment in an Uber arranged by Lazzaro. Once they entered Lazzaro's building, Medina and V-1 told the hotel staff they were there to see Tony in 1920. The hotel staff then accompanied them to an elevator and pushed a button for the nineteenth floor. V-1 recalled that Lazzaro's door had a gold door knocker in the form of a lion. Lazzaro provided V-1 and Medina alcohol, and they got drunk.

15.     V-1 said that, while they were sitting in Lazzaro's living room during that first meeting, V-1 told Lazzaro that she was sixteen years old. She recalled Lazzaro saying

the age of consent in Minnesota is sixteen so "we're fine." V-1 said Lazzaro then took out a stack of cash and asked them, "What would you do for this money?" Lazzaro told them: "If you take off your shirts, I'll pay you $100. If your take off your pants, I'll pay you $200. And if you have sex with me, I'll pay you $300." Lazzaro paid V-1 and Medina $200 each to kiss each other and $100 each to perform fellatio. V-1 and Medina then agreed to have sex with Lazzaro in exchange for money.

16.     V-1 described a mirror on the ceiling of Lazzaro's bedroom and a security camera on the ceiling of his living room. V-1 overheard Lazzaro telling Medina that he wanted her to recruit thirteen- and fourteen-year-olds to have sex with him. V-1 said Lazzaro then gave them an envelope with cash inside. V-1 said that she and Medina felt they would have gotten more money if the had done more with him.

17.     V-1 returned to Lazzaro's apartment on several occasions with and without Medina and engaged in sex with Lazzaro in exchange for money. V-1 confirmed that Medina would arrange for V-1 to have sex with Lazzaro. The arrangements were made through Snapchat. V-1 said Medina would tell her to "get ready, you're leaving in an hour." V-1 said after each time she was sent by Medina to have sex with Lazzaro, he would give her an envelope with money, a portion of which was for V-1 to give to Medina.

18.     V-1 said that, on one occasion, Lazzaro showed her his Pornhub channel, which depicted what she described as teenage girls having sex with men. Lazzaro told V-1 that he recorded the videos, which appeared to have been recorded in someone's home. Lazzaro talked to V-1 about being in some of his videos, but Lazzaro told her that she could

not participate because she was not eighteen years old. V-1 said it was difficult to tell if the girls in the videos were really eighteen years old since body types are not all the same.

19.    V-1 said that she was involved in an incident with Medina and Medina's boyfriend during the summer of 2020. V-1 and Medina were visiting Medina's boyfriend at his home. While they were there, V-1 observed Medina and her boyfriend having sex. V-1 said she thought Medina was being raped so she went outside and damaged Medina's boyfriend's car. V-1 said that, when the damage was discovered, the police were called and came out and made a report. Medina's boyfriend demanded V-1 pay for the damage, but she did not have any money. V-1 said to get money, she contacted Lazzaro and demanded the money he had previously given to Medina after V-1 had sex with him.

20.    In the Snapchat documents I have reviewed, there was an exchange on July 29, 2020, between V-1 and the Snapchat user "tonygop." These records and my investigation identify Snapchat user "tonygop" as Lazzaro. In the July 29 exchange, V-1 requested money from Lazzaro that he owed her as a result of Medina "pimping" her to have sex with him in exchange for money. V-1 told Lazzaro that because Medina took a cut of the money he gave her to have sex with him that made Medina a "pimp." V-1 told Lazzaro that she knew three other girls that Medina recruited to have sex with him in exchange for money. V-1 told Lazzaro that she had reported this to the police and that Lazzaro could either pay V-1 $900 that he owed her or she would give his name, phone number, and address to the police. Lazzaro responded "no."

21.	V-1 said that Lazzaro then had his attorney draft a Non-Disclosure/Non-Disparagement Agreement (NDA) that was to be signed by V-1, her father, Lazzaro, and Medina. V-1 said that she believed the agreement was Lazzaro's attempt to keep her from telling anyone about her being pimped by Medina to have sex with him in exchange for money. V-1 said that she and her father refused to sign the agreement. I have reviewed law enforcement's incident report detailing the damage that V-1 did to Medina's boyfriend's car, which was dated July 28, 2020. I have also reviewed the draft NDA, which states Mr. Lazzaro and V-1 "had a consensual interaction in the recent past."

