## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

     Plaintiff,

v.

Anton Joseph Lazzaro,

     Defendant.

Case No. 21-cv-0173 (PJS/DTS)

**REPORT AND RECOMMENDATION**

## INTRODUCTION

Defendant Anton Joseph Lazzaro moves the Court to dismiss the indictment against him, alleging selective and vindictive prosecution [Dkt. No. 236]. In addition, he contends the Government violated his Sixth Amendment right to counsel and moves the Court for sanctions [Dkt. No. 213]. For the reasons stated below, the Court recommends Lazzaro's motions be denied.

## FINDINGS OF FACT

**Lazzaro's Political Activities**

Lazzaro has an "active and robust" political life. Defendant's Amended Motion to Dismiss for Selective or Vindictive Prosecution (Mot. to Dismiss) at 8; Dkt. No. 236. He has donated to the Republican party, run Republican campaigns, and voiced criticism of the current Department of Justice. Mot. to Dismiss at 8-9; Dkt. No. 236. Lazzaro and his political action committee, Big Tent Republicans, have also alleged that a Democratic Congresswoman from Minnesota has committed various crimes and frauds. Mot. to

Dismiss at 9; Dkt. No. 236. Lazzaro runs a Twitter account which he describes as "entirely political." Mot. to Dismiss at 9; Dkt. No. 236.

In contrast to his conservative political activities, Lazzaro notes that the lead prosecutor on his case has donated thousands of dollars to Democratic political candidates, "including candidates who ran against opponents supported by Lazzaro." Mot. to Dismiss at 10-11; Dkt. No. 236. This apparent political disagreement forms, in part, the basis for Lazzaro's claim that the Government has acted vindictively in prosecuting him for the indicted crimes. Mot. to Dismiss at 10-11; Dkt. No. 236. Lazzaro contends his political speech itself is the reason he has been selected for prosecution. Mot. to Dismiss at 8-11; Dkt. No. 236. Lazzaro further claims that the lead prosecutor disapproves of Lazzaro's intimate personal relations and has indicted him on that basis. Mot. to Dismiss at 16-17; Dkt. No. 236. Finally, Lazzaro claims the Government also selected him for prosecution based on his wealth. Mot. to Dismiss at 11-14; Dkt. No. 236.

**Law Enforcement's Monitoring of Lazzaro's Jail Calls**

Since his indictment in August 2021, Lazzaro has been incarcerated in the Sherburne County Jail. Sealed Tr. of Mot. Hrg. (Hrg. Tr.) at 82; Dkt. No. 234. About a week after his arrival at Sherburne County, Lazzaro was given an Inmate Handbook, which included information on how he could request attorney-client privileged phone calls while in jail. Hrg. Tr. at 83; Dkt. No. 234. While the jail's phone system – NCIC – is set to record all inmate calls, if phone numbers are properly designated as belonging to an inmate's attorney, the calls are not recorded. Hrg. Tr. at 83-84, Dkt. No. 234. Lazzaro requested "[a]lmost immediately" that calls to phone numbers belonging to his attorneys, Charles Clas and three others, not be recorded. Hrg. Tr. at 83, 84-85; Dkt. No. 235. Lazzaro testified that he requested this multiple times. Hrg. Tr. at 100, Dkt. No. 234; Def.

2

Ex. 2. Requests are not processed until the jail confirms the numbers actually belong to the inmate's attorneys. Hrg. Tr. at 94-96; Dkt. No. 234. On December 8, 2021, Lazzaro requested confirmation that his attorney calls were not being recorded. The next day, the jail confirmed. Def. Ex. 2.  In early 2022, Lazzaro requested calls to two more attorneys not be recorded. Def. Ex. 3.

Also in August of 2021, Susan Webb, an analyst working in the Minneapolis Police Department's Bureau of Criminal Apprehension Human Trafficking Investigators Task Force (BCA) and Mary Cunningham, Tactical Specialist for the Federal Bureau of Investigation (FBI) began reviewing jail calls and video recordings relating to Lazzaro's case. Hrg. Tr. at 14-15, 52; Dkt. No. 234. An intern at the BCA also listened to calls under Webb's direction. Hrg. Tr. at 17-20; Dkt. No. 234. Cunningham and Webb were mostly concerned with calls made to Lazzaro's friends, girlfriend, and associates. Hrg. Tr. at 59; DKt. No. 234. They were listening with an ear toward information relating to the case or "threats against the prosecution." Hrg. Tr. at 59-60; Dkt. No. 234. Cunningham also testified that she could identify certain phone numbers on sight, in part by their area codes, and would only listen to calls made to specific people, like Lazzaro's girlfriend. Hrg. Tr. at 74; Dkt. No. 234. In fact, the analysts knew which callers they wanted to listen to and sought out calls to their numbers and avoided listening to calls to other numbers. *Id.*

