UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-173-01 (PJS/DTS)

UNITED STATES OF AMERICA

Plaintiff,

v.

**GOVERNMENT'S
TRIAL BRIEF**

ANTON JOSEPH LAZZARO,
a/k/a Tony Lazzaro,
a/k/a Tony,

Defendant.

The United States of America, by and through its attorneys, Andrew M. Luger,

United States Attorney for the District of Minnesota, and Emily Polachek, Laura

Provinzino, and Melinda Williams, Assistant United States Attorneys, hereby submits

this trial brief outlining the evidence the Government intends to present at trial.

## I.   OVERVIEW

This is a sex trafficking case.  From May to December of 2020, Defendant Anton

"Tony" Lazzaro conspired with Gisela Castro Medina and others to recruit young

girls—15-year-olds and 16-year-olds—to have sex with Lazzaro in exchange for cash

and other items of value.

Lazzaro was a wealthy 30-year-old man.  He lived in a luxury condo in the

penthouse of the Hotel Ivy in downtown Minneapolis.  Lazzaro had a stated sexual

preference for young, tiny girls.  In May 2020, Lazzaro met co-defendant Castro Medina

on a "sugar daddy" website.  At the time, Castro Medina was 18-years-old and just finishing high school.  After Lazzaro paid Castro Medina for sex, he made her an offer. He wanted her to recruit other girls for him.  Girls who were young, small, and vulnerable.  Lazzaro explained he wanted the "broken girls."  And he would pay Castro Medina for providing him with these girls.

And that's precisely what he did.  From May until December 2020, Castro Medina, and others, recruited women and minor girls to have sex with Lazzaro.  For her successful efforts, Lazzaro paid Castro Medina well over $50,000.

Lazzaro often sent cars, typically Ubers, to transport these girls to his Hotel Ivy penthouse.  Indeed, at one point, Lazzaro sent a driver to pick up a group of girls (14, 14, and 15-years-old) from a slumber party in St. Michael, Minnesota.

Once the girls Castro Medina recruited arrived at Lazzaro's apartment, a similar pattern ensued.  Lazzaro would brag about his wealth and connections.  He would give the girls—small and young—hard liquor.  Lazzaro would take out stacks of cash and offer the girls precise sums of money to perform certain sex acts with him, and with each other. $100 to kiss. $400 for sex.  And so forth.  He would send them home with cash, vapes, alcohol, Plan B, cell phones, and other items of value.

This was Lazzaro's trafficking scheme.  It targeted young vulnerable girls.  It was ongoing from May 2020 until December 2020.

On December 15, 2020, a search warrant was executed at Lazzaro's condo and he was served with a federal target letter.  After this target letter was served, Lazzaro

and Castro Medina attempted to obstruct the testimony of 15-year-old Minor Victim

C.

Lazzaro and Castro Medina were charged with sex trafficking in August 2021.

Castro Medina has pled guilty. She is cooperating with the government and will testify

about her role in the trafficking scheme at trial.

## II.   CHARGES AGAINST THE DEFENDANT

On August 11, 2021, a federal grand jury returned an indictment against

Defendant Anton Lazzaro and Gisela Castro Medina. At trial, Lazzaro will face a seven-

count indictment: conspiracy to commit sex trafficking of minors (Count 1), sex

trafficking of a minor (Counts 2–6), and sex trafficking—obstruction (Count 7).

## III.   ANTICIPATED FACTS AT TRIAL

From approximately May 2020 through December 2020, Anton Lazzaro—

known to the victims as "Tony"—conspired with Gisela Castro Medina to recruit

minor girls to engage in sexual acts with Lazzaro in exchange for cash and other things

of value such as cellular telephones, disposable vaping pens called Puff Bars, designer

purses, and alcohol. The government anticipates presenting the following evidence at

trial.[1]

---

[1] The factual summary provided, given upon information and belief, is not intended to be a full description of the government's evidence in this case. It is provided in order to give the Court sufficient information to consider the government's motions in limine. The United States respectfully reserves the right to supplement this recitation or file additional motions before or during the trial as necessary upon receipt

### A.      Conspiracy to Commit Sex Trafficking of Minors (Count 1)

Gisela Castro Medina will testify that she entered into an agreement with Lazzaro and, as part of that agreement, she recruited the minor victims and others to engage in sexual acts with Lazzaro in exchange for items of value.  Lazzaro used and directed Castro Medina to identify girls she knew and others on social media who might be willing to have sex with Lazzaro for money.  Lazzaro told Castro Medina that he was looking for young girls of a certain skin color, petite body type, without tattoos.  Lazzaro told Castro Medina he wanted her to find him vulnerable victims—"whores," "sluts," and "broken girls."

