**ANTON J. LAZZARO**
c/o Sherburne Co. Jail
13880 Business Center Dr. N.W., Suite 200
Elk River, MN 55330

RECEIVED
BY MAIL

JUN 1 2 2023

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS. MINNESOTA

June 8, 2023

Patrick J. Schiltz, Chief Judge          *Via USPS Certified Priority Mail*
Untied States District Court
300 S. Fourth Street | Minneapolis, MN 55415

**RE:  *United States v. Lazzaro*, 21-CR-173 (PJS/DTS) – Open Letter to the Court.**

Dear Chief Judge Schiltz:

I hope this correspondence finds you very well. Fear not, this is not a pro-se motion and merely a friendly large-fonted letter from the defendant who has been "studying this case for 18 months obsessively", as Your Honor put it. (Trial Tr. Vol. VI at 1425). The purpose of this letter is to address my feelings of tremendous improprieties by the federal Government.[1] I will reference case-law as an effort to safeguard my assertions and respect the Court. Additionally, a copy of this letter is being submitted to the DOJ Office of Professional Responsibility per the procedure detailed in *Bartko v. U.S. DOJ*, 898 F.3d 51 (D.C. Cir. 2018). I greatly appreciate your time and attention to this matter.

Throughout my obsessive studies, I discovered several improper arguments by the Government during trial. While some of these were objected to by my counsel, most were not. Therefore, I feel obligated to inquire to the Court regarding these remarks, which I perceive to be **clear prosecutorial misconduct**. It is of course widely know that **"a trial judge should deal promptly with any breach by either counsel."** *U.S. v. Young*, 470 U.S. 1 (1985).

▪ <u>**Improper Vouching for Ms. Medina during Closing Argument:**</u>

---

[1]  This letter will refrain entirely however from any reference to Selective Prosecution as my points have already been emphasized to this Court previously.

1

SCANNED

JUN 1 2 2023 *AV*

U.S. DISTRICT COURT MPLS

During the Government's closing argument, the following remarks were made:

> "You heard from Gisela last Thursday. Cooperating with the Government. She testified to her role in the defendant's conspiracy. In her words, what she did was disgusting and it was horrible. Agreed. Just to be clear, we prosecuted her too. ***She testified truthfully. She cooperated with the Government.***"
> (Trial Tr. Vol. VIII at 1602).

"Improper vouching may occur when the Government expresses a personal opinion about credibility, implies a guarantee of truthfulness, or implies it knows something the jury does not . . . Evidence of the existence, the terms, and the witness's understanding of a plea or witness immunity agreement is not vouching." *U.S. v. Roundtree,* 534 F.3d 876 880 (8th Cir. 2008).[2]

The Eighth Circuit found in *U.S. v. Freisinger*, 937 F.2d 383 (8th Cir. 1991) that when a prosecutor stated, "'They came here and told the truth.' . . . **This kind of argumentation is not only improper, it is unnecessary . . . [and] at the very least suggests that the government may know something that the jury does not.**"

The Government's remarks surely touch on at least two of the key elements in the *Roundtree* test. Unlike in *Roundtree* however, the Government plainly stated that Ms. Medina "testified truthfully" and "cooperated" (without detailing what that actually entailed) and failed to provide actual evidence to support the claim she testified truthfully.[3] To the contrary, the Government did precisely what occurred in *Freisinger* which is explicitly proscribed.

In a case this Court is surely familiar with, the Eighth Circuit further stated that "[a]lthough attempts to bolster a witness by vouching for his

---

[2] *Roundtree* is the test most frequently utilized by the Eighth Circuit to establish improper vouching.

