# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-3098
_____

United States of America

*Plaintiff - Appellee*

v.

Anton Joseph Lazzaro, also known as Tony Lazzaro, also known as Tony

*Defendant - Appellant*

_____

No. 23-3411
_____

United States of America

*Plaintiff - Appellee*

v.

Anton Joseph Lazzaro, also known as Tony

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 24, 2024
Filed: February 25, 2025

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

A jury convicted Anton "Tony" Lazzaro of sex trafficking of minors and conspiring to do the same. Lazzaro appeals after the district court[1] denied his various motions. He argues that the federal sex trafficking statute is unconstitutionally vague; that the evidence is legally insufficient to sustain his convictions; that he should have been permitted to introduce evidence of the age of consent under state law; and that his trial was infected with prosecutorial and juror misconduct. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

"We recite the facts in the light most favorable to the jury's verdict." United States v. Galloway, 917 F.3d 631, 632 (8th Cir. 2019) (citation omitted). In May 2020, Lazzaro was 29 years old and living in a condominium in downtown Minneapolis. Through "SeekingArrangement.com,"[2] he met 18-year-old Gisela Castro Medina. He messaged Castro Medina and offered to pay her and her friend, G.L., for a photograph of their faces. Medina and G.L. agreed. The next day, Lazzaro asked Castro Medina to meet him. When asked if G.L. could join, Lazzaro said it was perfectly fine, even though G.L. was only 16 years old. So, Lazzaro ordered a car to bring both G.L. and Castro Medina to his condo.

_____

[1]The Honorable Patrick J. Schiltz, Chief Judge, United States District Court for the District of Minnesota.

[2]Following a rebrand, the website is now known as "Seeking.com," though the services remain the same: connecting individuals looking to engage in "sugar dating." As explained at trial, "sugar dating" refers to an older man—a "sugar daddy"—gifting a younger woman money or expensive items in exchange for dates or sex.

-2-

Once they arrived, Lazzaro gave them alcohol, though he did not drink any himself. He spoke with them about their struggles with abuse and drug addiction while Castro Medina and G.L. continued drinking. As they got drunk, Lazzaro displayed a wad of cash. He offered to pay them if they would kiss each other or undress. Though Castro Medina and G.L. declined to kiss, they took off their clothes. Then, Lazzaro took G.L. to his bedroom and had sex with her. A short time later, G.L. came out and told Castro Medina that it was her turn, so Castro Medina had sex with Lazzaro as well. Lazzaro then paid them both, ordered them food, and called a car to take them away.

A couple of days later, Lazzaro again ordered a car to bring Castro Medina and G.L. to his apartment. This encounter proceeded in much the same way as the first. Lazzaro gave Castro Medina and G.L. alcohol until they were drunk. He offered them money to kiss each other, though this time they agreed to do so. After again having sex with both G.L. and Castro Medina, Lazzaro once again paid them and ordered them food, and they left his apartment. At this meeting, however, Lazzaro also approached Castro Medina with a different request. He wanted her to be, in his words, his "recruiter." As Lazzaro's recruiter, Castro Medina would message girls on his behalf, and she would get paid to do so. Lazzaro told Castro Medina what he wanted: "younger girls" between 16 and 18—with a preference for the former—who were "broken girls, sluts, [and] whores." Though Castro Medina initially refused, at another meeting later that month, she eventually agreed.

Throughout this time, G.L. continued to visit Lazzaro's condo alone. Though she could not remember the exact number, G.L. visited multiple times, each time having sex with Lazzaro and getting paid afterwards. G.L. had no doubt that Lazzaro was paying her for sex, and she would not have continued if Lazzaro stopped paying her. Each time he paid G.L., however, Lazzaro would give her two envelopes of cash: one for her and one for Castro Medina. Over time, Lazzaro began putting less money in G.L.'s envelope and more in Castro Medina's. G.L. soon voiced her displeasure and refused to continue visiting Lazzaro.

-3-

Despite G.L.'s decision, Lazzaro's relationship with Castro Medina continued. In the months that followed, Castro Medina helped find more girls for Lazzaro. The interactions followed a similar pattern. Lazzaro or Castro Medina would identify young girls through social media. Then Castro Medina or someone acting on her behalf would reach out, asking if the girls wanted a "sugar daddy" and offering to put them in touch with Lazzaro. Often, the girls would be told how Lazzaro could get them alcohol or whatever else they wanted, and how he would pay for their time. They would receive photos of money and alcohol, or photos of Lazzaro with celebrities. The girls would then be put in touch with Lazzaro, who would talk with them through social media. Eventually, the girls would arrive at Lazzaro's condo, where he would ply them with drugs or alcohol, while remaining sober himself. He would offer them money to remove their clothes, pose for photos, or kiss each other. Lazzaro would then have sex with the girls in his bedroom. After he was finished, Lazzaro would give the girls money or other expensive items, and each time, Castro Medina would get a cut for her help arranging the meeting.

To be sure, not every encounter was identical. In one instance, Lazzaro met the victim, 16-year-old E.L., when she came to his apartment with her 18-year-old sister and a 17-year-old friend. Though E.L. did not have sex with Lazzaro that night, she returned a few weeks later with her sister and another friend, then 18 years old. In his apartment, Lazzaro brought all three of them to his bedroom, where he lined them up naked and face down on his bed. He took a photo of them, which he shared with Castro Medina. Then, Lazzaro offered E.L., her sister, and their friend $400 each to have sex with him. They agreed, and Lazzaro had sex with all three, "one by one." When the friend became uncomfortable and started to leave, Lazzaro said, "[I]f you're not going to stay, you're not going to get paid." She left, and true to his word, Lazzaro did not pay her.