## Interviews with Victims 2 and 3

22.	On July 30, 2020, sisters V-2 (DOB XX/XX/2003) and V-3 (DOB XX/XX/2001) were interviewed by an investigator with the West Hennepin Police Department. V-2 told the investigator that she was contacted by a male individual, W-1 (DOB XX/XX/2003), to see if V-2 and V-3 wanted to make money by having sex with a man that W-1 knew. V-2 agreed, and W-1 provided her with the Snapchat name "tonygop," and told her that it was the username for a guy named "Tony." V-2 subsequently identified "Tony" as Anton Lazzaro.

23.	V-2 said that she drove to Lazzaro's apartment at the Hotel Ivy with V-3 and another friend. V-2 stated that, while she and V-3 were at Lazzaro's apartment, he asked them to take off their clothes and kiss each other for money. V-2 and V-3 each had sex with Lazzaro in exchange for money. Lazzaro paid them each $400 in cash. In total, V-2 and V-3 met with Lazzaro four times at his apartment and had sex in exchange for money.

24.     On December 1, 2020, I observed the CAFI interview of V-2 and V-3. In addition to much of the same information V-2 has provided to law enforcement, V-3 described the multiple times she and her sister (V-2) went over to Lazzaro's penthouse to have sex with him in exchange for cash. Lazzaro used his cell phone to show V-3 pornographic pictures and videos that he produced in his penthouse and posted on Pornhub. V-3 said that she recognized Lazzaro's furniture and other items in his home in the images he showed her. V-3 said Lazzaro offered to pay her $6,000 to have sex with a friend of his who was a "pornstar," which she declined. V-2 stated that while she, V-3, and one of their friends were topless in his bed, she saw Lazzaro using his cell phone to take images of them with their tops off. V-2 said she believed Lazzaro video recorded them and possibly sent the video to someone else.

### Interviews with Victims 4 and 5

25.     On or about October 18, 2020, the FBI was contacted by W-3 who advised that her daughter, V-4 (DOB XX/XX/2003), had met a man using the Instagram name "MPLSTONY" and engaged in sex with him in exchange for money. Through open-source research, I know that the profile page for the Instagram name MPLSTONY is associated with the Snapchat username of "tonygop," and is Lazzaro.

26.     On October 19, 2020, I observed the FBI CAFI interview of V-4. Around late summer 2020, V-5 (DOB XX/XX/2004), a friend of V-4, received a Snapchat message from someone V-5 knew (Medina) saying, "my sugar daddy thinks you're really pretty[,] do you want his Snapchat?" V-5 replied "yes" because she wanted to make money. V-4

and V-5 both began communicating with "tonygop" through Snapchat. V-4 referred to this man as "Tony" and his Instagram username as MPLSTONY.

27.    V-4 and V-5 met Lazzaro at his residence in the Hotel Ivy. When they arrived at the building, they went to the front desk and told the receptionist that they were there to see Tony in unit 1920. V-4 and V-5 went up to Lazzaro's residence where they engaged in sexual activity with Lazzaro. V-4 described a mirror hanging from the ceiling above Lazzaro's bed, and she felt as though he was filming their sexual encounter. Lazzaro gave V-4 a new iPhone and paid both V-4 and V-5 $800 each in exchange for the sex acts. Lazzaro also gave V-4 and V-5 vaping cartridges.

28.    At a later date, V-4 returned alone to see Lazzaro at his apartment. The visit was arranged through Snapchat. During this visit, V-4 and Lazzaro engaged in sex, and he gave her $500 and more vaping cartridges.

29.    V-4 and V-5 told Lazzaro the name of the high school they attended, and, through Snapchat, they told him that they were 16 years old. Lazzaro engaged in commercial sex with them knowing their true age.