Webb and Cunningham could query NCIC by searching for Lazzaro's name. Hrg. Tr. at 18-19.   The query results included numerous columns of information. *See* Government's Ex. 1. In the left-most column, NCIC users found a button marked "Listen" that allowed them to hear the recording of the call. Gov. Ex. 1. Listed next was the date and time of the call, then five more columns of information. Gov. Ex. 1. Next, the phone

3

number Lazzaro called was listed, followed by the location connected to that phone number's area code. Gov. Ex. 1. Still further to the right in the spreadsheet were five more columns of information. Gov. Ex. 1. Nowhere did the query results spreadsheet identify the person whom Lazzaro was calling by name, only their telephone number. Gov. Ex. 1.

After clicking "Listen" to hear a call, NCIC displays a pop-up window that shows the phone number associated with that call and allows for playback of the call. Hrg. Tr. at 59, Dkt. No. 234; Def. Ex. 2. When an NCIC user clicks "Listen" that action is also recorded in the system, regardless of whether and how long the user actually listened to the recording. Hrg. Tr. at 41; Dkt. No. 234. In short, the system logs when a user merely clicks "Listen," then closes the pop-up window without hearing any of the call. Hrg. Tr. at 41; Dkt. No. 234. Once the user clicks "Listen", there is a six-second delay before the recording begins to play. The playback of the recording begins with a message that the call is being recorded and monitored. Hrg. Tr. at 61; Dkt. No. 234. Lazzaro testified that he did not hear that message when making calls, except possibly at the beginning of his incarceration, though his friends and family did. Hrg. Tr. at 99-100. Lazzaro further stated he believed his attorneys would not hear the message if their numbers were properly configured. Hrg. Tr. at 100; Dkt. No. 234.

Webb and Cunningham each testified that they believed the NCIC system would not allow them to hear attorney-client privileged calls—that it was simply impossible because they were not recorded. Hrg. Tr. at 22, 63; Dkt. No. 234. Still, Webb and Cunningham took precautions to avoid inadvertently hearing privileged communications. Hrg. Tr. at 23, 63; Dkt. No 234. Webb stated the United States Attorney's office would inform her of the names of Lazzaro's attorneys, which she then provided to the intern she oversaw. Hrg. Tr. at 24; Dkt. No. 234. She instructed the intern to stop listening to a call

4

whenever she heard anything unusual or unexpected or she heard any conversations with anyone she thought might be one of Lazzaro's attorneys. Hrg. Tr. at 24, 46; Dkt. No. 234.

There are seven calls at issue in Lazzaro's sanctions motion. Sanctions Mem. at 5; Dkt. No. 213. By listening to these calls, Lazzaro claims, the Government intruded on his privileged communications with his lawyers, thus denying him his Sixth Amendment right to counsel. Mot. for Sanctions at 2; Dkt. No. 213. Of the seven calls, one involved Webb, the other six involved Cunningham. On December 6, 2021, Webb's intern was listening to calls and heard one placed on December 3, 2021. Hrg. Tr. at 26; Dkt. No 234.  Early in the call she heard a reference to a person named Charlie. Hrg. Tr. at 26; Dkt. No. 234. Upon hearing the name Charlie, the intern stopped listening to the call and reported to Webb, asking her to listen to the call. Hrg. Tr. at 25; Dkt. No. 234. Webb was familiar with the voice of one of Lazzaro's associates, Charles Bittman, which she described as "very distinctive" and "raspy." Hrg. Tr. at 27; Dkt. No. 234. After listening to the first ten seconds of the call in question, hearing Lazzaro say "Hey Charlie" and Charlie's response, Webb determined Lazzaro was not speaking to Mr. Bittman, not hearing his distinctive, raspy voice. Webb then ended the playback. Hrg. Tr. at 29-30; Dkt. No. 234. While Webb was uncertain to whom Lazzaro was speaking, she stopped listening in the event "Charlie" was Lazzaro's attorney Charles Clas. Hrg. Tr. at 30; Dkt. No. 234. Webb's intern made a notation that the call was with "Charlie" and they stopped listening to calls to that phone number. Hrg. Tr. at 28-30; Dkt. No 234.

The six other calls all involve what Cunningham described as "mis-clicks." Hrg. Tr. at 64; Dkt. No. 234. In choosing which recordings to access from the NCIC query results, Cunningham hit the wrong "Listen" button on six occasions. Hrg. Tr. at 64; Dkt.