Once Castro Medina identified the girls, she would share images of them with Lazzaro.  If Lazzaro approved of their appearance, Castro Medina would recruit the girls on Snapchat to have sex with Lazzaro for money.  Lazzaro would communicate with the girls on messaging applications and invite them to his condo located at the Ivy Residences in downtown Minneapolis.  Lazzaro provided his address to the girls and instructed them to tell the hotel's desk clerk they were there to see "Tony in room 1920."

Once the girls arrived at Lazzaro's penthouse, they were offered alcohol. Lazzaro did not partake.  Soon after, Lazzaro would engage in commercial sexual acts

---

of further information from defense counsel, including Defendant's witness and exhibit lists.

with the girls—offering them precise amounts of money for specific sex acts. Once the sexual acts were completed, Lazzaro would pay the girls in cash (often in the form of multiple hundred dollar bills), alcohol, cell phones, flavored vaping pens, makeup, designer purses, and other items of value. Lazzaro paid Castro Medina for her services with cash, Venmo payments, alcohol, vaping cartridges, Adderall, clothing and accessories, electronic devices, college tuition, an off-campus apartment, a Mini Cooper, and travel expenses in exchange for her role in recruiting the girls.

The indictment charges that Lazzaro engaged in this behavior with five minor girls, Minor Victims A–E. During the time period charged in the indictment, the victims were ages 15 and 16. Lazzaro was 30-years-old, although he often lied to the victims, posing as young man in his early 20s. All five of the minor victims are expected to testify at trial. Their testimony will mirror the information provided above. They will provide a consistent description of how they were recruited by Lazzaro and his co-conspirators. The victims will describe Lazzaro's residence. They will explain that Lazzaro portrayed himself as a man of wealth and power. The minor victims will talk about being given alcohol by Lazzaro. And each minor victim will tell the jury about the commercial sexual acts they engaged in with Lazzaro.

**B.      Sex Trafficking of Five Minor Victims (Victims A–E, Counts 2–6)**

**1.      Victim A (Count 2)**

Victim A and Castro Medina will testify that were acquainted with one another before meeting Lazzaro. When Victim A was 16-years-old and Castro Medina was 18-

years-old, they created profiles on a website called Seeking Arrangement—a "sugar daddy" website where older men advertise themselves as a "sugar daddy," offering to buy gifts and provide a "lavish lifestyle" to another person, often in exchange for sex. Castro Medina and Victim A met Lazzaro on this website.  Castro Medina and Victim A sent Lazzaro a selfie.  In return, Lazzaro sent them $50 via Venmo.

Shortly after meeting, on May 13, 2020, Lazzaro arranged for an Uber to bring Castro Medina and Victim A to his condo at the Ivy Residences.  Castro Medina and Victim A told the hotel clerk that they were there to see "Tony in 1920."  They went into Lazzaro's living room, where Lazzaro was told that Victim A was 16-years-old. Lazzaro was unfazed.  Lazzaro provided both Victim A and Castro Medina with alcohol. Lazzaro did not drink.  He then took out a stack of cash and asked them what they would do for the money.  He enumerated various sexual acts and set a price for each act.  Lazzaro paid them a total of $600 for the sex acts they performed on that occasion.  Victim A and Castro Medina soon returned.  They each had sex with Lazzaro and were paid money.

Lazzaro pulled aside Castro Medina and made her an offer.  Lazzaro would pay her to recruit other young girls for Lazzaro to have sex with.  Castro Medina agreed.

Victim A returned to Lazzaro's apartment on several more occasions without Castro Medina.  Castro Medina arranged these visits through text and Snapchat.  After Victim A had sex with Lazzaro on these visits, he would give her an envelope of cash, half of which was for Castro Medina.

6

On July 29, 2020, Victim A reached out to Lazzaro. She said he was going to report him to the police unless he paid her the money that had gone to Castro Medina. An agreement could not be reached and Victim A ended up reporting the crime to the police. The next day, Victim A's father received a Non-Disclosure Agreement (NDA) from one of Lazzaro's attorneys. The NDA stated that Lazzaro would pay $1000 to Victim A and that Victim A would agree not to disparage Lazzaro. The NDA further provided Victim A's agreement that she had engaged in a "consensual interaction" with Lazzaro. Victim A declined to sign the NDA.