[3] Ms. Medina answered primarily yes/no questions proposing she was a "sex trafficker" yet failed to remember answers to simple questions. e.g. "Q. And you sent the message to Mr. Lazzaro explaining that what you were doing -- you weren't really going to cooperate but what you were going to do -- you just wanted to get out of jail, right? A. I don't remember what I said." (Trial Tr. Vol. II at 435).

credibility are normally improper, the government may explain why the jury might find the government's witnesses credible." *U.S. v. Sevilla-Acosta*, 746 F.3d 900 (8th Cir. 2014). Distinctly, the Government's statement was far from the conduct in *Roundtree* and *Sevilla-Acosta,* yet identical to *Freisinger.*

These remarks were not even close to the first (or last) time the Government blatantly made improper remarks. In closing alone, the Government managed to also (a) accuse myself of committing perjury without any support and (b) accuse counsel of being deceitful and conspiring with me to deceive the jury.

▪ **Prosecutorial Misconduct Falsely Claiming I was "wildly untruthful" when Testifying:**

The Government could not resist wrongfully accusing me of perjury during their closing argument:

> **"When the defendant testified, he was wildly untruthful.** The sardines photo, the Epstein text, the word 'recruiter,' the whole scheme. It was absurd."
> (Trial Tr. Vol. VIII at 1643).

First, it must be said that all three of these instances don't even come close to showing any remote dishonesty. The "sardines" photo was never repudiated, and it does absolutely nothing to establish sex trafficking:

"Q. You heard her say that you took a photo of the three of them face down. Do you remember that, on the bed? A. **Yes.** Q. She said it looked like sardines in a can, I think was her description? A. **Uh-huh.** Q. Is that a yes? A. **Yes."** (Trial Tr. Vol. VI at 1464.)[4]

I also acknowledged using a perfectly legitimate "recruiter" (dating agency in New York) (Trial Tr. Vol. VI at 1448), and commenting on a

---

[4]   I answered affirmatively at least three times, clearly acknowledging this irrelevant photo existed. The "sardines photo" was not only undemonstrative of sex trafficking, its sole purpose was furthering the Government's personal disapproval of my consensual partner choices in 2020. This only further inflamed the jury with prejudicial exhibits doing zero to prove commercial sex.

Clinton/Epstein[5] meme that the Government intentionally did not reveal, that was evidently *sent by Mr. Bittman, not myself.* ("A: I can't see it. I guess it says, 'Image omitted.'" Trial Tr. Vol. VI at 1484 and "A: It looks like I'm replying to a message that Charles sent me, and I was probably talking about the conspiracy of how he supposedly killed himself in prison -- or jail." (Trial Tr. Vol. VI at 1488)).

I need not cite lengthy case-law to the Court to prove this obvious impropriety. In *U.S. v. Peyro,* 786 F.2d 826 (8th Cir. 1986), the prosecutor called the defendant an "obvious liar" in her closing argument. **"Statements by the prosecutor such as, 'This man is an obvious liar,' have no place in a criminal trial".** *Id.* The Government's remarks suggesting I was a liar are both improper and clearly not supported by any remote truth. I testified 100% honestly. I told my attorneys and my girlfriend that night that all I did was tell the truth and it felt great. I will happily take an FBI polygraph test.

▪ <u>**Prosecutorial Misconduct Stating Defense Counsel "took a page out of his client's playbook"**</u>**:**

During rebuttal, the Government continued to show zero restraint:

```
"So Mr. Gerdts and I are good colleagues, maybe friends.
But defense counsel, what he just stood up here and did was
took a page out of his client's playbook. It's the minors'
fault. Let's drag them through some mud. Let's dig up some
 dirt. Let's let it fly. They got what they deserved . . .
  He was singing the same song that you heard from the
 defendant on the witness stand . . . When the defendant
          testified, he was wildly untruthful."
              (Trial Tr. Vol. VIII at 1643).
```

In *U.S. v. Holmes,* 413 F.3d 770 (8th Cir. 2005), the Eighth Circuit declared:

---

[5]   Epstein was never even convicted of any sex trafficking due to his premature death. It's still unclear to me why this piece of "evidence" was allowed at trial. Especially considering the image was never revealed and it was falsely suggested I had sent it. Notably, like Epstein, Mr. Stennis, Mr. Jungers, and my personal hero Wilhelm Reich, all suffered "death by BOP". (The Court's familiarity with these cases is assumed with the exception of *Reich v. U.S.*, 239 F.2d 134 (1st Cir. 1956)).