Lazzaro did not always meet the girls for the first time at his condo, either. Lazzaro first met 16-year-old E.P. in person at the Mall of America, where he purchased her a Prada bag. Though E.P. declined to return to his condo that day, her friend S.G.—also 16 years old—became envious of the bag and reached out to

-4-

Lazzaro herself. When Lazzaro invited S.G. to his condo, she shared the invitation with E.P., who agreed to come along. Lazzaro offered E.P. and S.G. alcohol, and though they declined to drink, they both had sex with Lazzaro. Later that month, E.P. returned to Lazzaro's condo alone. This time, however, E.P. and Lazzaro knew "what [she] was there for," so they skipped the usual introductory practices and moved quickly to the bedroom to have sex. Separately, S.G. also returned to Lazzaro's condo alone, where she had sex with Lazzaro and was paid afterwards.

Nor did Lazzaro always order a car. 15-year-old E.R.[3] twice traveled to his apartment in a car that Lazzaro ordered for her. For a later encounter, however, Lazzaro himself drove to pick up E.R. in his Ferrari. During this encounter, E.R. became so drunk that Lazzaro let her stay the night, driving her home the next morning in his Cadillac.

There were other differences. The acts leading up to sex varied. Sometimes he had the girls play-fight in a sexual manner. Other times he had them dance in lingerie or play sexual truth-or-dare. The alcohol differed, too. He gave them champagne, or vodka, or shots of grain alcohol, or schnapps. After he was done having sex with them, Lazzaro gave some girls emergency contraceptives. In addition to cash, some girls received vape pens, or a new iPhone, or cosmetics.

Whatever these differences, many things remained the same. Lazzaro used Castro Medina to identify potential matches—most often underage girls—and to make the initial introduction. He used his condo to meet the girls and have sex with them. He always paid the girls afterwards, and he always paid Castro Medina for her assistance.

In August 2021, a grand jury indicted Lazzaro and Castro Medina on six counts: one count of conspiring to commit sex trafficking of minors, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c) and 1594(c), and five counts of sex

---

[3]E.R. told Lazzaro that she was 16, not 15.

Appellate Case: 23-3098   Page: 5   Date Filed: 02/25/2025 Entry ID: 5489076

trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c), 1594(a), and 2.[4]  Castro Medina pled guilty to the conspiracy count and one count of obstruction, and she agreed to cooperate with the Government's investigation and testify against Lazzaro.  The grand jury then returned a superseding indictment charging Lazzaro with those same six counts.[5]  Though initially limited to three counts, Lazzaro eventually moved to dismiss all counts of the indictment, arguing that § 1591 was unconstitutionally vague both facially and as applied to him.  The district court denied the motion as premature, noting that Lazzaro's vagueness claim rested on the facts specific to his charges, which needed to be further developed at trial.

The Government moved in limine to exclude evidence of the minors' purported consent and Minnesota's age of consent law as irrelevant under Federal Rule of Evidence 401 and confusing or misleading under Rule 403.  According to the Government, state law was not relevant to whether Lazzaro violated 18 U.S.C. § 1591, and consent was neither an element of sex trafficking nor a valid defense.  The district court granted the motion in part.  The district court prohibited Lazzaro from arguing that he had not violated § 1591 if the victims consented, and it barred any evidence of the age of consent under Minnesota law because the state age of consent had no bearing on whether Lazzaro violated § 1591.  But the court prohibited the Government from implying Lazzaro's guilt based only on the fact that he had sex with 16-year-olds, and it further permitted Lazzaro to introduce "evidence of what happened" during the interactions, including "evidence of consent."

---

[4]The original indictment also charged Lazzaro with one count of attempted sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c) and 1594(a), and two counts of sex trafficking obstruction, in violation of 18 U.S.C. § 1591(d), and included an additional count of sex trafficking obstruction against both Lazzaro and Castro Medina.

[5]The superseding indictment dropped the attempted sex trafficking and two of the obstruction counts, leaving one sex trafficking obstruction charge.  The district court dismissed that remaining count on the Government's motion before trial.

The case proceeded to trial. In its opening statement, the Government articulated its theory of the case and previewed the evidence it intended to introduce. Five times, the Government referred to Lazzaro's victims as "underage." After the Government concluded, Lazzaro objected and moved for a mistrial, arguing that the references improperly suggested that sex with underage girls is itself a federal crime. Though the district court agreed that the term might confuse the jury about the relevance of consent, it denied Lazzaro's motion for a mistrial. Instead, the district court issued a curative instruction, informing the jury that, without more, "it is not a violation of federal law for an adult to have consensual sex with a 16-year-old." Further, it advised the Government to instead refer to the girls as "minors" or "under 18," and the Government agreed to do so.