30.    On October 21, 2020, I observed the FBI CAFI interview of V-5. V-5 met Lazzaro when Medina told her through Snapchat that her "sugar daddy" thought she was cute and wanted to get her Snap. Medina told V-5 that she sometimes had sex with Lazzaro, and he would buy her stuff in exchange. V-5 identified his Snapchat name as tonygop.

Lazarro would message V-5 through Snapchat and post pictures of money on his Snapchat story.

31. V-5 said that, in August 2020, she and some friends, including V-4, drove to the Mall of America. V-5 met Lazzaro inside Nordstrom where Lazzaro offered to pay her to come home with him, but V-5 refused. They then went into the Prada store located inside Nordstrom. V-5 said Lazzaro purchased her a purse from the Prada store. Lazzaro paid for the Prada purse with his credit card. V-5 said she completed a registration card for the purse using her personal information. I obtained a copy of the receipt and surveillance footage of the purchase, which shows V-5 meeting Lazzaro just outside of Prada. After a short conversation, V-5 and Lazzaro entered the Prada store, and Lazzaro purchased a Prada purse with his credit card. I have confirmed Lazzaro made the purchase with his personal credit card. Based on my training and experience, I believe this purchase was intended to entice V-5 to come back to his penthouse.

32. V-5 said Lazzaro would often text her and invite her over to his home, but she declined. But after V-4 began messaging Lazzaro, V-4 wanted the two of them to go to Lazzaro's house together with the hope that Lazzaro would give them money. V-5 eventually agreed.

33. V-5 knew that Lazzaro lived on the nineteenth floor of the Hotel Ivy. When V-4 and V-5 arrived there, they were given a tour of Lazzaro's apartment. V-5 described a television in the bathroom mirror. Lazzaro told V-4 and V-5 it was a two-way mirror and "someone could be watching you and you wouldn't even know it." Based on my training

and experience, I know that a camcorder with an SD card for storing recordings or other type of recording device can be positioned behind a two-way mirror to record images and a display monitor can be used to observe what is being recorded.

34.     V-5 stated that they went to Lazzaro's bedroom where Lazzaro asked, "So you're sixteen, right?" Lazzaro then told V-4 and V-5 to take off their clothes, and they engaged in sexual activity with Lazzaro. V-5 performed oral sex on Lazzaro. V-5 noticed a mirror above Lazzaro's bed that was not flat against the ceiling. It hung down away from the ceiling and was surrounded by lights. V-5 thought about the possibility that Lazzaro had a video camera behind the mirror. Lazzaro gave V-5 $500 in fifty-dollar bills and gave V-4 a phone that cost $1,000 and $800 in one hundred-dollar bills in exchange for sex. As they were leaving, Lazzaro asked if they wanted some vape pens. V-5 said she and V-4 took as many vape pens as they could carry.

35.     About a week and a half later, Lazzaro asked V-5 to come over to his home, and V-5 agreed. V-5 said she performed oral sex on Lazzaro and then he put on a condom and vaginally penetrated her. V-5 said Lazzaro then made her lay on her side while he penetrated her vaginally from behind. Lazzaro gave V-5 $500 in fifty-dollar bills and e-cigarettes. Over the days that followed, V-5 said Lazzaro continued to ask her to come over to his home.

## Interview of Victim 6

36.     On November 4, 2020, an FBI Agent and I interviewed V-6 (DOB XX/XX/2002). V-6 knows Medina because they went to high school together in Delano. V-6 knows that Medina is friends with a man named "Tony" who is interested in girls from Delano. Medina told V-6 that Lazzaro was interested in meeting her after Medina showed Lazzaro V-6's picture on Instagram. V-6 provided law enforcement with screen captures of Snapchat messages from Medina. One dated October 9, 2020, included a Snapchat message from Medina saying "my sugar daddy saw u on my insta [Instagram] and wants to meet u." The name on V-6's Snapchat photo was "GIISELAMEDINA." V-6 asked Medina who she was talking about, and Medina replied "My BFF TONY" who gives her $10,000 per month. V-6 declined Medina's solicitation.