No. 234. This happened, she stated, because the numerous columns of information displayed in the query results would occasionally result in her clicking on the wrong recording. Hrg. Tr. at 65; Dkt. No. 234. Any click, even a mis-click, would prompt the NCIC pop-up window and record her name in the system. Hrg. Tr. at 26, 59; Dkt. No. 234. In these six incidents when she saw the phone numbers in the pop-up window and realized it was an attorney call, Cunningham closed the calls without listening to them. Hrg. Tr. at 64; Dkt. No. 234. All six of these calls were placed prior to December 9, 2021 when the jail confirmed Lazzaro's attorney calls were not being recorded. Def. Ex. 2. Cunningham also testified that she listened to calls Lazzaro placed to his brother, an attorney, and that the calls contained discussion of Lazzaro's case and case strategy. Hrg. Tr. at 76; Dkt. No 234.

Based on Webb's and Cunningham's actions, Lazzaro moves for sanctions against the Government, including dismissal of the indictment against him.

## CONCLUSIONS OF LAW

### I.    Selective Prosecution

Lazzaro has moved to dismiss the indictment against him, alleging the Government selectively prosecuted him in violation of the due process clause of the Fifth Amendment. Mot. to Dismiss at 1-3; Dkt. No. 236. A successful selective prosecution claim requires a defendant prove that "(1) he was singled out for prosecution while others similarly situated were not prosecuted for similar conduct, and (2) the decision to prosecute him was based on an impermissible motive such as race, religion, or an attempt by the defendant to secure other constitutional rights." *United States v. Rodriguez*, 581 F.3d 775, 815 (8th Cir. 2009). Put differently, the defendant must show that the

prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Prosecutors hold wide discretion when making decisions about who and what crimes to prosecute. *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979); *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015). In deciding to prosecute, the Government might consider a wide variety of factors including strength of the case against a defendant, extent of involvement in a crime, resources required to successfully prosecute a defendant, deterrent effect of the prosecution, and penalties available if convicted. *See, e.g.*, *United States v. Schullo*, 390 F.Supp. 1067, 1068 (D. Minn. 1975); *United States v. Ojala*, 544 F.2d 940, 944 (8th Cir. 1976); *Batchelder*, 442 U.S. at 124 (1979). Courts "presume that [prosecutors] have properly discharged their official duties." *Id.* at 880 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Because of the presumption that a prosecution is undertaken in good faith, the defendant bears the "heavy" burden of establishing a selective prosecution claim. *Ojala*, 544 F.2d at 943.

## A. Lazzaro has not adequately identified others, similarly situated, who were not prosecuted

Selective prosecution claims rely on the legal framework of equal protection. *Armstrong*, 517 U.S. at 465. A claimant must adequately identify comparators to prove the prosecution's conduct had a discriminatory effect. *Id.* For example, "to establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a *different* race were not prosecuted." *Id.* (emphasis added); *see also United States v. White*, 928 F.3d 734, 743 (8th Cir. 2019) (finding the defendant had not proven the first prong of a selective prosecution claim where he failed to demonstrate "a policy

by which residents of states where marijuana has been legalized are affirmatively treated differently from those of states where it has not").

Lazzaro claims the Government has prosecuted him because of his wealth and because of his exercise of his First Amendment right to engage in political speech. To prove discriminatory effect for a selective prosecution based on wealth, it is not enough for Lazzaro to find other people accused of, but not prosecuted for, crimes similar to those for which he was indicted. Instead, he must identify others who are members of a different economic class than his but who were not prosecuted for similar crimes. *Cf. Armstrong*, 517 U.S. at 465.

To establish his political speech claim, he must show one of two discriminatory effects. First, a defendant may argue he has been selected for prosecution because of his association with a group that is at odds with the government. *See United States v. Falk*, 479 F.2d 616, 619-620 (7th Cir. 1973) (defendant "asserted that the prosecution against him . . . was brought not because he had violated the statute but to punish him for and stifle his and others' participation in protected First Amendment activities"). In such a case, the defendant must identify others accused of similar crimes who were not members of the group and were not prosecuted. *Id.*, *see also United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972) (addressing selective application of disorderly conduct regulations based on the subject and viewpoint of the prosecuted protesters' speech). Lazzaro implies the Government prosecutor is at odds with conservative Republicans with whom he associates. Mot. to Dismiss at 8-11; Dkt. No. 236. Thus, under this prong of his political speech claim, Lazzaro must identify similarly situated people who are not

conservative Republicans who were not prosecuted despite allegedly engaging in similar criminal conduct.