### 2.     Victim B (Count 3)

In the spring of 2020, Victim B and her older sister were recruited to have sex with Lazzaro in exchange for money by a male friend (a minor at the time) who was also associated with Castro Medina. At Castro Medina's prompting, the male friend asked Victim B's 18 year-old sister, T.L., if she wanted to make money by meeting up with Lazzaro. T.L. then exchanged messages with Lazzaro. In June 2020, Victim B, T.L., and a friend went to Lazzaro's residence for the first time. The sisters initially told Lazzaro that they both were 18-years-old, but soon thereafter told him that Victim B was only 16-years-old. Lazzaro shifted his attention to Victim B upon learning her real, younger age. On that first visit, after consuming a substantial amount of hard alcohol, T.L. had sex with Lazzaro and was paid several hundred dollars.

Victim B and T.L. returned to Lazzaro's condo. Victim B went with T.L. despite Lazzaro's requests over Snapchat that Victim B come alone. Lazzaro paid Victim B

and T.L. in cash for specific sex acts.  In addition to cash, Lazzaro ordered the sisters hundreds of dollars worth of cosmetics and perfume from Sephora, which would be available for them at his condo when they returned.

The last time that Victim B was at Lazzaro's condo, Victim B got scared and tried to get her sister, T.L., to leave the condo with her.  Victim B's sister was too intoxicated to leave.  Lazzaro got angry with Victim B and grabbed her by her arm and physically pushed her out of the front door.  Victim B called her father in the early morning hours to come pick her up.  When Victim B's father arrived at the Hotel Ivy, he tried to reach T.L. on her cell phone.  The Hotel Ivy staff said that, if T.L. was an adult, there was nothing they could do.  Victim B's father and Victim B eventually left the hotel without T.L.

They were later contacted by the West Hennepin Police Department.

### 3.    Victim C (Count 4)

In the summer of 2020, Castro Medina reached out to Victim C on Snapchat, and then met with her in person.  Victim C bonded with Castro Medina over Victim C's recent break up with her boyfriend.  Castro Medina told Victim C that "her friend Tony" thought Victim C was cute, that he was rich, and that he paid girls to come to his house to "party."  Victim C gave Castro Medina a photo of herself to share with Lazzaro, and Castro Medina put Lazzaro and Victim C in direct contact on Snapchat. Victim C was 15-years-old at the time and her Snapchat profile username included her birth year—2005.

8

In early August 2020, Victim C was at a sleepover with three other girls.  Lazzaro sent an Uber to St. Michael to the sleepover to pick up the girls.  One girl decided not to go, but loaned Victim C her cell phone.  Records show that Victim C and the other two girls from the sleepover (ages 14 and 14) arrived at the Hotel Ivy around midnight. Lazzaro gave the girls hard liquor.  He impressed them with his wealth and status.  He let them hold his guns.  At one point, Victim C—badly drunk—disappeared into Lazzaro's bedroom.  She came out of the bedroom naked from the waist down.  She was so drunk that she face-planted in the living room.  Lazzaro paid the three girls that came $100 each.  He gave them an additional $200 for their friends and suggested that they should return.  He then arranged for an Uber to take them back to the sleepover so they wouldn't be missed.

On August 31, 2020, Victim C went to another sleepover.  Lazzaro again arranged for the transportation of Victim C and another minor to his penthouse. Lazzaro greeted Victim C and a friend on the street outside of the Hotel Ivy and paid the cab driver in cash.  Once inside, Lazzaro gave the girls with alcohol and paid them money to make out with each other.  Lazzaro took Victim C to his bedroom to have sex. Lazzaro provided the girls with pills that they believed would help with a hangover, a Plan B pill for Victim C, and lots of cash.  Lazzaro paid for an Uber to drive them home.

On October 4, 2020, Lazzaro requested that Victim C's friend come alone to his residence.  Victim C went instead as she was worried something bad would happen if

her friend went alone.  Lazzaro picked up Victim C in his Ferrari and drove her back to the Hotel Ivy.  Lazzaro gave 15-year-old Victim C alcohol to the point where she again became near black-out drunk.  He paid her $400 to have sex with him.  Lazzaro then drove her home the next morning, this time using his black Cadillac sedan.