"[C]omments referring personally to [defense counsel] and the necessity for [defense counsel] to 'get his stories straight,' taken as a whole and in the context of the rebuttal argument, show that the government attorney was accusing defense counsel of conspiring with the defendant . . . Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case. More than thirty-five years ago our court found such statements to be improper. See *Cline v. United States*, 395 F.2d 138, 141 (8th Cir. 1968) (finding it improper for a prosecutor to accuse defense counsel of dishonesty). Such statements are improper because a prosecutor's comment 'carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.'" *U.S. v. Young*, 470 U.S. 1, 18-19, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985).

**"These types of statements are highly improper because they improperly encourage the jury to focus on the conduct and role of Mr. Holmes attorney rather than on the evidence of Mr. Holmes guilt. Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case."** *Holmes.*

▪ <u>**Relentless Improper and Irrelevant Remarks by the Government:**</u>

From the moment the Government began their opening statement, they defied the Court's direct guidance from the Pretrial Conference. If I were to include every occurrence in this letter, it would easily be 50+ pages. I will spare you that and only highlight some of the most obvious and absurd.

- The Government's use of the term "underage" and "minor" repeatedly after **the Court clearly stated: "'[U]nder 18' would be more careful. MS. WILLIAMS: Thank you, Your Honor." (Trial Tr. Vol. I at 56).**

  Adobe Acrobat's advanced search of the terms **"underage" and "minor"** <u>**return over 300 instances**</u>. Even if half occurred during sidebar and other non-jury present conversations (a very generous estimate), it is vividly clear the Court's instructions were not remotely followed nor enforced.

e.g.

**"Minor girls were lovely to the defendant."**
(Trial Tr. Vol. VI at 1483).

"Q. **You did have sex with them?** A. Yes. **Q. You had sex with them here.** This is your bedroom? A. Yes, ma'am. Q. Your bed? A. Yes." (Trial Tr. Vol. VI at 1439)

Literally seconds later, another instance of the myriad continued:

"Q. **You had sex with them?**
A. Yes.
Q. You knew Gxxxxx was 16?
MR. GERDTS: Objection, Your Honor. **This is at least the seventh time.**
THE COURT: Yes. Under 18, please."
(Trail Tr. Vol. VI at 1440).

The Court's aristocratic reminder to the Government did utterly nothing to stop their total disregard for the Pretrial Conference's trial guidelines:

e.g. "Q. You told her you wanted young girls, **16** ideally?
A. No.
Q. You told her you preferably wanted them to be **white**?
A. She knew I liked **white girls**, yeah.
Q. You wanted no **tattoos**?
A. I prefer women without tattoos, that's true.
Q. You wanted **tiny** girls, **petite** girls, yes?
A. No.
Q. And you were looking for girls who would be the **easiest to groom**, right?
A. I don't even know what that word means, but no.
Q. The **sluts**, the **whores**, and the **broken girls**. That's what you requested, right?[6]
A. No, ma'am."
Trial. Tr. Vol VI at 1450).
. . .

---

[6] This characterization was also debunked during Medina's cross-examination. ("Q. His fondness specifically was in fixing broken girls, correct? A. That's what he said." (Trial Tr. Vol. III at 443-444)).

`"[M]inor girls` that he wanted, `minor girls who were small, white, vulnerable."` (Trial Tr. Vol. VIII at 1588).

In addition to the Government's lambasting over lawful sexual encounters, their prejudicial remarks continued on and on doing absolutely zero to prove sex trafficking. Just a couple of these unnecessary inflammatory remarks included:

`"Q. And to be clear, you had explained to Gisela that Exxxx had fat thighs,` right?" (Trial Tr. VII at 1533).

`"I think it's hard to forget Gxxxxx's description on the stand of sex with the defendant. She was his favorite. He loved her child-like body`[7]." (Trial Tr. VIII at 1597).