The Government called Castro Medina as a witness. She testified to her relationship with Lazzaro and her role in recruiting minor girls for him. In one exchange, she discussed a photo Lazzaro had sent to her and G.L. after their first meeting. The photograph—a selfie of Lazzaro with no shirt, wearing Minnesota Vikings-branded underwear, and holding wads of cash—was accompanied by a message: "I don't fuck around." According to Castro Medina, this meant Lazzaro was willing to "pay up" for sex. Lazzaro did not object to the Government's questions or Castro Medina's answers.[6]

The Government called several other witnesses, including the minor victims, members of law enforcement, and a developmental and forensic pediatrician. After the Government rested, Lazzaro moved for a judgment of acquittal, arguing that the evidence was insufficient to prove all of the elements of the charges beyond a

---

[6]Lazzaro did object to the introduction of the photograph for lack of foundation on the basis that the photograph was reproduced by an intelligence software and, at that point, the Government had not called a witness to testify to the software's reproduction process. The district court overruled that objection, noting that the Government intended to call such a witness and, in any event, Castro Medina already testified that she received the text messages and photograph. Lazzaro did not object to the photograph on any other basis.

reasonable doubt.  The district court denied the motion, and Lazzaro proceeded to present his defense.  In addition to calling five witnesses of his own, Lazzaro elected to testify in his own defense.  He admitted to having sex with each of the minor victims and to giving them money or other expensive items.  According to Lazzaro, however, the money and items he gave to the girls were not payment for sex, just "gifts that they asked for."  Though he admitted asking Castro Medina to "hook [him] up" with girls, he stressed that he never asked her to be his "recruiter."  At the close of his evidence, Lazzaro once again moved for judgment of acquittal.  The district court denied the motion and the parties made their closing arguments.

During its closing, the Government twice referred to Lazzaro as a "predator" and his minor victims as his "prey."  The Government also commented on Castro Medina, stating that while she admitted her conduct was "disgusting" and "horrible," she was "unshakeable up on th[e] witness stand" and "testified truthfully."  In contrast, the Government asserted that Lazzaro was "wildly untruthful," as his testimony was "absurd" and "self-serving."  Lazzaro never objected.  The case was submitted to the jury, which found Lazzaro guilty on all counts.

After trial, Lazzaro renewed his vagueness challenge to 18 U.S.C. § 1591, but the district court concluded the statute was not void for vagueness.  The court held that the statute gave adequate notice that Lazzaro's conduct was prohibited and that the statute did not lend itself to arbitrary enforcement.  Thus, the district court denied Lazzaro's motion to dismiss.

The day before he was scheduled to be sentenced, and over four months after the jury rendered its verdict, Lazzaro filed a motion for a new trial, asserting that the jurors had been dishonest when answering questions during voir dire and that the Government had engaged in prosecutorial misconduct.  The court withheld its decision and sentenced Lazzaro to 252 months' imprisonment.

Several weeks later, after further briefing by the parties, the district court addressed Lazzaro's motion for a new trial.  After trial, Lazzaro had retained an

-8-

investigation firm to determine if the jurors had been truthful during voir dire. According to Lazzaro, the investigation discovered that five seated jurors allegedly concealed or were otherwise dishonest about material information. One juror (Juror 34) failed to disclose family members who were victims of sexual assault and worked for sexual assault advocacy organizations. Another (Juror 45) failed to disclose that that she was a supporter of the #MeToo movement; that her daughter was the subject of various criminal cases in Minnesota; and that her sister had a criminal history. After the trial, this same juror posted on social media that she "was one of the lucky 12 to be picked" for the case. According to Lazzaro, other jurors had similar non-disclosures: family members who volunteered with sexual assault victims, served in law enforcement, or had criminal records.

Separately, Lazzaro asserted that the Government engaged in misconduct by misrepresenting the "actual context of the communications" surrounding the photograph he sent to G.L. and Castro Medina. He claimed that he only became aware of the "true context" after receiving both the photograph and accompanying text messages in a single display. Lazzaro acknowledged, however, that he received both the photograph and text messages during discovery, and he further acknowledged that he was the person who sent both the photograph and the text messages. All the same, Lazzaro argued that the purported misrepresentation constituted prejudicial misconduct by the Government.

The district court denied the motion. First, it noted that Lazzaro's motion was filed more than 14 days after the jury rendered its verdict, making it untimely unless it was based on "newly discovered evidence." Because the district court found that the evidence raised in the motion was available and discoverable through due diligence before and during trial, it denied the entire motion as untimely.

Even assuming timeliness, the district court went on to deny Lazzaro's motion on the merits. As to the alleged juror misconduct, the district court noted that none of the jurors were asked questions that might have disclosed any of the alleged dishonesty. Further, all the jurors affirmed their ability to render their verdict fairly

and impartially, and none of the evidence discovered in the post-trial investigation undermined those assurances.  As to the prosecutorial misconduct claim, the district court noted that Lazzaro had the photograph and accompanying text messages before trial and that he was given the opportunity to argue his theory of the photograph to the jury.

Lazzaro now appeals, raising multiple points of error.  He argues that 18 U.S.C. § 1591 is unconstitutionally vague as applied to his conduct; that the evidence was insufficient to prove that he violated § 1591; that he should have been permitted to refer to the age of consent under Minnesota law; that his trial was infected with prosecutorial misconduct; and that he is entitled to a new trial based on juror misconduct.  We address each point in turn.

## II.

Lazzaro first argues that 18 U.S.C. § 1591 is unconstitutionally vague.  "We review de novo whether a penal statute . . . is void for vagueness under the Fifth Amendment."  United States v. Birbragher, 603 F.3d 478, 484 (8th Cir. 2010).

"The Fifth Amendment guarantees every citizen the right to due process.  Stemming from this guarantee is the concept that vague statutes are void."  United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002).  A vague statute is one that "'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or . . . 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  United States v. Cook, 782 F.3d 983, 987 (8th Cir. 2015) (quoting Holder v. Humanitarian L. Project, 561 U.S. 1, 18 (2010)).  A defendant bringing a vagueness challenge must demonstrate that the statute is vague as applied to his particular conduct, "for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  Id. (alteration in original) (quoting Holder, 561 U.S. at 18-19).