37.     In my training and experience, I know cell phones, tablets, and other computers are used to communicate with victims, co-conspirators (bottoms), and potential "johns" or commercial sex purchasers through Snapchat, Instagram, text messages, Facebook Messenger, and various other apps. As such, the cellular telephone would include contact information, photographs, videos, text messages, and other communication between the trafficker and the victims and the trafficker and co-conspirators. I also know that cellular telephones are used to take photographs and/or videos to advertise (via the Internet) victims for commercial sex acts, often wearing minimal to no clothing, some of which may constitute child pornography. They also may be used to record sex acts as part of the grooming or recruiting process. Moreover, through the use of GPS technology,

cellular telephones are used to record locations or travel and communication. Cellular telephones can also contain evidence that may be indicative of obstruction or the attempt to obstruct or in any way interfere with or prevent the enforcement of federal sex trafficking laws. Cellular telephones can also contain evidence that may be indicative of the concealment and/or use of illicit proceeds from commercial sex to further promote the commercial sex or "pimping" business through email, text messages, and online banking and online purchasing activities. It is likely that such information would remain on a cellular telephone or indicia of such evidence would be available through forensic review of such a device.

38.     I also know that recording devices can be hidden in areas, to include behind mirrors, to covertly record individuals engaging in illicit sexual activities and that these devices can store recordings on SD cards or other storage devices contained within them.

## **TECHNICAL TERMS**

39.     Based on my training and experience, I use the following terms to convey the following meanings:

a.  Cellular telephone: A cellular telephone (or cell phone, mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through

made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic address books; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning systems ("GPS") technology for determining the location of the device.

b.  Digital camera and camcorder: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage media to a separate reader. Removable storage media include various types of flash memory cards or miniature drives. Most digital cameras also include a screen for viewing the stored images. This storage can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage

media. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact lists, clock, or games.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards, USB drives, external hard drives and/or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range $0 - 255$, separated by periods (e.g. 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly

from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term IP addresses, while other computers have dynamic – that is, frequently changed IP addresses.

f. Internet: The Internet is a global network or computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

40. Based on my training, experience, and research, I know a wireless telephone has capabilities that allow it to access the Internet and to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41. Based on my knowledge, training, and experience, I know electronic devices can store information for long periods of time, including evidence of child pornography. Similarly, things that have been viewed via the Internet are typically stored some period of time on the device. This information can sometimes be recovered with forensic tools.

42. **Forensic evidence.** As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as

direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices to be seized because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a picture that has been deleted).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. Identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.    **Nature of examination.**  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

44.    **Manner of execution.**  Because this warrant seeks permission to enter Lazzaro's residence, the execution of this warrant does involve physical intrusion by law enforcement.  Consequently, I submit there is a reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

45.    The victims in this investigation have told me and other members of law enforcement that Lazzaro knew their ages and, in some cases, where they attended high school.  Lazzaro discussed "age of consent" in Minnesota, knowing it to be 16 years of age.  One victim told law enforcement that Lazzaro requested that Medina identify and recruit thirteen- and fourteen-year-old girls to have sex with him.

46. Based on information provided by one of the victims, Lazzaro provided her and other girls alcohol before engaging in sex acts. While they were in Lazzaro's bed, she saw Lazzaro using his cell phone to take photos of them with their tops off. She believed that he videotaped them and possibly sent the video to someone else.

47. Some victims reported that Lazzaro showed them videos and photographs of pornographic images on his cell phone that he said he created and uploaded to the porn website Pornhub. One of the victims could not confirm if the girls in videos and photographs Lazzaro showed her were eighteen years old or not.

48. Based on my knowledge, training, and experience, I know that cellular telephones and other computers are commonly used in connection with criminal activities such as communicating with co-conspirators for the purpose of facilitating the sex trafficking of minors, and the production, distribution, and possession of child pornography. Based on the foregoing, I believe there is probable cause to believe that Lazzaro used cameras, computers, cellular telephones, and external media storage devices to, among other things: to take or create digital images of the above-mentioned individuals and possibly other juvenile victims; and to communicate, via text message, Snapchat, and Instagram in an attempt to facilitate Sex Trafficking of Juveniles in violation of Title 18, United States Code, Sections 1591 and 1594; and in the Production, Attempted Production, Distribution, and Possession of Child Pornography, in violation of Title 18, United States Code, Sections 2251 and 2252.