Second, a defendant may argue instead that he has been invidiously selected for prosecution because of his *individual* speech. *United States v. Ojala*, 544 F.2d 940 (8th Cir. 1976). In that case, a defendant must provide evidence that people accused of the same crimes who undertook similar First Amendment speech (e.g. outspoken political activism) did not face prosecution for their alleged crimes. *Falk*, 479 F.2d 616. For example, in *Falk*, a draft resister was prosecuted for destroying his draft card. *Id.* He successfully identified 25,000 other draft registrants who had done the same, yet only nine of them were prosecuted.[1] *Id.* at 621. In Lazzaro's case, this element would require him to show that others engaged in similar speech to his—engaging in advocacy of the GOP—were not prosecuted despite evidence they committed the same or similar crimes.

Lazzaro has not identified any wealth or political speech comparators. While he points to "hundreds of tips" to the National Human Trafficking Hotline,[2] Lazzaro merely notes that those hundreds of tips did not result in federal prosecution while the single tip about his conduct did. Mot. to Dismiss at 5; Dkt. No. 236. He also provides data about the prosecution of similar crimes at the state level in Minnesota and argues these suggest "countless opportunities" for the federal government to prosecute similar crimes. Mot. to Dismiss at 7- 8; Dkt. No. 236. This data provides only half of what is required for Lazzaro to prove this element. As noted above, Lazzaro must show that either (1) members of a different economic class were not prosecuted while he was; (2) members of a different

---

[1] The court granted Falk an evidentiary hearing based on that evidence. *Falk*, 479 F.2d at 621.

[2] The Court assumes without deciding that these tips alleged crimes similar to the ones of which Lazzaro is accused.

political party were not prosecuted while he was; or (3) other outspoken Republicans were not prosecuted while he was. He has shown none of these things. Without such evidence, Lazzaro has failed to prove the first element of his selective prosecution claim.

**B.  Lazzaro has not provided sufficient evidence to prove improper motive**

Even if Lazzaro had sufficiently identified comparators, he has failed to produce any evidence that he was prosecuted with an improper purpose.

**1.  Wealth is not a protected class**

Lazzaro argues he was selected for prosecution based on his "pot of gold," that is, his wealth and the potential for the government to seize valuable assets. Mot. to Dismiss at 11; Dkt. No. 236. Lazzaro posits that wealth is a "highly suspect" classification subject to "exacting judicial scrutiny," Mot. to Dismiss at 11; Dkt. No. 236.  In fact, wealth is *not* a suspect class. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *Maher v. Roe*, 432 U.S. 464 (1977). The Supreme Court "has never held that financial need alone identifies a suspect class for purposes of equal protection analysis." *Maher*, 432 U.S. at 471 (citing *Rodriguez*, 411 U.S. at 29). Broad or amorphous assertions that those with "less" or "more" money are treated unequally do not warrant strict scrutiny. *Rodriguez*, 411 U.S. at 22. Lazzaro suggests that he was prosecuted because the DOJ could use the assets "under the guise of legitimate prosecution." Mot. to Dismiss at 14; Dkt. No. 236. Yet, he has not provided any evidence that his assets are being improperly used or targeted. Lazzaro points to excerpts from an FBI interrogation of his co-defendant as evidence of improper motive. Mot. to Dismiss at 13; Dkt. No. 236. While the FBI agents asked questions about cash and precious metals in Lazzaro's home (Mot. to Dismiss at 13, Dkt. No. 236) the Court lacks proper context needed to analyze the propriety of the interview based only on those brief excerpts. Similarly, the subpoena of records

associated with Lazzaro's investment accounts (Mot. to Dismiss at 14, Ex. D; Dkt. No. 236, 236-4) do not demonstrate improper motive in and of themselves. That Lazzaro is wealthy does not establish the Government's motivation to acquire his assets.

### 2. Lazzaro's political speech

Lazzaro argues he has been prosecuted for exercising his First Amendment free speech rights. As evidence, he points to specific events. First, he notes that he was arrested on the same day he was scheduled to appear on a TV program known for conservative political commentary. Mot. to Dismiss at 9; Dkt. No. 236. He also points to the subpoena of his "entirely political" Twitter account as proof of impermissible motive. *Id.* These events are not enough to meet Lazzaro's "heavy" burden to establish improper motive. *United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976).