### 4.    Victims D (Count 5) and E (Count 6)

Late in the summer of 2020, 16 year-old Victim E received a Snapchat message from Castro Medina, saying that Castro Medina's "sugar daddy" thought Victim E was "really pretty."  Castro Medina sent Victim E pictures of money, designer purses, and other products.  She said she had gotten these items from her sugar daddy.  Victim E inquired further and Castro Medina said that she sometimes had sex with her sugar daddy to get more money and other nice things.  Castro Medina then put Victim E in touch with Lazzaro and the two began exchanging messages on Snapchat.

On September 4, 2020, Victim E met Lazzaro at the Mall of America, and he offered to buy her something.  Victim E asked her friend, 16-year-old Victim D, and another friend to come along and "spy" on her and Lazzaro during the shopping trip to make sure everything was safe.  Victim E and Lazzaro went to the Prada store located inside Nordstrom.  Lazzaro bought Victim E an expensive Prada purse.  Lazzaro asked Victim E to come home with him, but Victim E declined.

Some time afterwards, Victim D and Victim E agreed to go to Lazzaro's residence together.  A friend drove the girls to the Hotel Ivy.  The girls asked for Tony in 1920 and the desk clerk granted them access to Lazzaro's condominium.  Lazzaro

offered them alcohol, but the girls declined.  The girls told Lazzaro that they were 16-years-old.  Both Victims D and E engaged in oral sex with Lazzaro, and then Lazzaro had vaginal sex with Victim D.  Afterwards, Lazzaro gave hundreds of dollars in cash to Victim E and gave Victim D hundreds of dollars in cash and a new iPhone valued at around $800.  Tony also gave both girls handfuls of flavored Puff Bar disposable vaping pens on their way out the door.

In October 2020, Victim D returned alone and had sex with Lazzaro in exchange for $500 and more vaping cartridges.  Victim E returned to Lazzaro's residence alone around the same time.  She engaged in multiple sex acts with Lazzaro and was provided with $500 and Puff Bars.  In the days following this encounter, Lazzaro repeatedly asked Victims D and E to meet him again.

Victim D's mother became suspicious, which led to the FBI being called and a joint investigation with the Minnesota Bureau of Criminal Apprehension started in late October.

### C.     Sex Trafficking — Obstruction (Count 7)

At some point after having sex with Victim C multiple times in exchange for large sums of cash, Lazzaro learned Victim C was 15-years-old rather than 16-years-old.  Lazzaro and Castro Medina were served with federal target letters in December 2020, informing them they were under investigation for, among other things, sex trafficking.

In March 2021, Castro Medina went to Victim C's workplace on Lazzaro's instruction.  Castro Medina gave Victim C vapes, alcohol, and cash in exchange for Victim C keeping quiet.

### D.    Other Anticipated Testimony

The Government also anticipates calling those experts previously noticed.  ECF No. 280. This will cover expert testimony about sex trafficking, the forensic analysis of digital devices, and analysis of cell phones, including their specific locations at a given time.

## IV.    TRIAL COUNSEL

The United States will be represented at trial by the following Assistant United States Attorneys:

Emily A. Polachek
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
emily.polachek@usdoj.gov

Laura M. Provinzino
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
laura.provinzino@usdoj.gov

Melinda A. Williams
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
melinda.williams@usdoj.gov

## V.    LENGTH OF TRIAL

The Government anticipates that its case-in-chief can be presented in 10 trial days or less.  Allowing for jury selection, jury charge, and a possible defense case, the Government believes that the trial will be complete or near complete in 12 trial days.

## VI.   ELEMENTS OF THE CHARGED OFFENSES

The crime of conspiracy to commit sex trafficking, as charged in Count 1 of the Indictment, has three elements:

*One*, that in and between May 2020 and December 2020, two or more people reached an agreement to commit the crime of sex trafficking of minors;

*Two*, the defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect; and

*Three*, at the time the defendant joined the agreement, he knew the purpose of the agreement.

*See* Manual of Model Crim. Jury Instr. 8th Circuit §§ 5.06A-1, 6.18.1591 (2021) (noting in the Committee Comments that "if the offense charged is conspiracy to commit sex trafficking," the jury instruction "should be modified to omit the overt act requirement"); 18 U.S.C. §§ 1591, 1594(c).