- Countless ungainly questions requesting vivid details of sexual encounters that did zero to decipher if sex had been trafficking or lawful.

e.g. "Q. Okay. Can you **tell the jury what you remember about that sex**[?]" (Trial Tr. Vol. IV at 808).

- Inquiring to Kira if she said that she was willing to commit murder for me (Trial Tr. Vol. V at 1243) to the point of terrifying a juror enough to inquire with the Courtroom Deputy regarding her safety. (Trial Tr. Vol. VI at 1341). (In addition to multiple other totally prejudicial questions to Kira entirely irrelevant to the case: "Q. Well, Ms. Cxxxxx, your dad was in prison, right?" and "Q. Ben found you under a bridge using drugs?" (Trial Tr. Vol. V at 1237)).

- The Government relentlessly pursued countless lines of questioning that did absolutely nothing to prove transactional exchanges, and only served to grow prejudice in jurors towards my lifestyle in 2020. These are only some of the Government's favorites:

---

[7]  Even if this had been true, it would still be irrelevant. But my testimony was distinctly that I wanted to *date* Kira and stopped seeing Gxxxxx due to her drug use and lone interest in receiving gifts from me. (Trial Tr. Vol. V at 1320 and 1278, respectively).

"mirror": 81 instances[8]
"porn [business]": 10 instances[9]
"gun": 34 instances[10]
"Happy Meal": 13 instances[11]
"Adderall": 34 instances[12]
"Plan B [pill]": 9 instances[13]
"[gold] ceiling": 26 instances[14]
"Disney [movies]": 7 instances[15]
"slumber party": 39 instances[16]
"Trump": 8 instances[17]
"Mr. Tony": 55 instances[18]
"Ferrari": 23 instances[19]

---

[8] e.g. "He would turn her head towards the *mirror* and make her watch" (Trial Tr. Vol. VIII at 1591).

[9] e.g. "Q. And to your knowledge, did Tony have a *pornography business*?" (Trial Tr. Vol. II at 424).

[10] e.g. "Q. [D]id Mr. Tony show you his *guns*?" (Trial Tr. Vol. III at 567).

[11] e.g. "After that first time they had sex, the defendant ordered food for them, *Happy Meals*." (Trial Tr. Vol. I at 32). Notably, it was later discovered there were no *Happy Meals* ordered. ("Q. There was no *Happy Meal* in there, was there? A. Not on that order, no." (Trial Tr. Vol. V at 1188)). (No evidence was ever introduced suggesting such a "second order" the same evening ever occurred regardless of subpoenaing Uber Eats).

[12] e.g. "Q. Who was giving you the *Adderall*?" (Trial Tr. Vol. II at 525).

[13] e.g. "Q. And you said Tony gave you *Plan B*?" (Trial Tr. Vol. I at 211).

[14] e.g. "The defendant's condo had a *gold ceiling*. His walls were covered with photos of the defendant with celebrities, rich and powerful people. Politicians, athletes, rock stars, even the President." (Trial Tr. Vol. I at 29).

[15] e.g. "While *Disney* movies played in the background, defendant called Gisela and Minor Victim A, Gxxxxx, into his bedroom." (Trial Tr. Vol. VIII at 1592). (In reality, "Q. You said Gxxxxx started kissing Tony and shortly after, they had sex. How do you know that happened? A. They went into his room. Q. What did you do? A. I think I was just in like the common area." (Trial Tr. Vol. II at 288)).

[16] e.g. "Q. Do you know how many times Exxxx left *slumber parties* to see *Mr. Tony*? A. I don't know how many times exactly." (Trial Tr. Vol. II at 572).

[17] e.g. "Q. And who was that? A. *Donald Trump*. Q. Fair enough." (Trial Tr. Vol. III at 681).

[18] e.g. "Q. And you said you communicated with *Mr. Tony* on Snap? A. Yes." (Trial Tr. Vol. III at 573).

[19] e.g. "He had a *Ferrari*, a luxury condo. He had all the trappings of wealth and all the trappings of privilege." (Trial Tr. Vol. VIII at 1587).