-10-

As relevant here, § 1591(a) has two elements: A defendant must knowingly "recruit[], entice[], harbor[], transport[], provide[], obtain[], advertise[], maintain[], patronize[], or solicit[] by any means a person," and the defendant must do so with knowledge, or with reckless disregard for the fact, that the victim is under 18 years old and "will be caused" to engage in a "commercial sex act."[7]  See 18 U.S.C. § 1591(a)(1).  According to Lazzaro, this statute fails to provide adequate notice and lends itself to arbitrary enforcement.  He is wrong on both points.

A.

First, the statute provides adequate notice of the conduct it covers.  It prohibits knowingly recruiting, enticing, transporting, obtaining, or soliciting another person by any means.  18 U.S.C. § 1591(a)(1).  While these acts are not specifically defined, Congress is "not required to define every term in a statute."  Adam & Eve Jonesboro, LLC v. Perrin, 933 F.3d 951, 958 (8th Cir. 2019).  Rather, the terms of a statute are given their ordinary meaning.  Id.

A person of ordinary intelligence would know that the statute covers Lazzaro's conduct.  For example, a person "transports" something when they "transfer or convey" that thing "from one place to another."  Transport, Merriam-Webster's Collegiate Dictionary 1330 (11th ed. 2020); see also Sacramento Nav. Co. v. Salz, 273 U.S. 326, 329 (1927) ("To transport means to convey or carry from one place to another."); Muscarello v. United States, 524 U.S. 125, 134 (1911) (noting that "transport" does not necessarily imply "personal agency [or] some degree of possession").  An ordinary person would know that driving a person somewhere, or paying for cars to do so, fits that definition.  Indeed, Lazzaro admitted as much on cross examination at trial.  So too would a person of ordinary intelligence know that Lazzaro "recruited" the girls when he used Castro Medina to identify, contact, and persuade them to meet with him.  See Recruit, Merriam-

_____

[7]A "commercial sex act" is a sex act "on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

-11-

Webster's Collegiate Dictionary 1041 (11th ed. 2020) (defining "recruit" as "to secure the services of" and "to seek to enroll").  Again, Lazzaro himself used the term to describe Castro Medina's role—his "recruiter."

The same goes for the other acts in subsection (a)(1).  A person of ordinary intelligence would know that Lazzaro "enticed" his victims by displaying photographs of himself with expensive items and celebrities.  See Entice, Merriam-Webster's Collegiate Dictionary 417 (11th ed. 2020) (defining "entice" as "to attract artfully or adroitly or by arousing hope or desire"); United States v. Flechs, 98 F.4th 1235, 1243 (10th Cir. 2024) ("[T]o entice is to draw on by arousing hope or desire." (citation omitted)).  So too can a person of ordinary intelligence discern the scope of other acts listed, like "solicit," see Solicit, Merriam-Webster's Collegiate Dictionary 1187 (defining "solicit" as "to approach with a request or plea" or "to proposition . . . as or in the character of a prostitute"); Wisc. Dep't of Revenue v. William Wrigley, Jr. Co., 505 U.S. 214, 223 (1992) ("'Solicitation,' commonly understood, means '[a]sking' for, or 'enticing' to, something." (alteration in original) (citation omitted)); or "obtain," see Obtain, Black's Law Dictionary (12th ed. 2024) ("To bring into one's own possession; to procure."); see also United States v. Jungers, 702 F.3d 1066, 1076 (8th Cir. 2013) (rejecting sufficiency challenge where defendant attempted to "obtain" a minor by attempting to get the minor "alone . . . in a room").

Similarly, § 1591(a)'s second element applies to defendants who commit such acts knowing that a person under the age of 18 "will be caused" to engage in a commercial sex act.  Again, the statute does not define the phrase, but the same analysis applies.  A person of ordinary intelligence would know that flaunting cash and valuables to minors, plying those minors with alcohol and drugs, and paying them in cash or valuables after sex could "cause" those minors to engage in a commercial sex act.  Moreover, that a defendant must intend certain consequences further undermines Lazzaro's arguments.  Section 1591(a) requires proof that a defendant "mean[t] to 'cause' the minor to engage in commercial sex acts." United States v. Paul, 885 F.3d 1099, 1103 (8th Cir. 2018) (citation omitted).  That state of

-12-

mind narrows the statute's application considerably yet still sweeps in Lazzaro's conduct here. See United States v. Williams, 553 U.S. 285, 306 (2008) (noting that "[w]hether someone . . . had an intent is a true-or-false determination"). Taken together, neither element leaves doubt about § 1591's scope, and a person of ordinary intelligence would know that it covers Lazzaro's conduct.

B.

Second, § 1591 does not lend itself to arbitrary enforcement. Vagueness concerns arise when statutory text "permit[s] 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" Birbragher, 603 F.3d at 489 (second alteration in original) (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)). That normally requires "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." Williams, 553 U.S. at 306. In contrast, that "someone held a belief or had an intent" is an objective fact which presents a binary choice: Either the defendant held that intent or did not. Id. Statutes including such binary choices do not present vagueness concerns, as these mens rea requirements substantially "narrow[] the [statute's] scope . . . and limit[] prosecutorial discretion." United States v. Carlson, 810 F.3d 544, 550-51 (8th Cir. 2016) (quoting McFadden v. United States, 576 U.S. 186, 197 (2015)).