49.    I submit that this affidavit supports probable cause for a search warrant authorizing the seizure and examination of the locations described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Richard A. Waller
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
using reliable electronic means (Facetime
and email) on December 14 , 2020:

KATHERINE M. MENENDEZ
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property To Be Searched

This warrant authorizes the search of Anton Lazzaro's residence located in the Hotel Ivy, 201 South 11th Street, Unit 1920, in downtown Minneapolis, Minnesota. His residence is at the penthouse level, which is the 19th floor of the hotel. The hotel is tan in color and the main entrance is in the front of the building.



+

**Particular Things To Be Seized**

1. All records that relate to the violations of Title 18, United States Code, Sections 1591, 1594, 2251, and 2252, including but not limited to:

   a. lists of commercial sex buyers and related identifying information;

   b. human trafficking activity such as dates, process, offers for sex, descriptions of sexual services offered, solicitation of others, communication between traffickers and trafficked victims;

   c. cellular telephones and the videos and/or photographs produced by and stored on such devices and/or internal media such as SD cards depicting child exploitation known as child pornography;

   d. camcorders and/or other live-action recording devices and videos stored on such devices and/or internal media such as SD cards depicting child exploitation known as child pornography;

   e. text message communications stored on devices, including messages sent through messaging applications, such as Snapchat, Instagram, and SeekingArrangement.com;

   f. hotel transactions and other receipts related to commercial sex and/or prostitution activity;

   g. call history and contacts;

   h. any information related to human trafficking activity (including names, addresses, phone numbers, online postings or advertisements, or any other identifying information);

   i. transportation records, including GPS location information, IP addresses, travel receipts, and other records, including with Lyft, Uber and similar services;

   j. all bank records, checks, credit card bills, cash withdrawal records, account information, PayPal, Bitcoin, Venmo, and other such financial records;

   k. all purchase and registration records, including receipts from Nordstrom and Prada;

   l. all travel records for Minnesota and within the United States, to include the manner and method of payment;

   m. all ledgers, account records, payments, promissory notes or contracts related to payments and bank deposits made to facilitate child exploitation;

n. all U.S. currency, gold bars, and other financial instruments which could be used in exchange for sex; and

o. all vaping pens, vaping cartridges, and other nicotine products.

2. Evidence of user attribution showing who used and/or owned devices at the time the events described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, social media usernames and/or identities and social media activities, and browsing history.

3. Records evidencing the use of the Internet to communicate, including:
   a. Internet history as it relates to human trafficking and child pornography activity such as Pornhub.com and similar websites, as well as chat line history;
   b. Internet history as it relates to commercial sex acts, sex trafficking, money laundering, and child pornography, through the use of Snapchat, Instagram, Facebook, and similar websites and social media platforms;
   c. Records of Internet Protocol addresses used; and
   d. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## SEARCH WARRANT ADDENDUM

1. In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2. If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3. Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4. The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: 305G-MP-3335032

On (date) 12/15/2020

item (s) listed below were:
- [✓] Collected/Seized
- [ ] Received From
- [ ] Returned To
- [ ] Released To

(Name)  ANTON LAZZARO

(Street Address)  201 SOUTH 11TH ST; UNIT 1920

(City)  MINNEAPOLIS

Description of Item (s):

1. WINDOWS SURFACE W/ CHARGING CORD - KITCHEN ON COUNTER - ROOM F (BURNHAM)

2. BLACKBERRY PHONE - ON THE BED PLUGGED IN - ROOM I - IMEI: 015103000107958 W/ 32G SD CARD

(SCHANTZEN)