Any connection between Lazzaro's speech activity and the prosecution appears coincidental at best. Though Lazzaro's political speech and the investigation and prosecution overlapped in time, mere temporal proximity is insufficient to prove motive. *See, e.g., Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 800 (8th Cir. 2009) (internal citations omitted). Indeed, an accused with a "robust and active" political life like Lazzaro (Mot. to Dismiss at 8; Dkt. No. 236) must expect that any investigation or prosecution would overlap with his frequent political speech. This is not a case where Lazzaro's prosecution obviously stems from his expressive activity. Lazzaro was not arrested after announcing his intent to break the law as a political protest, or after participating in a controversial group protest. *See, Ojala* 544 F.2d 940; *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972). The mere fact that he was arrested on a day on which he was scheduled to appear on television is insufficient as there is nothing in

the record to suggest that the prosecutor or law enforcement knew of Lazzaro's imminent appearance or what it involved.

Moreover, in contrast to other cases claiming selective prosecution based on exercise of First Amendment speech rights, the crimes for which Lazzaro is being prosecuted bear no connection to the content of his political speech. Lazzaro suggests the prosecutor's cross-examination of a witness at his detention hearing demonstrates her political animus. Mot. to Dismiss at 9-10; Dkt. no. 236. However, the questioning at issue was ordinary cross-examination within the scope of the witness's direct testimony, which included references to his and Lazzaro's political ties. Restricted Transcript of Arraignment and Detention Hearing at 54-74; Dkt. No. 29. The evidence Lazzaro points to as proof of improper motive does not satisfy his heavy burden.

## II.   Vindictive Prosecution

Similar to his claim of selective prosecution, Lazzaro also argues the Government has vindictively prosecuted him. Mot. to Dismiss. at 14-18; Dkt. No. 236. To prove a claim of vindictive prosecution, the defendant must show through "objective evidence" that the prosecution was brought to punish the defendant for the exercise of a legal right. *United States v. Beede*, 974 F.2d 948, 951 (8th Cir. 1992). Courts look at the "prosecutor's actions within the context of the entire proceeding." *United States v. Chappell*, 779 F.3d 872, 880 (8th Cir. 2005). A finding of vindictiveness is based on evidence of the prosecutor's motives. *Id.* at 878-79. Again, the defendant's evidentiary burden is "a heavy one." *Id.* at 879.

The law on vindictive prosecution is somewhat murky. Despite the broadly stated rule that vindictive prosecution may exist whenever a prosecutor brings charges to punish a defendant for the exercise of "a legal right," vindictive prosecution claims typically, if not

12

exclusively, arise in a narrower context. In practice, vindictive prosecution claims arise, almost invariably, when a criminal defendant has invoked a procedural right or employed a procedural mechanism and then experiences alleged retaliation for that conduct, usually in the form of modified or increased charges. *E.g. United States v. Rodgers* 18 F.3d 1425,1430 (8th Cir. 1994) (addressing reindictment on revised charges); *Bordenkircher v. Hayes*, 434 U.S. 357 (1978) (addressing increased charges after not guilty plea); *Chappell*, 779 F.3d 872 (8th Cir. 2015) (addressing additional charge of the already-indicted crime); *United States v. Goodwin*, 457 U.S. 368 (1982) (addressing elevated charges); *see also Rodgers* 18 F.3d 1425. Thus, vindictive prosecution cases do not typically involve retaliation for the exercise of just *any* legal right, but rather for the exercise of a *procedural right* exercised during the course of a defendant's case.

In fact, some courts have gone so far as to expressly limit vindictive prosecution claims to those stemming from retaliation for a defendant's exercise of a procedural right. *See, e.g.*, *United States v. Wilson*, 639 F.2d 500, 502 (9th Cir. 1981) ("Vindictive prosecution arises only where the government increases the severity of alleged charges in response to a defendant's exercise of constitutional rights."); *Jarrett v. United States*, 822 F.2d 1438, 1442 (7th Cir. 1987) (noting that where "there is a single prosecution, and no increase in charges" there is no vindictive prosecution). Furthermore, this Court is unaware of any cases like the instant one, and Lazzaro has cited none, where a defendant successfully challenged his initial indictment on the basis of vindictive prosecution. Because Lazzaro has not exercised a legal right similar to those described above, his claim for vindictive prosecution is dubious at best.

Even if vindictive prosecution were construed broadly enough to cover the circumstances of Lazzaro's case, he has failed to provide sufficient objective evidence

that the Government prosecuted him vindictively. *See Chappell*, 779 F.3d 879 (8th Cir. 2015). In looking at the lead prosecutor's conduct in the entire scope of Lazzaro's proceedings, there is no evidence to establish she acted vindictively in prosecuting Lazzaro. That she and Lazzaro would seem to disagree about politics is insufficient to establish a prima facie case of vindictive prosecution. Lazzaro argues that the lead prosecutor's political campaign contributions demonstrate vindictive motive. Yet, the only motive her political contributions clearly evince is that of electing certain candidates, not hunting Lazzaro. Any perceived link between Lazzaro's speech, the prosecutor's campaign contributions, and the subsequent prosecution is speculation.