The crime of sex trafficking, as charged in Counts 2–6 of the Indictment, has three elements:

*One*, the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited by any means Minors A–E, or attempted the same;

*Two*, the defendant knew or recklessly disregarded the fact that Minors A–E were under 18 years of age and would be caused to engage in a commercial sexual act; and

*Three*, the offense was in or affected interstate ecommerce.

*See* Manual of Model Crim. Jury Inst. 8th Circuit § 6.18.1591 (2021); 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), 1594(a).

The crime of obstruction and interference with the enforcement of 18 U.S.C. §§ 1591(a) and (d), as charged in Count 7 of the Indictment, has three elements:

*One*, the defendant was being investigated or prosecuted for sex trafficking of a minor;

*Two*, the defendant knew of that investigation or prosecution, or had reason to believe of its existence; and

*Three*, the defendant voluntarily and intentionally acted in some way to obstruct, attempt to obstruct, interfere with, or prevent that investigation or prosecution.

*See* 18 U.S.C. § 1591(d); *United States v. Stennis*, No. 20-cr-19 (PJS/BRT), 2022 WL 2312214, at *6 n.9 (D. Minn. June 27, 2022) (noting that "a defendant's belief in the existence of an investigation might be sufficient" to prove a violation of 18 U.S.C. § 1591(d)); *United States v. Stennis*, No. 20-cr-19 (PJS/BRT) (D. Minn. Oct. 7, 2021), ECF No. 153 at 11.

## VII.  MOTIONS IN LIMINE

The Government has filed the following motions in limine for the Court's review under separate cover:

- Motion to preclude unnoticed and improper defenses;
- Motion to sequester witnesses;

- Motion to preclude evidence and arguments regarding consent and state law;

- Motion to preclude mention of punishment;

- Motion to preclude references to uncharged individuals;

- Motion to preclude evidence of the victims' past sexual behavior or predisposition pursuant to Rule 412;

- Motion to preclude references to issues litigated in pretrial motions; and

- Motion to refer to minor victims by first names only

In accordance with the Court's practice pointers, the Government met and conferred with defense counsel regarding these motions.

## VIII.  ANTICIPATED EVIDENTIARY AND PROCEDURAL ISSUES

### A.      Other Bad Acts Evidence

The Government anticipates that, in the course of presenting its case-in-chief, the evidence will include references to uncharged victims and uncharged instances of and attempts to engage in sex trafficking and obstruction of justice.  The Government's evidence will also show that, while committing the charged offenses, Lazzaro engaged in various illegal behaviors, including providing and gifting alcohol and vapes to minors, purchasing and distributing a controlled substance (Adderall), allowing minors to hold weapons, and offering to show his co-defendant how to make a fake ID.  This evidence is admissible as res gestae evidence intrinsic to the charged offenses; or, in the alternative, admissible under Federal Rule of Evidence 404(b).

First, the aforementioned illegal acts are intrinsic to the charged offenses because it is inextricably intertwined with the conduct charged in the indictment. "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." *United States v. Young*, 753 F. 3d 757, 770 (8th Cir. 2014) (internal quotations and citations omitted). Lazzaro's actions in providing illicit substances to underage girls and to his co-defendant are part of the charged conduct in that they demonstrate some of the means by which Lazzaro recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited the minor victims. And instances of uncharged sex trafficking acts and victims is intrinsic in that it provides context to and is inextricably intertwined amidst the testimony of the charged victims. *See United States v. Moore,* 735 F.2d 289, 292 (8th Cir. 1984) ("A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge."). As such, these acts are plainly admissible as intrinsic to the charged offenses.

Second, even if the Court finds that this conduct is not intrinsic, evidence of Lazzaro's other bad acts should come in under Rule 404(b) to prove intent, plan, and knowledge. Evidence of other crimes, wrongs, or acts is admissible under Rule 404(b) if it is: "(1) relevant to a material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by a preponderance of the evidence; and (4) higher in probative value than in prejudicial effect." *United States v. Buckner,* 868 F.3d 684, 687

16

88 (8th Cir. 2017).  Rule 404(b) is "a broad rule of inclusion." *United States v. Hawkins*,

548 F.3d 1143, 1146 (8th Cir. 2008).  As a result, such evidence is admissible for any

other purpose, so long as the government provides proper notice, as it has done here.

Fed. R. Evid. 404(b)(2); *United States v. Oaks*, 606 F.3d 530, 538 (8th Cir. 2010).