**▪ The Court's Curative Instruction on "Consent" did Little to Resolve the Government's Endless Deception:**

The Court's curative instruction to the jury only added insult to injury after the Government's opening statement where they stated "underage" girls cannot consent. (Trial Tr. Vol. I at 30). The curative instruction seemingly suggested to the jury that while there is no federal statute prohibiting consensual sex with a 16-year-old, it may very well violate *state law*:

> "THE COURT: It is not a violation of **federal law** for an adult to have consensual sex with a 16-year-old. That does not violate, **in and of itself, federal law.**"
> (Trial Tr. Vol. I at 128).

At the pretrial conference, the Court assured us that: **"[N]owhere in this trial will [the Government] be allowed to argue that he should be convicted merely because he had sexual contact with a 16-year-old. That's not a crime under federal law." (Pretrial Conf. Tr. at 14).**

Yet this was precisely the Government's undisturbed line of attack from start to finish. e.g. **"[T]he guy who seemed to have it all was actually a predator." (Trial Tr. Vol. VIII at 1588).**

The Court's highly disappointing decision to forbid mention of age of consent stripped me of the obvious and only defense to this indictment. The defenses one has against this charge is that (a) they did not have a reasonable opportunity to observe the person's age (b) they did not engage in sex acts with them or cause them to engage in sex acts with others, or **(c) the sex was lawful, not commercial.**[20]

To argue lawful sex, it is fundamentally necessary to convey to the jury that it's *lawful* in Minnesota to hook up with a 16-year-old. This fact is simply not widely known. A good friend of mine attended the entire trial, she was 100%

---

[20] The Court recognized this very defense at the Pretrial Conference: "THE COURT: Yeah, I assume you're going to – one potential defense would be, and there's some reference to this in your papers, this isn't commercial sex. It's just two people hooking up. And one of them happens to be generous and is generous to the other person, and that's not commercial sex. **And that would be a perfectly legitimate defense.**" (Pretrial Conf. Tr. at 12).

convinced that I had broken the law for having sex with these individuals. This individual is a highly sophisticated woman with a Masters Degree. I have no doubt jurors had her same understanding, that I had violated at least some criminal sexual conduct law – suggesting my intention was *not* law-abiding, irregardless of not being commercial.

"The reality is that jurors do not parse instructions for subtle shades of meaning in the same way lawyers might." *Kansas v. Carr*, 577 U.S. 108 (2016) (internal quotes omitted). Jurors also do not weigh a defendant's integrity based on *which laws* they intended to abide by or violate. I encourage Your Honor to poll ten non-lawyers on the Minnesota age of consent. My personal results have yielded under 25% of residents answering correctly.

The Court could have simply instructed the jury, for example: *"It is not a crime under federal or Minnesota law to have sexual contact with a 16-year-old. It is a crime to cause a person under 18 to engage in a commercial sex act."*

The only case the Government cited in suggesting age of consent was improper to argue in a federal criminal sex trial was *U.S. v. Anderson*, 563 F. Supp. 3d 691, 698 (E.D. Mich. 2021) (ECF No. 301 at 2). In *Anderson* however, the defense did not even oppose the motion as it was irrelevant to their defense. My counsel did not address the case-law that overwhelmingly supports my position. (ECF No. 321). The Eighth Circuit has had no issue with District Courts "instruct[ing] the jury 'Except under circumstances not present in this case, [position of authority] the age of consent to sexual contact in Minnesota is 16'." *U.S. v. Patten*, 397 F.3d 1100 (8th Cir. 2005).

And most precisely to my point, Courts have denied Government motions to ban mention of age of consent. Because just as I have pleaded, **"[age of consent] may be relevant to defendant's knowledge and intent."[21][22]** *U.S. v.*

---

[21] The clear intent to follow age of consent law and total absence of child pornography in and of itself demonstrate the intent to be law abiding versus other remotely comparable cases in this Court. e.g. *U.S. v. Fortier*, Case No. 17-CR-0096 (PJS/DTS) (D. Minn. Jan. 12, 2022) (Overwhelming evidence of production and possession of child pornography), *U.S. v. Stennis*, Case No. 20-CR-0019 (PJS/DTS) (D. Minn. June 27, 2022) (Defendant admitted violently beating sex worker during altercation).