Section 1591(a) is such a statute. In addition to proving the knowing commission of a prohibited act under subsection (a)(1), the Government must also prove that the defendant took those actions intending to cause the victims to engage in commercial sex. See Paul, 885 F.3d at 1103. Whether Lazzaro possessed that intent "is a true-or-false determination," one passed upon by courts and juries every day. Williams, 553 U.S. at 306. A statute that ties culpability to such objective facts does not lend itself to arbitrary enforcement. See Birbragher, 603 F.3d at 489.

-13-

C.

Lazzaro's counterarguments are unconvincing.  He asserts that the first element of § 1591 "provides nothing whatsoever that might have alerted him that his conduct could be construed as criminal."  As already discussed, however, ordinary people can readily discern § 1591's scope, which extends to Lazzaro's conduct here.  Next, he asserts that the statute's terms "describe perfectly ordinary, lawful conduct that does nothing to provide sufficient notice of what is prohibited."  This misses the point.  Whether the law prohibits conduct that is not malum in se does not impact whether the law adequately describes its prohibition.  See, e.g., Slavin v. United States, 403 F.3d 522, 523-24 (8th Cir. 2005) (per curiam) (rejecting vagueness challenge to prohibition of the "knowing transportation of birds . . . for purposes of having the birds participate in a fighting venture, regardless whether the fight would be legal in the state where it was to occur").  That driving a minor across the city might be perfectly lawful in and of itself has no bearing on whether § 1591 prohibits that conduct when the defendant does so to facilitate commercial sex with that minor.

Lazzaro also suggests that the district court's jury instructions impermissibly broadened § 1591 to the point of vagueness.  Referencing statements by individual legislators, he claims that Congress intended § 1591 to apply only to individuals who "control" minors into engaging in commercial sex.  That argument is misplaced.  Apart from the fact that § 1591 says nothing about control when it comes to sex trafficking minors, see United States v. Biancofiori, 94 F.4th 651, 653 (7th Cir. 2024) (noting that, under 18 U.S.C. § 1591(a), "trafficking of a minor [is] an alternative to trafficking of 'a person' by 'force, threats of force, fraud, coercion . . . or any combination of such means'" (second alteration in original) (citation omitted)), generalized notions of Congressional intent do not impact the standard of conduct outlined in the text of the statute, regardless of the statements of individual legislators.  Id. at 654 (noting that a legislator's statement that "does not match the enacted statute . . . does not render invalid an enacted text whose meaning is ascertainable").

-14-

Lazzaro argues that applying the statute to his conduct opens a host of concerns for other, innocent dating patterns. He points to the definition of "commercial sex act" in 18 U.S.C. § 1591(e)(3), asserting that the phrase "anything of value" could cover "vast swaths of legal, consensual, non-commercial sexual activity." True, "commercial sex act" is extremely broad. See Cook, 782 F.3d at 988. That is not sufficient, however, to make the statute unconstitutionally vague. The statute must instead fail to give a person of ordinary intelligence fair notice of what it covers, or it must be liable to arbitrary enforcement based on subjective standards. Id. at 987. Neither is true here. A person of ordinary intelligence would know that Lazzaro's conduct falls within § 1591's prohibition, and the statute does not rest on "wholly subjective standards." See Williams, 553 U.S. at 306. Whatever uncertainties might exist at the margins, hypothetical vagueness is not enough. Cook, 782 F.3d at 987. Lazzaro must instead demonstrate that § 1591 "is vague as applied to the particular facts" of his case. Id. (citation omitted). He has not done so. Accordingly, § 1591 is not vague as applied to Lazzaro.

III.

Lazzaro next argues that the evidence presented at trial was insufficient to support his convictions. We review his challenge de novo, taking the evidence in the light most favorable to the verdict, accepting all reasonable inferences and resolving any conflicts in its favor. United States v. Euring, 112 F.4th 545, 555 (8th Cir. 2024). We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id.

Lazzaro knowingly had multiple sexual encounters with multiple girls under the age of 18. He arranged to meet the girls at his condominium, and he gave them alcohol, food, expensive personal items, and money. This much is undisputed. Appellant Br. 3, 5. On appeal, Lazzaro only argues[8] that there was insufficient

---

[8]Lazzaro makes no distinction between his conspiracy and substantive sex trafficking convictions. Accordingly, he appears to concede that his conspiracy conviction rises or falls with the substantive counts.

-15-

evidence to prove that he knew or recklessly disregarded the fact that his actions would cause these minor girls to engage in commercial sex acts: "sex acts, on account of which anything of value is given to or received by any person." See 18 U.S.C. § 1591(e)(3). We disagree

Drawing all reasonable inferences in favor of the jury's verdict and viewing the evidence in the light most favorable to the Government, Jungers, 702 F.3d at 1075, the evidence was more than sufficient to prove that Lazzaro intended and knew that each of the minor victims would be caused to engage in commercial sex. Lazzaro followed a consistent pattern. With Castro Medina's help, he would identify and recruit young women by glamorizing "sugar dating"—a relationship by its nature transactional. He crafted messages displaying his purported wealth to entice his targets. He would offer his victims alcohol or drugs, while he remained sober. He would display large amounts of cash and offer to pay the victims if they took off their clothes, kissed, or played sexual truth-or-dare. He would then have sex with them, and he would pay the girls after sex in cash or other valuable items every time.