3. PUFF BAR (VARIETY) - ON WASHER/DRYER - ROOM A (DAWSON)

4. PUFF BAR (VARIETY) - WASHER/DRYER - ROOM A (DAWSON)

5. PEACH ICE PUFF BAR - BEHIND BED/HEADBOARD - ROOM I (SCHANTZEN)

6. VAPE CIGARETTE - IN NIGHTSTAND - ROOM I (SCHANTZEN)

7. TRACKER - CLOSET DRAWER - ROOM E (DAWSON)

8. HANDWRITTEN NOTES/PASSWORD SHEET - KITCHEN DRAWER - ROOM F (BURNHAM)

9. US CURRENCY $5,445.00 (32 X $100S, 38 X $ 50S, 21 X $20S, 2 X $10S, 1 X $5S)  ROOM G - TOP DRWAER END TABLE

(BURNHAM)

10. CO-PERFORMER RELEASE AGREEMENTS - ROOM G - LEFT SIDE DESK - (HANSON)

11. US CURRENCY - ROOM G - IN WALLET ONTOP OF END TABLE $4,283. 00 (42X$100S, 3X$20S, 1X$10, 1X$5, 8X$1)

(BURNHAM)

12. CELLPHONE BITTIUM - ROOM G - ON DESK (HANSON)

13. BLACK/SILVER IPHONE ROOM G - ON DESK (HANSON)

14. LG CELL PHONE - ROOM G - ON DESK (HANSON)

15. IPHONE SE - ROOM G - ON DESK (HANSON)

Received By: _Richard A Waller_ (Signature)  Received From: _____ (Signature)

Printed Name/Title: RICHARD A WALLER Printed Name/Title: _____

Special Agent

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: 305G-MP-3335032

On (date) 12/15/2020

item (s) listed below were:
- [x] Collected/Seized
- [ ] Received From
- [ ] Returned To
- [ ] Released To

(Name)  ANTON LAZZARO

(Street Address)  201 SOUTH 11TH ST; UNIT 1920

(City)  MINNEAPOLIS

Description of Item (s):  16. LG CELLPHONE - ROOM G - ON DESK (HANSON)

17. WHITE/BLACK MOTOROLLA CELLPHONE - ROOM G - ON DESK (HANSON)

18. GRAY/BLACK  MOTOROLLA CELLPHONE - ROOM G - ON DESK (HANSON)

19. LEDGER NANO S CRYPTO CURRENCY FLASH DRIVE WALLET - ROOM G - ON DESK (HANSON)

20. KEEP KEY (DIGITAL) - ROOM G - ON DESK (HANSON)

21. INSPIRAN DELL LAPTOP; SER# 43271725539 - ROOM G - ON DESK (HANSON)

22. DELL SILVER XPS LAPTOP - ROOM G - ON DESK (HANSON)

23. 14X SD CARDS, 2X THUMB DRIVES - ROOM G - MIDDLE DRAWER, END TABLE (BURNHAM)

(PREVIEWED BY BCA TEAM DME AT 0820 HOURS)

24. 2X THUMB DRIVES - ROOM G - BOTTOM DRAWER END TABLE (BURNHAM) - PREVIEWED BY BCA TEAM 0820

25. CASH LEDGER - ROOM G IN SAFE TOP DRAWER (BURNHAM)

26. XIAOMI PHONE - SER# 188848/28VN00206 IN THE RED TREASURE CHEST - ROOM G (BURNHAM)

27. TCL CELL PHONE - IN THE RED TREASURE CHEST - ROOM G (BURNHAM)

28. BLACK IPHONE - IN THE RED TREASURE CHEST - ROOM G (BURNHAM)

29. GRAY/BLACK BLACKBERRY - IN THE RED TREASURE CHEST - ROOM G (BURNHAM)

30. US VALUE $819 - DINARI - (39X $25,000 DINARI NOTES) FROM THE SAFE - ROOM G (GERNENTZ)

31. US VALUE $2,906.64 - HYRVNIA (403X $200 NOTES, 5X $20 NOTES, 4X $10 NOTES) FROM THE SAFE - ROOM G (GERNI

32. US VALUE $33,150 (663 $50 DOLLAR BILLS) - FROM THE SAFE - ROOM G (GERNENTZ)

33. US CURRENCY 2962.00 (132X $20, 25X $10, 3X$5, 3X$2, 51 X $1) - FROM THE SAFE - ROOM G (GERNENTZ)

Received By: _____
(Signature)