Lazzaro suggests the prosecution is preoccupied with his political affiliations, and that such a preoccupation is proof of improper motive. He notes that the FBI questioned his co-defendant about photographs of Lazzaro with Donald Trump and Dick Cheney. While it is unclear from the very brief excerpt why the FBI inquired about those photographs, the questions are equally as consistent with a benign motive as with an improper one.

Lazzaro also claims a meeting with an FBI agent to discuss allegations against Democratic Congresswoman Ilhan Omar was canceled at the last minute at the direction of the lead prosecutor on his case. Mot. to Dismiss. Ex. D; Dkt. No. 236-4. He contends the cancellation demonstrates her animus toward his political views, presumably because he feels she thwarted his efforts to uncover the Congresswoman's alleged wrongdoing. Lazzaro's allegations lack the specificity necessary to support his claim. The timeline of his investigation into Representative Omar and the timeline of the Government's

investigation into Lazzaro's conduct is unclear. Without more, the Court cannot infer from a coincidence in timing evidence of improper motive.

Lazzaro also contends he is being prosecuted for his exercise of his right to privacy or free association because the prosecutor disapproves of his choice of intimate partners. Mot. to Dismiss at 15; Dkt. No. 236. Lazzaro argues the prosecutor has "repeatedly referenced" his involvement in the legal adult entertainment industry and mentioned that involvement at his detention hearing in "obvious disapproval" of his character. Mot. to Dismiss at 16-17; Dkt. No. 236. However, Lazzaro's impression that the prosecutor does not like him or disapproves of his actions does not demonstrate vindictiveness. *See United States v. Walker*, 514 F.Supp. 294, 311 (E.D. La., 1981) (citing *Gregg v. Ga.*, 428 U.S. 153, 183-84 (1976)) (noting that vindictiveness cannot be so broadly defined in a legal system that recognizes the legitimacy of retribution). Prosecutors are not required to feel neutral about the defendants they prosecute. *Cf. id.* It would be unusual to find a prosecutor who does not feel some level of emotional response to the subject of the prosecution. As noted, it is unclear Lazzaro's exercise of the "right to privacy" can be the basis for a vindictive prosecution claim, but even if it can, Lazzaro has provided no objective evidence that the prosecutor's disapproval of his sexual encounters (as distinct from her judgement that the behavior was criminal) motivated the prosecution.

The evidence Lazzaro has provided, even taken as a whole, is insufficient to prove selective or vindictive prosecution. For his selective prosecution claim, Lazzaro has not provided adequate evidence of comparators or improper motive. If a vindictive

prosecution claim can apply to these facts at all, Lazzaro's evidence is too thin to prove that claim. The Court recommends Lazzaro's Motion to Dismiss [Dkt. No. 236] be denied.

## III.     Sixth Amendment Deprivation

Lazzaro argues the Government violated his Sixth Amendment rights by listening to phone calls he made to his attorneys while in jail. Motion for Sanctions for Government Breach of Privileged Communications (Mot. for Sanctions), *passim*; Dkt. No. 213; Defendant's Post-Hearing Memorandum in Support of Mot. for Sanctions (Sanctions Mem.), *passim*; Dkt. No. 235. Lazzaro claims that violation warrants relief, including possible dismissal of the indictment against him.

The Sixth Amendment guarantees to criminal defendants the assistance of counsel for their defense, which in turn protects attorney-client communications. *See, e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, *passim* (1977). Even so, an intrusion on the attorney-client relationship is a not a per se violation of the Sixth Amendment. Instead, such a violation is established only if "(1) the government *knowingly* intruded into the attorney-client relationship and (2) the intrusion demonstrably prejudiced the defendant or created a substantial threat of prejudice." *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (emphasis added) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)). The Supreme Court has described the intrusion required as not simply a knowing one but rather a purposeful one. *Weatherford*, 425 U.S. at 558 ("There being no . . . purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment . . . ."). The defendant bears the burden of proving a violation of the Sixth Amendment. *Kriens*, 270 F.3d at 603 (8th Cir. 2001); *Solomon*, 679 F.2d at 1250.