The Government anticipates that Lazzaro may continue to argue that the cash

and gifts he provided to the minor victims were not a quid-pro-quo but rather he was

merely a "generous date."  His actions in plying his victims (charged and uncharged)

and recruiter with alcohol and other items that they were too young to acquire for

themselves is material to the question of whether the girls were recruited, enticed,

provided, patronized, and solicited to engage in commercial sex acts.  It also shows the

ways in which he paid his recruiter, Castro Medina, for the services she provided in

recruiting, enticing, obtaining, maintaining, and soliciting the minor victims.  And the

fact that Lazzaro engaged in this conduct with others known to the Government's

witnesses is relevant in rebutting any claims related to Lazzaro's state of mind, including

knowledge, intent, plan, and lack of mistake or accident.

This material evidence is sufficiently similar to the charged offenses and not

remote in time.  It will be proven by a preponderance of the evidence through the

testimony of Government witnesses.  And the  material value of the proffered evidence

is not substantially outweighed by the danger of unfair prejudice under Rule 403.  The

Government's evidence will be limited in scope—it is part of the victims' account of

what happened, and the focus of their testimony will be the charged instances of sex

trafficking. There is little risk of undue delay, wasted time, or needlessly presenting cumulative evidence on such a circumscribed presentation. The risk of confusing or misleading the jury is likewise absent because the evidence is limited in scope, straightforward, and simple to understand. In fact, the evidence will be valuable to the jury's evaluation of the case by providing context for the victims' testimony. Because none of the Rule 403 concerns are present, they cannot substantially outweigh the highly probative value of Lazzaro's conduct and means of trafficking the minor victims for commercial sex.

> **B.     Rule 1006 Summary Charts**

The Government anticipates offering summary exhibits that may include, but are not limited to: (1) a chart listing the minor victims and charged counts, (2) a chart listing the cash and other items of value that Defendant provided to Gisela Castro Medina for recruiting minors to have commercial sex with Defendant, (3) Snapchat records, and (4) Uber records. Because the data underlying these summaries are voluminous and interconnected, the government intends to offer summary charts into evidence to aid the jury. Summary charts are properly admitted when (1) the charts fairly summarize voluminous trial evidence; (2) they assist the jury in understanding testimony already introduced; and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary. *United States v. Spires*, 628 F.3d 1049, 1052-53 (8th Cir. 2011); *see also United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008). Such is the case here, and the summary charts should be admitted.

## C.     Use of Exhibits in the Government's Opening Statement

The Government anticipates using a small selection of photos as part of its opening statement.  The Government will confer with defense counsel as to whether the parties can stipulate as to the authenticity of these exhibits prior to trial.  If no such agreement is reached, the Government may request that the Court rule on the admissibility of these exhibits during the parties' pretrial conference to permit the Government to use these exhibits in opening statement.

## IX.    POTENTIAL JURY INSTRUCTION DISPUTES

The parties have submitted joint proposed jury instructions under separate cover consistent with the Court's trial order.  The areas of disagreement are underlined and further explained in footnotes.

Aside from the substantive instructions as to the elements of sex trafficking obstruction—which the Government derived from this Court's instruction and post-trial order in *United States v. Stennis*, 20-cr-19 (PJS/BRT)—the Government proposes one additional instruction that does not originate from a model instruction.  Specifically, the Government requests the following instruction as to consent:

> With regard to the charges of sex trafficking of minors (Counts 2–6), it is irrelevant if the minors consented to or otherwise voluntarily participated in the sex acts, as the consent or voluntary participation of minors is not a defense to the charge of sex trafficking of minors.

The legal basis for this instruction can be found in the Government's motion to preclude evidence and arguments inviting jury nullification.  In short, it is well-

established that consent is not a defense to sex trafficking of minors.  *United States v. Taylor*, 44 F.4th 779, 790 (8th Cir. 2022); *United States v. Campbell*, 6 F.4th 764, 772 (8th Cir. 2014) (citing *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009)).

Respectfully submitted,

Dated:  March 6, 2023

ANDREW M. LUGER
United States Attorney

*s/ Emily Polachek*
BY: EMILY A. POLACHEK
Attorney Reg. No.0390973
LAURA M. PROVINZINO
Attorney Reg. No. 0329691
MELINDA A. WILLIAMS
Attorney Reg. No. 491005 (D.C.)
Assistant United States Attorneys