[22] The Eighth Circuit further notes that when determining good faith, "compliance with state law may

*Ray,* Case No. 2:12 CR 171 (N.D. Ind. Aug. 23, 2013). The Supreme Court also readily acknowledges both state and federal age of consent. "31 States and the District of Columbia set the age of consent at 16." *Esquivel-Quintana v. Sessions,* 581 U.S. 385 (2017). Furthermore, the "age of consent in the federal maritime and territorial jurisdiction is 16." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). There is simply no case-law to support the Government or this Court's notion that this highly relevant information should be banned entirely from a jury's purview.

▪ **The Cumulative Effect of these Improprieties Clearly Violated the Right to a Fair Trial:**

Even if the trial had only contained a fraction of these "improprieties", the argument for due process violations weighs substantially in my favor. **"A single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."** *U.S. v. Beeks,* 224 F.3d 741, 746 (8th Cir. 2000).

The Eighth Circuit found in *U.S. v. Cannon,* 88 F.3d 1495 (8th Cir. 1996) that "[t]he appellate court examines prosecutorial remarks to determine, first, whether the remarks were in fact improper, and if so, whether, in the context of the entire trial, the remarks prejudicially affected defendants' substantial rights, so as to deprive them of a fair trial. If the appellate court reaches the second step, it considers: (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of defendants' guilt; and (3) the curative actions taken by the trial court."

The instances highlighted above easily satisfy these requirements, especially when taking into account the completely novel nature of this case, never seen in the 23-years of the *Trafficking Victims Protection Act of 2000.*

▪ **The Government's Case did *not* Establish "Commercial Sex":**

After reading over a thousand sex trafficking opinions including all

_____

well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes." *U.S. v. Baker,* 16 F.3d 854 (8th Cir. 1994).

throughout the Eighth Circuit, I have found zero remotely similar to this case. All others involve either force, fraud, threats, or coercion, third-party pimp control (Government stings even include a fictitious pimp handling communications), and of course - traditional pimp/massage/brothel cases. The Government's case proved that I had consensual/lawful sex with these young women, and that I gave them many high-ticket gifts, including their friends whom I did *not* have sex with, nor did the Government call to testify. None of the Government's case included any evidence or testimony of negotiated sexual transactions.

The vague hint of an explicit quid-pro-quos seemed to come from sister Exxxx (Individual B) whose 18-year-old friend was apparently not given as many gifts because her boyfriend had arrived at the condo. (Trial Tr. Vol. III at 633). Yet Txxxx's testimony wholly contradicted this insinuation by the Government, during her direct examination:

**"[W]as there an explicit discussion of sex for money? A. <u>No</u>."** (Trial Tr. Vol. II at 632).

(Furthermore, the Government did not even bother calling Exxx to testify – just like Cxxxx (formerly Individual F) – further demonstrating their deliberate knowledge that gifts were *not* given on any condition of sexual contact).

Exxxx (Individual C) even stated unequivocally, "Q. Okay. Now, you were questioned about your interactions with Tony, and you said, '**It sounds bad, but it wasn't. <u>It wasn't bad. It wasn't like prostitution or anything</u>**.' You said that, right? A. I can't for sure say I remember saying that, but **that sounds like something that I agree with right now.** Q. So you agree with it now? A. Yes." (Trial Tr. Vol. I at 227).[23]

The verbs "entice" and "transport" must be attributed to anyone who uses a vehicle or event invitation to eventually achieve a consensual sexual encounter. If I am indeed a sex trafficker (merely because I gave *expensive* gifts), it still cannot be argued that any college student who has sex with a high school

---

[23] No alleged victims testified to any financial propositions whatsoever from me to engage in commercial sex with them. To the contrary, the Government's focal point is on "enticing" them with things *too valuable* before and after lawful sexual encounters.

student is not sex trafficking them if beer, party invitations, or even any intangible thing of value is used to "entice" them (ie: TikTok video sharing, popularity/reputation, etc.).