Lazzaro argues that there was no evidence that he ever explicitly offered anything for sex, and that he never "expressly discussed, negotiated, or considered out loud" whether he would give the victims anything. That argument fails for two reasons. First, the evidence shows that he *did* make such a statement. He explicitly offered $400 to E.L., her sister, and their friend for sex, and when the friend became uncomfortable, Lazzaro made clear that she would not get the money if she left. Second, and more fundamentally, the jury was not required to find an explicit agreement. Rather, the jury was entitled to use "reason and common sense in light of their own observations and experiences." See United States v. Owens, 966 F.3d 700, 709 (8th Cir. 2020). In particular, the jury could infer Lazzaro's state of mind "from circumstantial evidence." See Staples v. United States, 511 U.S. 600, 615 n.11 (1994). Using that common sense, a reasonable jury could infer that all of Lazzaro's repeated conduct over an eight-month span—glamorizing "sugar dating," displaying cash and other valuables beforehand, explicitly offering money for acts

-16-

of sexual foreplay, and invariably giving his victims money or valuables afterwards—demonstrated an ongoing, implicit offer to pay for sex acts.

Finally, Lazzaro asserts that, while he gave money or valuables to every girl he met with, sex acts did not always occur and thus his endeavors were "hit or miss." Whatever the truth of these statements, they are immaterial to his sufficiency challenge. The Government did not need to prove that a commercial sex act did or was virtually certain to occur. It only had to prove that Lazzaro "mean[t] to cause" the minors to engage in commercial sex acts. See Paul, 885 F.3d at 1103 (citation omitted). When coupled with the substantial evidence that Lazzaro recruited, enticed, transported, obtained, or solicited the minor girls, the proof of intent we have already described is enough to support his convictions. See id. Lazzaro argued that he lacked the necessary state of mind, in part based on his apparent generosity, but this is an argument for the jury. Our review is limited to determining whether a "reasonable jury could find all the [crime's] elements beyond a reasonable doubt." Paul, 885 F.3d at 1102 (alteration in original) (citation omitted). A reasonable jury could do so here. Accordingly, the evidence was sufficient to support Lazzaro's convictions.

IV.

Next, Lazzaro argues that the district court should have permitted him to introduce evidence of the age of consent under Minnesota law. We review the district court's evidentiary ruling for an abuse of discretion. United States v. Condon, 720 F.3d 748, 754 (8th Cir. 2013). We give "substantial deference to a trial court's exclusion of evidence under Federal Rule of Evidence 403." Id. (emphasis omitted) (citation omitted). But we pay special attention to ensure that the exclusion did not unfairly prevent Lazzaro from making his case. Id.

-17-

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. Further, relevant evidence[9] may be excluded if its probative value is substantially outweighed by the danger of, among other things, "confusing the issues" or "misleading the jury." Fed. R. Evid. 403. Evidence is likely to confuse the issues "if admission of the evidence would lead to litigation of collateral issues." Condon, 720 F.3d at 755 (citation omitted).

Lazzaro argues that he should have been permitted to reference Minnesota law because it was relevant to his "good faith . . . attempt[s] to conform his conduct to what the law explicitly permitted." Even assuming Minnesota's age of consent bore some relevance to Lazzaro's case, its probative value was "substantially outweighed" by a risk of confusing the issues or misleading the jury. See Fed. R. Evid. 403. Lazzaro was charged with violating the federal sex trafficking statute. Reference to whether he complied or attempted to comply with Minnesota law would only confuse the issues. He was charged with violating § 1591, and the relevant age under that statute is 18, regardless of what state law permits. See United States v. Antelope, 430 U.S. 641, 648-49 (1977) (noting that, where federal law applies, it does so "regardless of the laws of States with respect to the same subject").

Nor is there any indication that the exclusion "unfairly prevent[ed]" Lazzaro from presenting a complete defense. See Condon, 720 F.3d at 756. It is true that excluding evidence might "deprive[ a defendant] of his fundamental constitutional right to a fair opportunity to present a defense," Crane v. Kentucky, 476 U.S. 683, 687 (1986), but that is not what happened here. Nothing from the district court's ruling prevented Lazzaro from putting the Government to its burden at trial, nor would the age of consent "provide a defense for the crime" or "go to any element of the offense." See United States v. Elbert, 561 F.3d 771, 777 (8th Cir. 2009). Lazzaro's asserted purpose—to show his alleged "good faith" attempts to abide by the law—was not foreclosed by the district court's ruling. He argued to the jury that

---

[9]Evidence is relevant if it makes a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401.

-18-

he did not engage in commercial sex and that the money and things of value were just evidence that he was a "generous guy." That the jury rejected this argument does not mean that Lazzaro was deprived of his ability to present a complete defense. Accordingly, the district court did not abuse its discretion by precluding reference to Minnesota's age of consent.[10]

V.

Lazzaro next argues that he was entitled to mistrial—and a new trial under Rule 33—due to prosecutorial misconduct. We review the district court's denial of both a mistrial and a post-trial Rule 33 motion for abuse of discretion. United States v. Thao, 76 F.4th 773, 779 (8th Cir. 2023); United States v. Boesen, 599 F.3d 874, 876 (8th Cir. 2010). When a defendant fails to raise the claims in the district court, however, those "unpreserved allegations of prosecutorial misconduct" are reviewed for plain error. United States v. Foreman, 588 F.3d 1159, 1164 (8th Cir. 2009). "Accordingly, [w]e will only reverse under exceptional circumstances." United States v. Redd, 81 F.4th 822, 831 (8th Cir. 2023) (alteration in original) (citation omitted).