Printed Name/Title: _____

Received From: _____
(Signature)

Printed Name/Title: _____

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: __305G-MP-3335032__

On (date) __12/15/2020__

item (s) listed below were:
- [x] Collected/Seized
- [ ] Received From
- [ ] Returned To
- [ ] Released To

(Name)  ANTON LAZZARO

(Street Address)  201 SOUTH 11TH ST; UNIT 1920

(City)  MINNEAPOLIS

Description of Item (s):  34. US VALUE $4.88, (1 $500 JAMAICAN DOLLARS 6X $100 JAMICAN DOLLARS) - FROM THE SAFE

35. US VALE 325,400.00 (3254X $100) - FROM THE SAFE - ROOM G (GERNENTZ)

36. US VALUE $15.71 (4X $5 CANADIAN DOLLAR BILLS) FROM THE SAFE - ROOM G (GERNENTZ)

37. US $171.56 (2X$500 BILLS - CHINESE, 3X $100 BILLS, 1X$20, 1X$10) - FROM THE SAFE - ROOM G (GERNENTZ)

38. US VALE .20 (1 REAL BRAZILLIAN) - FROM THE SAFE - ROOM G (GERNENTZ)

39. US VALUE $66.70 (UAE 1X$200 NOTE, 2X$20 NOTES, 1X$5 NOTE), FROM THE SAFE - ROOM G (GERNENTZ)

40. US VALUE .31 (YUAN 1X$2 NOTE) - FROM THE SAFE - ROOM G (GERNENTZ)

41. US VALUE $134.98 (YENS 1X$10,000 NOTE, 4X$1000 NOTE) - FROM THE SAFE - ROOM G (GERNENTZ)

42. US VALUE $6,283.00 (EURO 102X$50 NOTES, 1X$20 NOTE, 2X$10 NOTES, 2X$5 NOTES) - FROM THE SAFE - ROOM G (

43. WINDOWS SURFACE TABLET - ON THE BOOKCASE - ROOM G (WALLER)

44. 504 OUNCES GOLD- IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

45.ONE (1 ) KILO OF GOLD - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

46. ONE (1) GOLD COIN - LABLED $50.00 - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

47. 3,455 OUNCES OF SILVER - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

48. SIX (6) ONE OUNCE SILVER DOLLAR COINS - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

49. ONE $50 CANADIAN COIN (LISTED AS ONE OUNCE PALADIAN) - IN SAFE - ROOM G (BURNHAM) * AS STAMPED C

50. ONE OUNCE OF PALADIAN - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

51. ONE OUNCE OF RHODIUM - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

52. ONE OUNCE PLATNUM BAR - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

Received By: _____          Received From: _____
                    (Signature)                                               (Signature)

Printed Name/Title: _____          Printed Name/Title: _____

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID:  305G-MP-3335032

On (date)  12/15/2020

item (s) listed below were:
- ☑ Collected/Seized
- ☐ Received From
- ☐ Returned To
- ☐ Released To

(Name)  ANTON LAZZARO

(Street Address)  201 SOUTH 11TH ST; UNIT 1920

(City)  MINNEAPOLIS

Description of Item (s):  53. 1/2 POUND OF COPPER - IN SAFE - ROOM G (BURNHAM) * AS STAMPED ON ITEM

54. CONTRACTS + STI PANELS ONLY TINY TEENS - IN OFFICE - ROOM G (GERENTZ)

55. LOAN CONTRACT AND DRIVING RECORD - IN OFFICE - ROOM G (GERENTZ)

56. UKRAINE CURRENCY  RECEIPTS - IN OFFICE - ROOM G (FREDERICK)

57. NOTES REALESTATE HOUSE BIDS - ROOM G (FREDERICK)

58. CRYPTO CURRENCY WALLET - ON DESK - ROOM G (WALLER)

Received By: _____
(Signature)

Received From: _____
(Signature)

Printed Name/Title: _____

Printed Name/Title: _____