### A. The Government did not knowingly intrude on Lazzaro's relationship with his attorneys

The record before the Court does not indicate the Government knowingly intruded on Lazzaro's attorney-client relationship in violation of the Sixth Amendment. First, Webb and Cunningham both mistakenly believed that Lazzaro's calls with attorneys were not recorded and therefore there was no way for them to hear such privileged conversations. Hrg. Tr. at 22, 63; Dkt. No. 234. Given that belief, they did not knowingly access recordings of calls made to Lazzaro's attorneys. Furthermore, neither Webb nor Cunningham intended to listen to calls between Lazzaro and his lawyers. Cunningham did not intend to select the six calls at issue, let alone listen to them. Similarly, Webb did not purposefully intrude on Lazzaro's attorney-client relationship when she listened to the call with attorney Clas because she did not know at the time the call was with Clas, and she stopped listening as soon as they recognized the possibility. *Cf. Weatherford*, 429 U.S. at 557 (finding no purposeful intrusion where a government informant was present during the defendant's meeting with his attorney because he went, "not to spy" but because the defendant asked him to attend).   Without evidence that Webb and Cunningham listened to the calls intending to intrude on Lazzaro's relation with his attorneys, Lazzaro cannot prove his Sixth Amendment claim.

Second, because Webb and Cunningham did not hear any actual communication of legal advice or strategy between Lazzaro and his attorneys, there was no intrusion. *Weatherford v. Bursey*, 429 U.S. 545, 552 (1977) (noting that whether there is a violation "depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial"). Cunningham testified that she never clicked the "play" button for the six calls. Hrg. Tr. at 64; Dkt. No. 234. While the NCIC system showed

she had listened to those calls, the initial selection of a call from the query results is logged as "listened to", regardless of whether a user actually hears any of the recording. Hrg. Tr. at 41; Dkt. No. 234. Here, Cunningham heard nothing because she never played the errantly selected recording. *Id.* Having heard nothing, Cunningham did not intrude on Lazzaro's relationships with his attorneys.[3]

Webb heard more than Cunningham, but still did not hear any substantive communications between Lazzaro and his lawyers. Webb heard what essentially amounted to telephone greetings, then stopped listening to that recording. Hrg. Tr. at 29-30; Dkt. No 234. Webb did not hear any discussion of the case, any reference to case strategy, or any statement even cursorily connected to Lazzaro's defense. Hrg. Tr. at 29-30; Dkt. No 234; *Weatherford*, 429 U.S. 545. Webb's exposure to introductory pleasantries between Lazzaro and his counsel did not intrude on Lazzaro's privileged relationship with his attorneys.

Lazzaro's brief makes somewhat cursory mention of calls he placed to his brother, Derek, who is an attorney. Sanctions Mem. at 10-11; Dkt. No 235. Cunningham acknowledged she had listened to calls between Lazzaro and Derek, that she knew Derek is a lawyer, and that Lazzaro and Derek discussed Lazzaro's case. Hrg. Tr. at 76; Dkt. No. 234. Lazzaro claims those conversations were subject to attorney-client privilege and that Cunningham intentionally listened to them. Sanctions Mem. at 10-11; Dkt. No. 235. The Court finds various shortcomings with that argument.

---

[3] Of course, the Court's analysis on this issue depends upon the veracity of Webb's and Cunningham's testimony. The Court heard the testimony of the witnesses and observed their demeanor. The Courd finds their testimony credible.

To start, it is unclear that an attorney-client relationship exists between Lazzaro and his brother, which is required before the attorney-client privilege attaches. *United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013). Derek Lazzaro has not appeared in this case, nor did Lazzaro submit Derek's phone number to the jail to prevent them from recording calls placed to Derek. Def. Exs. 2, 3. Moreover, because Lazzaro failed to request his conversations with Derek not be recorded, he effectively waived any privilege that might be said to exist. The attorney-client privilege is deemed waived where the client knows the communication is not private, for example when the client knows they are being recorded. *United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003). A recording device is the "functional equivalent of the presence of a third party" and "destroy[s] attorney-client privilege." *Id.* Lazzaro knew from the earliest days of his incarceration that all jail calls were recorded unless he requested calls to a particular number be excepted from that rule. Hrg. Tr. at 82-84; Dkt. No. 234. Lazzaro never requested the jail stop recording his calls to Derek. *See* Def. Exs. 2, 3. Because Lazzaro knew the calls to his brother were being recorded, he waived any alleged attorney-client privilege between them. *Hatcher*, 323 F.3d at 674. Webb did not intrude on Lazzaro's attorney-client relationship with his brother.[4]

---

[4] The Court notes that this same reasoning could suggest Lazzaro waived attorney-client privilege for each of the seven calls at issue in his Motion for Sanctions because each call was placed prior to Lazzaro's request that Sherburne County Jail stop recording calls to his attorneys. Because the Court finds no knowing intrusion into Lazzaro's relationship with his counsel regardless of the timeline, the Court declines to analyze waiver regarding these calls.