The "sugar dating" concept is neither novel nor illicit. Providing for others is an ancient concept and there is no threshold that transforms generosity before or after intimate encounters into criminality. The Court's instructions tasked this jury to determine if *these young women* had sex *on account of* things of value given to them. This simply does not meet the *mens rea* requirement of the statute's intention or due process a defendant is entitled to. All the jury had to do was determine was that these women had sex ***in hopes of*** receiving things of value.[24]

Intelligibly, no agreements were made, and no control was exercised, like in every other § 1591 case. Any pool party, cabin trip, boat outing, car ride, or farm hand can equally be attributed to why a 17-year-old may be inclined to sleep with a man in their 20's. Congress did not pass the TVPA to criminalize teenage sex. 18 U.S.C.S. § 2422 criminalizes enticing a minor for **criminal sexual conduct or prostitution.** I was distinctly **not** charged under this statute for evident reasons.

Congress' intent rather was to combat the "modern manifestation of slavery."[25] Pimps who control women they sell, customers who buy that sex from them, and the atypical cases such as *Cook, Weinstein, R. Kelly, or Raniere* in which all the defendants used control (and force) to achieve sexual gratification.

---

[24] Supreme Court Justices have been recently criticized for accepting high-ticket gifts. While these gifts may blossom into friendships and even shift their ideologies, they are certainly not inherently criminal by any measure. See: "Flowers from Oprah, travel to Italy. Here's what Supreme Court discloses revealed". ([https://www.ustoday.com/story/news/politics/2023/06/07/oprah-winfrey-italy-supreme-court-disclosure/70299105007/](https://www.ustoday.com/story/news/politics/2023/06/07/oprah-winfrey-italy-supreme-court-disclosure/70299105007/)) (Last visited June 8, 2023).

[25] That statute begins with: "The purposes of this division are to combat trafficking in persons, a **contemporary manifestation of slavery** whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." (Trafficking Victims Protection Act 22 U.S.C. § 7101 (b)(1)). The definition of slavery can indeed be applied to any pimp controlling the sale of women, purchaser buying women from them (ie: Jungers), or individual using control and violence to achieve sexual gratification (ie: Cook). *Slavery* is defined as "An institution where one man is owned by and **bound to another.**" (Ballentine's Law Dictionary, 3rd Edition). It should be noted it does *not* require force, fraud, threat, or coercion for one to be "bound" to another.

The Void for Vagueness motion obviously conveys this in far greater detail.[26] It simply cannot be argued that the only thing separating this case from any young man in a fraternity hooking up with a 17-year-old is the measurement of a tangible or intangible "thing of value".

▪ **Final Remarks:**

As *Berger v. U.S.* 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935) found, **"The prosecutor has more control over life, liberty, and reputation than any other person in America."** These powers must be regulated by the Courts when it is abused. "It is clear that a district court may correct itself to avoid later reversal when convinced a decision is clearly erroneous and would work a manifest injustice." *County of Mille Lacs v. Benjamin*, 262 F. Supp. 2d 990 (D. Minn. 2003), in accord with *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992). The facts above surely exhibit clear injustice to a fair criminal trial in the greatest country in the world.

The Court summoned me to your podium when you felt I stepped out of line on the stand when replying to the Government's nonsensical questions that were virtually impossible to answer without invoking age of consent,[27] Rep.

---

[26] U.S. Sen. John Cornyn's authoring of the Justice for Victims of Trafficking Act of 2015 (TVPA amendment that added the purchaser language) was extremely clear on the intention of this bill. "[W]e don't treat a young girl who has been trafficked as the criminal. In other words, in the past I think there's been somewhat of a tendency to say, we're going to arrest a 15-year-old girl and charge her for being a prostitute. When in fact, **she has no choice in the matter. She is being compelled . . . it's not a voluntary act on her part."** (https://c-span.org/video/?324785-1/senate-session-part-1) at 4:59:38-5:00:11) (March 11, 2015) (Last visited June 2, 2023).