Lazzaro focuses on the Government using the word "underage" when referring to his victims, introducing the photograph of Lazzaro meant to convey his willingness to pay for sex, referring to Lazzaro as a "predator," vouching for Castro Medina as having testified "truthfully," and attacking Lazzaro's testimony as "wildly untruthful." But Lazzaro only objected to and moved for a mistrial based on the "underage" comments, and he moved for a new trial based on the photograph

---

[10]Lazzaro argues that he should have been permitted to introduce the evidence to "defend himself from the improper prosecutorial arguments that sex with all minors [is] a crime." To the extent that point is even relevant here, the district court counseled the jury that having sex with a 16-year-old girl was not, by itself, a violation of federal law. These types of cautionary instructions are usually sufficient to dispel any prejudice. See United States v. Davidson, 122 F.3d 531, 538 (8th Cir. 1997).

-19-

some four months after the jury's verdict.  Accordingly, though we examine "the cumulative effect of [any] improprieties," United States v. Cameron, 99 F.4th 432, 437 (8th Cir. 2024), the latter three arguments are reviewed for plain error.  See Foreman, 588 F.3d at 1164.

A.

For the allegations of prosecutorial misconduct based on the reference to Lazzaro as a "predator," the comments on Castro Medina's truthfulness, and the attacks on Lazzaro's lack thereof, Lazzaro neither objected at trial nor filed any post-trial motions for relief.[11]  Thus, reviewing for plain error, we will reverse only if the district court committed a clear or obvious error that affected Lazzaro's substantial rights and "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings."  See United States v. Troyer, 677 F.3d 356, 359 (8th Cir. 2012) (citing United States v. Olano, 507 U.S. 725, 732 (1993)).  Under this standard, Lazzaro "must therefore demonstrate a 'reasonable probability that the outcome would have been different absent the alleged error.'"  See United States v. Darden, 688 F.3d 382, 390 (8th Cir. 2012) (citation omitted).  Considering the record as a whole, we conclude Lazzaro cannot meet this standard.  Even assuming the Government made improper arguments in closing, it presented a wealth of evidence at trial, as already recounted.  Because that evidence "indicates that the result at trial would not have been different," id., the district court did not plainly err in denying Lazzaro a new trial on these grounds.

---

[11]Lazzaro also raised some of these arguments in a pro se letter more than two months after the verdict.  Even if we were to treat that letter as a motion for a new trial, see Lamar v. Payne, 111 F.4th 902, 907 n.2 (8th Cir. 2024) (noting that pro se filings are liberally construed), the outcome would not differ, as Lazzaro knew or could have discovered the alleged misconduct well before the 14-day deadline under Federal Rule of Criminal Procedure 33(b)(2).  See United States v. Delgrosso, 852 F.3d 821, 827 (8th Cir. 2017).

-20-

B.

Though Lazzaro did not object to the introduction of the photograph or the Government's related questioning, he did raise the alleged misrepresentation of the photograph's context as a basis for his post-trial Rule 33 motion.  As a threshold matter, however, the district court denied Lazzaro's motion as untimely, a conclusion we review de novo.  See Boesen, 599 F.3d at 876.  A defendant may move for a new trial within 3 years of the jury's verdict so long as that motion is "grounded on newly discovered evidence."  Fed. R. Crim. P. 33(b)(1).  When the motion rests on other grounds, however, it must be filed within 14 days after the verdict.  Fed. R. Crim. P. 33(b)(2).  Because Lazzaro filed his motion almost four months after that deadline,[12] his motion must rest on newly discovered evidence to be timely.

Evidence is not newly discovered when "the evidence could have been discovered earlier in the exercise of due diligence."  United States v. Bell, 761 F.3d 900, 911 (8th Cir. 2014) (citation omitted).  Thus, where the factual basis for the motion existed, and ordinary diligence could have uncovered it, that evidence is not "newly discovered."  Id.  Here, Lazzaro's claim of prosecutorial misconduct based on the photograph rests entirely on evidence that was actually known to him, easily discoverable through ordinary diligence.  Lazzaro would have known about the photograph and text messages when he sent them.  The Government also supplied Lazzaro with both during discovery and introduced them at trial.  At the very latest, Lazzaro became aware of the photograph and its context when he was cross-examined about it.  The fact that he knew the evidence existed demonstrates his motion's tardiness.  See Delgrosso, 852 F.3d at 827 (8th Cir. 2017) (denying motion

_____

[12]Once again, Lazzaro raised this purported misrepresentation in another pro se letter to the district court a month before his motion for a new trial.  To the extent that filing was intended as a motion for a new trial, see Payne, 111 F.4th at 907 n.2, it was untimely under Rule 33(b)(2), as the letter was filed more than three months after the jury rendered its verdict.

-21-

for new trial based on prosecutorial misconduct as untimely where defendant "was aware of [the Government's] alleged misconduct during the trial").

Lazzaro claims that he could not have known the "actual context" of the photograph until after trial because the discovery software did not display "the images and the texts together in context." This claim is meritless. Even assuming he was unaware of the "actual context" until this point, "Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available." See Bell, 761 F.3d at 911 (citation omitted). Lazzaro had the evidence well before the 14-day deadline under Rule 33(b)(2). That he now wishes to present that photograph in a different light does not make it "newly discovered." Accord United States v. Wiese, 750 F.2d 674, 678 (8th Cir. 1984) (finding no abuse of discretion in refusal to grant mistrial based on evidence that "existed and was known to [defendant]'s trial counsel at the time of trial"). Accordingly, this claim of prosecutorial misconduct was untimely, and the district court did not err in denying the motion on that basis.

C.