### B. Lazzaro has not shown any alleged intrusion caused him particular prejudice

Even if there was a knowing intrusion on Lazzaro's relationship with his attorneys, Lazzaro has failed to prove "the intrusion demonstrably prejudiced [him] or created a substantial threat of prejudice." *United States v. Sawatzky*, 994 F.3d 919, 923 (8th Cir. 2021). Lazzaro argues the Government's actions had a chilling effect on his phone communications with his attorneys. Mot. for Sanctions at 7; Dkt. No. 213. This chilling effect, he claims, has "prejudiced [his] trial preparation." Mot. for Sanctions at 8; Dkt. No. 213.

Lazzaro's generalized allegation of chilled communications is not enough to establish the "demonstrable" and "particular" prejudice required by law. *United States v. Sawatzky*, 994 F.3d 919, 923 (8th Cir. 2021). Even more specific allegations of prejudice have not met the defendants' heavy burden of demonstrating a Sixth Amendment violation. *See, e.g.*, *Sawatzky*, 994 F.3d at 923 (finding no prejudice even when the government seized the defendant's legal documents); *Rainer v. Dept. of Corr.*, 914 F.2d 1067, 1070 (8th Cir. 1990) (finding no prejudice where the government's presence did not affect the outcome of the defendant's expert's ballistics tests). Lazzaro's broad allegation of a chilling effect on his attorney-client communications does not meet it either. Without proof of particular, demonstrable prejudice, Lazzaro cannot show a Sixth Amendment violation.

### C. Even if the Government intruded, any sanction would be nominal at best

Even if Lazzaro had established that the Government's conduct violated Lazzaro's Sixth Amendment right, the remedy for that violation would not be dismissal of the indictment as Lazzaro urges. Mot. for Sanctions at 1, Dkt. No. 213. Remedies to Sixth

Amendment violations should be tailored to the injury suffered. *United States v. Solomon*, 678 F.2d, 1246, 1251 (8th Cir. 1982). Absent "some adverse effect on the effectiveness of counsel's presentation" or "prejudice to the defense," "there is no basis for imposing a remedy." *Morrison*, 449 U.S. at 365. Suppression of evidence, rather than dismissal of the indictment, is often most appropriate when the Sixth Amendment has been violated, *United States v. Morrison*, 449 U.S. 361, 365 (1981); *see also*, *Solomon*, 679 F.2d at 1251; *United States v. Kriens*, 270 F.3d 597, 603 (8th Cir., 2001), and dismissal of an indictment is a rare and "drastic remedy." *United States v. Singer*, 785 F.2d 228, 237 (8th Cir. 1986).

Here, any violation that did occur would be *de minimis* at best because neither Webb nor Cunningham heard any substantive communications between Lazzaro and his attorneys during the seven calls at issue. *See*, *Morrison*, 449 U.S. at 365 ("[C]ertain violations of the right to counsel may be disregarded as harmless error."). Such a *de minimis* intrusion does not warrant the "drastic" step of dismissing the indictment. *Singer*, 785 F.2d at 237. Further, since Webb and Cunningham did not hear anything related to Lazzaro's case, it is unclear what remedy the Court could impose that would redress this alleged *de minimis* violation. Hrg. Tr. at 28-30, 64; Dkt. No. 234. Given the lack of a knowing intrusion or demonstrable prejudice, the Court finds "no basis for imposing a remedy." *Morrison*, 449 U.S. at 365, and recommends denying Lazzaro's motion for sanctions.

### D.  Lazzaro has not established a Fifth Amendment violation either

Finally, Lazzaro briefly argues that this conduct denied him due process of law under the Fifth Amendment. Mot. for Sanctions at 3; Dkt. No. 213. Because the test for such a violation is conjunctive and includes two of the elements needed to prove a Sixth

Amendment violation, *United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013), and because Lazzaro has not proven those elements, the Court declines to further analyze whether Webb and Cunningham's conduct constitutes a due process deprivation.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1.      Defendant's Amended Motion to Dismiss for Selective or Vindictive Prosecution [Dkt. No. 236] be denied.

2.      Defendant's Motion for Sanctions for Government's Breach of Privileged Communications [Dkt. No. 213] be denied.


Dated: October 12, 2022                     ___s/David T. Schultz_____
                                            DAVID T. SCHULTZ
                                            United States Magistrate Judge



## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).