In *WinRed, Inc. v. Ellison*, 591 F. 4th (934) (8th Cir. 2023), the Eighth Circuit very recently reiterated the importance of **legislative intent** (while citing *Jungers)* in deconstructing a statute. "WinRed is right to **begin with the statutory text, but it is wrong to end there.** See *U.S. v. Jungers*, 702 F.3d 1066, 1069 (8th Cirt. 2013) (affirming that **this court 'look[s] beyond' statutory text when application of the plain language 'will produce a result demonstrably at odds with the intentions of its drafters.')** Citing *U.S. v. Ron Pair Enters,* 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2D 290 (1989)."

"Where the language of a statute is unambiguous, the statute should be enforced as written **unless there is clear legislative intent to the contrary."** *Haug v. Bank of America,* 317 F.3d 832 (8th Cir. 2003).

[27] "Q. You did have sex with 15- and 16-year-old girls? A. I had sex with one 15-year-old girl who told me she was 17. Q. You had sex with her? [Asked and Answered Repeatedly] A. Yes, because she told me she was above the age of consent and I didn't know that, that she was 15. And her own friend

Omar, etc.[28] [29] Nobody did that to the Government, not the Court nor my counsel. **"The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel."** *U.S. v. Young,* 470 U.S. 1 (1985).

It was once said, "it's never too late to change."[30.]
Thank you for reading this Your Honor, I wholeheartedly appreciate it.

Respectfully,

Anton J. Lazzaro

CC:  USAO-Main Justice OPR, USAO-MN OPR, DC ODC, AUSA Melinda Williams, AUSA Laura Provinzino, AUSA Emily Polachek, USDCMN Clerk of Court, Mag. David T. Schultz, Leah Heino-USP, Dan Gerdts, Esq., Tom Beito Esq., Steve Kessler, Esq., Stacy Bettison, Esq., Faisal Waged, Esq., Jeff Storms, Esq., Paul Applebaum, Esq., David Schultz-H.U., Erica MacDonald, Esq. Thomas Heffelfinger, Esq., J. Ashwin Madia, Esq., Doug Altman, Esq., Great North Innocence Project, ACLU MN, Institute for Justice, Eighth Circuit Ct. of App., Lou Raguse-KARE, Steven Montemayor-ST, Kirsten Swanson-KSTP,  Jennifer Mayerle-WCCO, Rob Olson-FOX9, Matt Sepic-PP/MPR, Ernesto Londono-NYT, MPR, MinnPost.

---

[Mxxxx] admits she lied about that. [Trial Tr. Vol. Vol. III at 553.] MS. WILLIAMS: Your Honor, may we have a moment?" (Trial Tr. Vol. VI at 1406). This was merely one of these countless exchanges offering me zero ability to defend my actions without offending the Court. Moreover, Exxxx certainly committed perjury per the undercover video the Court refused to admit into evidence where she repeatedly lies about her age and admits "cat-fishing" men on the internet claiming she was a variety of different ages. (Trial Tr. Vol. II at 1202).

[28]  The remark I made regarding being in jail was met unfit by the Court, yet the Government had just referenced jail phone calls with Kira declaring she was prepared to commit murder. The jury had obviously just heard this inquiry, obviously revealing I was in jail. (Trial Tr. Vol. V at 1243).

[29]  "Q. You're talking about this case, right, this situation? A. No. I'm talking about the Ilhan Omar thing. You can't show me this stuff and then I can't talk about anything else. THE COURT: You just did. Nobody objected. THE WITNESS: Well, she just looked at you. THE COURT: I told her to give you a chance to explain what these are. You had your chance to explain." (Trial Tr. Vol. VI at 1507). (As the record reflects however, the Court did not actually say anything and she continued her relentless, improper and harassing questions).

[30]  *On Being a Happy, Healthy, and Ethical Member of an Unhappy, Unhealthy, and Unethical Profession;* Author: Patrick J. Schiltz, Vanderbilt Law Review Journal, 1999, Vol. 52 at 950.