In contrast to his other claims of prosecutorial misconduct, Lazzaro timely objected to and moved for a mistrial based on the Government's use of the term "underage" during its opening statement. Thus, we review for abuse of discretion, see Thao, 76 F.4th at 779, and Lazzaro must show "both that the prosecutor's remarks were improper and that the remarks prejudiced his right to a fair trial." United States v. Patterson, 68 F.4th 402, 419 (8th Cir. 2023). In assessing prejudice, we examine the cumulative effect of any misconduct, the strength of the evidence, and any curative action taken by the court in response to the impropriety. Cameron, 99 F.4th at 437.

Applying that standard here, the district court did not abuse its discretion when it denied Lazzaro's motion for a mistrial after the Government's opening statement. Any potential prejudice was adequately dispelled when the district court

-22-

immediately cautioned the jury that having sex with minors is not, by itself, a violation of federal law. Usually, these types of cautionary instructions "remedy any potential prejudice" resulting from improper remarks by the Government. Thao, 76 F.4th at 780. We see no reason to depart from that general rule here. Accordingly, the district court did not abuse its discretion when it denied Lazzaro's motion for a mistrial based on the references to his victims as "underage."

## VI.

Finally, Lazzaro also argues that the district court should have granted him a new trial based on purported juror misconduct. On appeal, Lazzaro points to two jurors: Juror 34 and Juror 45.[13] We review the denial of a motion for a new trial based on alleged juror misconduct for an abuse of discretion, while juror honesty and bias are factual issues reviewed for clear error. United States v. Sledge, 108 F.4th 659, 671 (8th Cir. 2024).

## A.

As already noted, the district court denied Lazzaro's motion as untimely. Because Lazzaro filed his motion well after the 14-day deadline under Rule 33(b)(2), Lazzaro's motion must be based on newly discovered evidence of juror misconduct. See Fed. R. Crim. P. 33(b). "[E]vidence [that] could have been discovered earlier in the exercise of due diligence" does not fit that description. Bell, 761 F.3d at 911 (citation omitted). The district court held that Lazzaro's evidence was not newly discovered. We agree.

Here, the bulk of Lazzaro's claims focus on facts that were in existence at the time of jury selection. That Juror 34 had extended family members who were victims of sexual assault, or worked for a sexual assault advocacy group, were facts

---

[13]Lazzaro focuses his argument on appeal on Juror 34 and Juror 45. To the extent he intends to renew his arguments concerning other jurors, those claims fail for the same reasons as those he explicitly renews here.

then in existence. So too were most of Juror 45's alleged faults. Her support for the #MeToo movement and her daughter's criminal history existed at the time of voir dire and throughout trial.

Lazzaro claims the jurors concealed these facts, thus causing "his 'right to a peremptory challenge [to be] prejudicially impaired.'" But he discovered this information through the exercise of ordinary diligence, and there is no reason that he could not have used that same diligence to discover those same facts before or during trial. Lazzaro has no response to these points. Indeed, he did not even address the timeliness issue on appeal. Accordingly, we agree with the district court that the bulk of his Rule 33 motion was based on evidence that was not "newly discovered." The district court did not err in denying the motion on that basis.

B.

There is, however, one piece of evidence that was "newly discovered" within the meaning of the rule: Juror 45's social media post stating that she "was one of the lucky 12 to be picked for the Anton Lazzaro federal child sex trafficking case." This evidence is certainly "newly discovered," as even the exercise of ordinary diligence could not have uncovered the social media post before it was made. According to Lazzaro, the post is just further evidence of Juror 45's "strident support for the '#MeToo movement,'" something Lazzaro claims was improperly concealed during voir dire.[14] He asserts that Juror 45's affirmation that she could remain impartial was thus false.

To prevail on his claim, Lazzaro must show "(1) that the juror answered [a question during voir dire] dishonestly, not just inaccurately; (2) that the juror was motivated by partiality; and (3) that the true facts, if known, would have supported striking the juror for cause." See United States v. Ruiz, 446 F.3d 762, 770 (8th Cir.

---

[14]We thus assume that Lazzaro's claim of juror misconduct as to Juror 45 based on her alleged support for the #MeToo movement was timely, but we do so for the sake of argument only.

-24-

2006); see also McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (articulating the framework). The district court concluded that none of the jurors, including Juror 45, ever answered a material question dishonestly. This was not clear error. Even setting aside the fact that Juror 45 was never asked about her support for the #MeToo movement, see Sledge, 108 F.4th at 671, her assurances that she could be fair or impartial effectively doom Lazzaro's claim. See United States v. Needham, 852 F.3d 830, 839 (8th Cir. 2017) (requiring a juror to "profess his inability to be impartial" to overcome presumption of impartiality). Nothing about Juror 45's social media post suggests her affirmation was false or dishonest.

Lazzaro's focus on the social media post itself is similarly misplaced. As the district court put it, the mere fact that she stated she was "lucky" to serve on the jury does not suggest that she was biased absent some further evidence of dishonesty and impartiality. Lazzaro provides no such evidence here. See also Sledge, 108 F.4th at 671 (affirming district court finding that juror did not answer dishonestly despite, in a drug prosecution, failure to disclose family members with issues with opioids, addiction, or overdoses). Accordingly, the district court did not clearly err in concluding that Juror 45 never answered a material question dishonestly, and therefore did not abuse its discretion in denying Lazzaro's motion for a new trial.[15]

VII.

For the foregoing reasons, we affirm Lazzaro's convictions.

_____

_____

[15]For those same reasons, there was no abuse of discretion in denying Lazzaro's request for an evidentiary hearing as he "failed to carry [his] burden under the McDonough Power framework." Sledge, 108 F.4th at 672 (citation omitted).