UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-173(1) (PJS/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S RESPONSE** |
| | ) | **IN OPPOSITION TO THE** |
| v. | ) | **DEFENDANT'S SECOND** |
| | ) | **MOTION FOR A NEW TRIAL** |
| (1) ANTON JOSEPH LAZZARO | ) | |
| | ) | |
| Defendants, | ) | |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Nathan H. Nelson, Assistant United States Attorney, hereby submits its response to the defendant's second motion for a new trial in the above-captioned case, contained at docket entry 594. This response also addresses certain supplemental documents in support of the motion provided to undersigned counsel by the defendant on September 24, 2025. For the reasons stated herein, the Court should deny the motion.

## **BACKGROUND**

On April 3, 2023, a jury found the defendant guilty of conspiring to commit sex trafficking (Count 1) and five counts of sex trafficking pertaining to each of the defendant's five minor victims (Counts 2-6). ECF No. 346.

On the eve of sentencing, the defendant filed his first motion for a new trial, alleging "newly discovered evidence" of purported juror misconduct. ECF No. 448 at 1. Citing a report from a jury investigation firm, the defendant alleged that certain jurors—including Juror #45—had concealed material information during voir dire. *Id.* at 3-4. With respect to

Juror #45, the defendant argued that the juror failed to disclose: (1) her daughter's history of criminal charges, (2) her alleged "very strong anti-Trump political views," and (3) her alleged support of the #MeToo movement. *Id.* The defendant also cited Juror #45's posting after trial that she "was one of the lucky 12 to be picked for the Anton Lazzaro federal child sex trafficking case." *Id.* at 4.

After additional briefing, this Court denied the defendant's motion for a new trial as untimely. ECF No. 482 at 4-5. The Court noted that the evidence on which the defendant relied in his motion was "available before or during trial," and could have been discovered with due diligence. *Id.* at 5. Furthermore, the Court found the defendant's "objection to [Juror #45's] outspoken political opinions could have been addressed if he had asked the Court to question jurors about their political views during voir dire," but he did not. *Id.* at 7. In the alternative, the Court also denied the motion on the merits, holding the defendant failed to prove jurors answered questions dishonestly and were motivated by bias. *Id.* at 9-10.

The defendant appealed the denial of his motion for a new trial. ECF No. 491. The Court of Appeals for the Eighth Circuit affirmed, holding that most of the grounds for a new trial were untimely because the evidence on which they were based "existed at the time of voir dire and throughout trial." *United States v. Lazzaro*, 129 F.4th 514, 533 (8th Cir. 2025). The appellate court held, however, that Juror #45's post-trial social media post about being "one of the lucky 12 to be picked" for the case was newly discovered. *Id.* Because the defendant argued the "lucky 12" post was further evidence of Juror #45's support for the #MeToo movement, the court assumed for the sake of argument that the defendant's motion

was timely insofar as it was based on the juror's support for the #MeToo movement. *Id.* at

533-34 n.14. The Court then proceeded to reject the defendant's arguments about Juror #45:

> Even setting aside the fact that Juror 45 was never asked about her support for
> the #MeToo movement, her assurances that she could be fair or impartial
> effectively doom Lazzaro's claim. Nothing about Juror 45's social media post
> suggests her affirmation was false or dishonest.
>
> Lazzaro's focus on the social media post itself is similarly misplaced. As the
> district court put it, the mere fact that she stated she was "lucky" to serve on the
> jury does not suggest that she was biased absent some further evidence of
> dishonesty and impartiality [*sic*]. Lazzaro provides no such evidence here.
> Accordingly, the district court did not clearly err in concluding that Juror 45
> never answered a material question dishonestly, and therefore did not abuse its
> discretion in denying Lazzaro's motion for a new trial.

*Id.* (citations omitted).

The defendant now brings a second motion for a new trial based on Juror #45. Relying

on a handful of post-trial social media posts, the defendant once again argues Juror #45

committed misconduct by "failing to disclose her bias in favoring the testimony of females

over men, and her belief that supporters of Trump (like Mr. Lazzaro) were all 'sexual

predators' and felons."[1]  ECF No. 594, at 6.

---

[1] In a letter asserting her standing as an "interested party," the defendant's fiancée /
wife K.C. also alleges that Juror #45 was dishonest in (1) denying involvement in any type of
civil litigation, and (2) failing to disclose her alleged long-time, active membership in the
"Occupy movement."  ECF No. 597, at 1-2.  K.C. cites Federal Rule of Civil Procedure 24
in support of her attempt to intervene in this case, but "[t]here is no counterpart in the federal
rules of criminal procedure to Rule 24 of the civil rules," and courts have observed it "would
be a recipe for chaos" to allow third-party intervention in criminal cases at the district court
level.  *United States v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012).  Moreover, under Fed.
R. Crim. P. 33, the Court may only grant a new trial "[u]pon the defendant's motion," not the
motion of a third party.  Fed. R. Crim. P. 33(a).

Even if the Court were to consider K.C.'s letter, the grounds she asserts for a new trial
are nonetheless untimely.  Like the defendant's earlier rejected claims, the juror's

On September 25, 2025, counsel for the defendant also provided the government with additional documents that he intends to provide the Court in support of his new trial motion, namely, text messages that purport to show Juror #45 responding to an electronic survey in a manner the defendant alleges is inconsistent with her response to the juror questionnaire in this case.   In the interest of judicial economy, the government will respond to these additional documents as part of its present response in Section II, *infra*.

## ARGUMENT

I.  **The Court Should Deny the Defendant's Second Motion for a New Trial Because He Has Failed to Demonstrate That a Juror Was Dishonest During Voir Dire, That the Juror Was Motivated by Partiality, or That the Evidence in the Defendant's Motion Would Have Supported Striking the Juror for Cause.**

The defendant once again seeks a new trial based on alleged juror dishonesty during voir dire.   This Court should deny his motion without a hearing.

### A.    Standard for a New Trial Motion Based on Alleged Juror Dishonesty

Upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."   Fed. R. Crim. P. 33(a).   If the motion is based on "newly discovered evidence," it must be filed within 3 years after the verdict.   Fed. R. Crim. P. 33(b)(1).   Motions for a new trial based on reasons other than newly discovered evidence, however, must be filed within 14 days after the verdict.   Fed. R. Crim. P. 33(b)(2).   When,

---

involvement with civil litigation could have been discovered earlier with reasonable diligence as the civil cases cited in K.C.'s letter are a matter of public record, readily viewable through the "Minnesota Court Records Online" system.   Furthermore, K.C. provides only the conclusory assertion that the juror "is, and has long been, and active member of the Occupy movement," *see* ECF No. 597 at 2, and completely fails to explain why that alleged association could not have been discovered before/during trial with reasonable diligence.

as here, a motion for a new trial is premised on alleged juror dishonesty during voir dire, the defendant must prove: (1) the juror answered dishonestly, not merely inaccurately; (2) that she was motivated by partiality; and (3) that the true facts, if known, would have supported striking the juror for cause.   *United States v. Tucker*, 137 F.3d 1016, 1026 (8th Cir. 1998).

The defendant's second motion for a new trial is premised on essentially the same arguments as his first: that Juror #45 was dishonest during voir dire because she failed to disclose (1) her dislike for President Trump and his followers and (2) her general support for the #MeToo movement and victims of sexual abuse or harassment.   Specifically, the motion is premised on two categories of evidence:

> (1) Juror #45's social media posts between July 2024 and March 2025 expressing a strong dislike for President Trump and claiming an association between the President's "followers" and "appointees"[2] on the one hand, and sexual predation on the other, *see* Def.'s Ex. A, C, D, F-H; and

> (2) social media posts in June 2024 and August 2025 using the slogan "Believe All Women," or "believe[] women," *see* Def.'s Ex. B, E.

For the reasons discussed below, the defendant has failed to meet his required burden for both categories of evidence.

---

[2] While the defendant interprets Juror #45's social media posts as expressing opinions about all "supporters" of President Trump, *see* ECF No. 594 at 6, the juror never uses that term and instead uses the terms "followers" and "appointees," *see* Def.'s Ex. A, C.   There is a meaningful difference, however, between a politician's "followers" (which has connotations of discipleship, or could simply mean people who "follow" the politician on social media platforms) and a politician's "supporters" (which has broader connotations of anyone who votes, donates, or advocates for a politician as part of the political process).   *Compare* "Follower" *with* "Supporter," American Heritage Dictionary (5th ed. 2022).   Accordingly, this response will use the term used by the juror in her posts: "follower."

**B.     Category #1: The Juror's Social Media Posts Regarding President Trump and His "Followers"**

With respect to the first category of evidence—the juror's dislike for President Trump and her belief in an association between his followers and sexual predation—the defendant's motion fails for several reasons.

**1.     The defendant failed to explore the juror's political views during voir dire.**

As this Court has already noted, the jurors were *not* asked about their political views during voir dire, nor did the defendant request that the jurors be asked about such matters. ECF No. 482 at 7.   The defendant's failure to use the voir dire process to make any inquiry into the views he now claims are disqualifying is an independent basis to deny the defendant's motion.   The Eighth Circuit has held that a defendant cannot obtain a new trial based on newly discovered evidence unless he alleges facts "from which the court may infer diligence on the part of the movant."   *See United States v. Bishop*, 825 F.2d 1278, 1284 (8th Cir. 1987); *see also United States v. Daniele*, 931 F.2d 486, 489 (8th Cir. 1991) (evidence is not newly discovered unless the defendant shows "that a reasonably diligent pretrial investigation would not have uncovered the evidence.").   Here, while the specific social media posts on which the defendant relies were not made until after trial and thus could not have been discovered by the defendant, the views the defendant claims those posts represent certainly could have been explored and discovered during the voir dire process.   *See United States v. Bell*, 761 F.3d 900, 911 (8th Cir. 2014) (noting that the unavailability of specific documentation until after trial does not make evidence newly discovered if the "factual basis" underlying that documentation existed before trial).   The defendant should not be allowed to challenge the

6

jury's verdict almost two-and-a-half years later based on a juror's views that he made absolutely no effort to explore when he had the opportunity.

> **2.    The defendant has failed to show Juror #45 answered any voir dire question dishonestly or was motivated by partiality**

The defendant's motion should also be denied because he has failed to show that Juror #45 answered any voir dire question dishonestly or was motivated by partiality.  Because jurors were never asked about their political views during voir dire, the defendant is left only to argue that Juror #45 should nonetheless have disclosed her views regarding President Trump and his followers/appointees when asked whether there was "any reason you can think of why, if you were to be selected for the jury, you might have trouble being a fair and impartial juror."  Voir Dire Tr. 226.  The defendant, however, cannot meet his burden of demonstrating that Juror #45 was being *dishonest* in her sworn belief that she could be fair and impartial, or that she was motivated by partiality.

The defendant claims that, in a case involving a purported "prominent Republican" accused of sex trafficking minors, "it is inconceivable that Juror 45 could have been impartial" given her social media posts, and "equally incredible that her failure to disclose [her] bias was merely inadvertent."  ECF No. 594, at 6.  This speculative argument, however, requires the court to make several unwarranted assumptions from the record.

The first unwarranted assumption is that the juror's social media posts—which are about President Trump and his followers—necessarily reflected the juror's views about *the defendant* at trial.  President Trump, of course, was not on trial.  The defendant's motion for a new trial thus turns on the juror's alleged views regarding the President's followers.  While

the defendant may believe that his identity as a figure in local/state politics makes his name synonymous with that of President Trump, one of the best-known political figures in the world, it is not the defendant's self-perception that governs but the juror's. The defendant has utterly failed to demonstrate that Juror #45 would have understood him to be a "follower" of the President. Neither President Trump's name, nor the office of the presidency, was mentioned during voir dire. While some jurors admitted knowing there was some vague political dimension to the defendant's life, *see* Voir Dire Tr. 67, 139, 167, 197-98, 233; Juror #45 did not profess any such knowledge, *see id.* at 223-26. Rather, according to the juror, her only prior exposure to the case was that her son "had the news on" that morning, and the news had said the trial was starting that day. *Id.* at 224. The defendant argues that the Juror should have disclosed her views about the President's followers due to the defendant's "notoriety as a prominent Republican donor." ECF No. 594, at 6. Once again, however, there is no evidence the juror knew during voir dire that the defendant "was a prominent donor to the Minnesota Republican party."[3] ECF No. 594, at 7. Accordingly, even assuming the juror was biased against followers of the President, there is no reasonable basis to believe she

---

[3] The defendant attempts to extrapolate that, because a *different* juror (Juror #37) knew he was a donor to the Minnesota Republican party, Juror #45 must have known as well. *See* Voir Dire Tr. 188-90. But unlike Juror #45, who had only overheard something on the news that morning about the beginning of jury selection, Juror #37 had seen the case "mentioned in the paper and on the news and stuff like that." *Id.* There is no basis in the record to assume their knowledge of the case was the same without engaging in sheer conjecture. In any case, even if Juror #45 was aware of the defendant's status as a "prominent donor to the Minnesota Republican party," the juror's social media postings do not express antipathy towards Republicans generally. Indeed, Juror #45 has explicitly stated that her dislike of the President is "not because he is a [R]epublican," but rather because of her belief that politicians are "crook[s]." ECF No. 451, at 76.

would have understood the defendant to be a follower at the time she swore she could be fair and impartial during voir dire.

Nor did the evidence at trial establish the defendant as a follower of the President. While the defendant may believe his case is inextricably intertwined with politics, the Court took great care to ensure the trial remained focused on the evidence of the defendant's sex trafficking and not any extraneous political matters.   Pretrial Conf. Tr. 8 ("I shouldn't hear anything whatsoever about vindictive or selective prosecution, any attack on the motives of the Government, anything about the political affiliations of the prosecutors, anything about the defendant's investigation of Representative Omar").   During trial, the only evidence of any connection between the defendant and the President was that the defendant had a picture of himself with the President that he used to impress his victims.   Trial Tr. 166, 346, 573, 681, 908.   While the sister of one victim briefly recounted the defendant saying that "he worked with [President Trump] in a way," the government's own cooperating witness made clear that the defendant was not friends with the President.   *Id.* at 324, 616.   In short, because the Court ensured the trial was focused on the facts of the offenses, the defendant simply cannot prove that Juror #45's alleged views about the President's followers meant she lied about her inability to be impartial about the defendant.

The second unwarranted assumption is that the juror's social media posts—the earliest of which was made well over a year *after* the verdict—reflect the juror's views at the time of the trial.   Again, without resort to sheer speculation, the defendant cannot make that showing here.   Even assuming for the sake of argument that the defendant falls within Juror #45's definition of a "follower" of President Trump, the views expressed in the juror's social media

9

posts may have been formed—at least in part—by her experience at the defendant's trial. Courts frequently distinguish between partiality developed from the evidence presented at trial and preexisting partiality from extrajudicial sources. *See Liteky v. United States*, 510 U.S. 540 (1994). For example, in addressing the issue of judicial bias, the Supreme Court has explained:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes . . . necessary to completion of the judge's task.

*Id.* at 550-51. In other words, if Juror #45 formed her views *because of* her service on the defendant's trial, those views would not and could not demonstrate she was dishonest about her ability to be impartial before the trial.[4]

The temporal element of this issue is further borne out by the fact that Juror #45's references to "sexual predators" or "felons" were made in response to events that were in the news long after the defendant's trial: (1) the arrest of W.F.G. for child sex crimes in March 2025, (2) the arrest of Minnesota Senator Justin Eichorn for attempted solicitation of a minor in March 2025, (3) the nomination of then-Representative Matt Gaetz—who at the time was facing allegations of sex trafficking—to be Attorney General of the United States in November 2024. In short, the defendant simply has no evidence to indicate that the juror's

---

[4] Of course, it should go without saying that it would not be reasonable for a juror to develop an opinion about all "followers" of President Trump based solely on trial of a single person who professes to be a follower. But the law does not expect jurors to be paragons of reasonableness during their informal online political discourse; it only expects them to be fair and impartial in assessing the evidence at trial, which Juror #45 affirmed she could do.

alleged beliefs about the association between followers of the President and sexual predation preexisted her service in this trial.   And without proof the juror's alleged views pre-dated the trial, he cannot show she was dishonest in her belief she could be fair and impartial.

### 3.    The defendant has failed to show Juror #45 would have been stricken for cause

The defendant also cannot show that the facts in his motion would have resulted in Juror #45 being stricken for cause.   The defendant simply assumes—with no factual basis—that the juror's online statements represent an entrenched worldview making her incapable of rendering fair judgement.   The law is to the contrary.   Courts presume prospective jurors will be able to set aside their beliefs and be impartial; thus, "establishing juror partiality is a high hurdle."   *United States v. Needham*, 852 F.3d 830, 839 (8th Cir. 2017). "Essentially, to fail this standard, a juror must profess [her] inability to be impartial and resist any attempt to rehabilitate [her] position."   *Id.*   Absent a profession of the inability to be impartial, "juror bias may be implied only in certain egregious situations," such as where "the relationship between a prospective juror and some aspect of the litigation makes it highly unlikely that the average person could remain impartial."   *Id.* at 840 (cleaned up).

The defendant has failed to meet that exacting standard.   Nothing in Juror #45's social media posts suggest that she would be completely "unable to lay aside . . . her impressions or opinions and render a verdict based on the evidence presented in court."   *United States v. Nosley*, 62 F.4th 1120, 1127 (8th Cir. 2023).   To the contrary, Juror #45 attested under oath that she could be fair and impartial.   As the Eighth Circuit observed in affirming the denial

of the defendant's first motion, "her assurances that she could be fair or impartial effectively doom Lazzaro's claim." *Lazzaro*, 129 F.4th at 533.

In addition to being legally unsupported, the defendant's assumption that Juror #45's could not set aside the beliefs espoused in her social media posts and render fair judgment is also factually unwarranted. A prospective juror's statements made in casual settings— particularly online or on social media—are not always reliable indicators of how that person will behave when instructed by a federal judge to render careful judgment in a courtroom. In informal settings, of course, people tend to speak more loosely, exaggerate for effect, or adopt a flippant tone that does not necessarily reflect their considered beliefs. The semi-anonymity and distance of online platforms can amplify this tendency, especially in political discourse, encouraging comments that are more impulsive or extreme. In contrast, jury service takes place in person and in a formal setting that carries serious responsibility and legal consequences. Jurors swear a solemn oath, are guided by instructions from the court, and are accountable to their fellow jurors and their oath.

Both this Court and the Eighth Circuit have already rejected the defendant's claim that Juror #45 would defy the Court's instructions during her jury service. The same is true for the defendant's current motion for a new trial and this Court should therefore deny the motion.

**C.     Category #2: The Juror's Social Media Posts Regarding "Believe all Women."**

With respect to the second category of evidence, the defendant seizes on two Facebook posts: (1) a June 8, 2024, Facebook post with a circular emblem bearing the slogan "Believe All Women," and (2) an August 7, 2025, re-posting of another Facebook user's statement that

12

"WE WOULDN'T BE WAITING FOR A LIST" (a reference to the so-called "Epstein list") "if we simply believed women."[5]   Def.'s Ex. B, E.   The defendant contends these posts show the juror could not be impartial "when making credibility determinations regarding the conflicting testimony of a woman and a man," and show an "express bias in favor of believing the testimony of women."   ECF No. 594, at 8.   Once again, the defendant made absolutely no effort during voir dire to explore Juror #45's beliefs regarding credibility determinations in the context of accusations of sexual misconduct.   The defendant's reliance on this evidence fails for many of the same reasons discussed above.

First, the defendant has again failed to show that Juror #45 was dishonest in her sworn affirmation that she could be fair and impartial.   "Believe women" is a slogan that grew out of the #MeToo movement—the juror's support of which was already the subject of the defendant's first new trial motion, the denial of which was affirmed on appeal.   The slogan sometimes gets recast as "believe all women," a formulation which even supporters of the #MeToo movement have described as "lacking in . . . nuance," "clumsy," and "deeply problematic."   *See* Traister, R., *"You Believe He's Lying?"* The Cut (Feb. 26, 2020); Wexler, L., *2018 Symposium Lecture: #metoo and Procedural Justice*, 22 Rich. Pub. Int. L. Rev. 13, 19 (2019).   At bottom, however, there appears to be general recognition among supporters of the #MeToo movement that the slogan is not a call for the unthinking acceptance of every accusation of sexual impropriety—especially not in the context of criminal proceedings in which constitutional due process protections apply.   Rather, supporters say the slogan is an

---

[5]   The government will assume, for the purposes of its response, that Juror #45's repost of another person's statement is intended to be an endorsement of that statement.

attempt to counter what they believe to be a long-standing presumption of *disbelief* that society has attached to women who come forward with claims.  *See* Traister, "*You Believe He's Lying?*"   As one commenter explained, "Believe All Women" is shorthand for a more complex idea:

> "Believe All Women"—while a little lacking in its nuance—I think is a . . . demand for equality.   It is not a demand to believe all women—whatever they say, regardless of what is said after that—that's the beginning and end of the story, but rather, a willingness to believe women at all.   To approach the inquiry with an openness to their truthfulness.   Because the lesson of Title VII, of Title IX, of our ongoing epidemic of sexual assault against women and men, is that often victims aren't believed.
> . . .
> #MeToo creator Tarana Burke has said, "when we say we believe survivors, it's not believe them without investigation.   Believe them without interrogation.   We have set a precedent in this country of not believing . . . thinking that women in particular are lying when they come forward with these allegations."

Wexler, *#metoo and Procedural Justice*, 22 Rich. Pub. Int. L. Rev. 13, 19-20 (2019); *see also Sanchez v. Sanchez*, Civil No. 18-449, 2021 WL 1227133, at *9 (M.D.N.C. Mar. 31, 2021).

In other words, the juror's mere reference to the slogan does not demonstrate she must have been lying when she attested that she could be fair and impartial.   The defendant has provided no evidence the juror's use of a slogan had anything to do with her views about impartiality in a courtroom setting.   He similarly provides only speculation that the juror's use of the slogan reflects an unthinking and uncritical acceptance of women's accusations of sexual misconduct.

The defendant has also failed to prove that—even if the juror did use the slogan to advocate for the uncritical acceptance of accusations—that she was being dishonest in her belief that she could set aside those views, follow the court's instructions, and be fair and

impartial during a trial.    As with his claims about the juror's views about the President and

his supporters, the juror's "assurances that she could be fair or impartial effectively doom

Lazzaro's claim." *Lazzaro*, 129 F.4th at 533.    Accordingly, the Court should reject the

defendant's motion on this ground as well.

## II.    The Defendant's Supplemental Documents in Support of His Motion Do Not Justify a New Trial.

The defendant has notified the government of his intent to provide the court with

certain text messages, which he claims show Juror #45 answering a purported electronic

"survey" in a manner that is inconsistent with answers she gave during voir dire.    Because

these messages were not attached to or discussed in the defendant's recent motion, the

government summarizes them below.

### 1.    The Survey Responses

The messages in question are between two parties: (1) N.M., a "Grad Student / Survey

Concierge," acting on behalf of an entity calling itself "Gopher Women's Institute," and (2)

a person utilizing a phone with a (320) area code.    The defendant claims the (320) phone user

is Juror #45—a claim which is apparently based on the phone number being associated with

the Juror on the website fastpeoplesearch.com.    The government, however, does not concede

that the defendant has established the phone was utilized by Juror #45 and thus will refer to

the user of the phone in this section as simply "the recipient" of the messages.

On August 8, 2025, N.M. initiated a text conversation with the recipient.    N.M.

addressed the recipient by Juror #45's first name and claimed that "Gopher Women's Institute

[was] conducting a survey to gather statistical data" and that the recipient's name came up as

a "key demographic" for their important work.   N.M. offered the recipient a $100 gift card for completing the survey and promised survey responses are "100% Confidential."

On August 9th, N.M. sent another message to the recipient, assuring him/her that the message was not spam and the offer of $100 was genuine.   The recipient responded by asking "what survey?"   N.M. replied it was a seven-question survey about "women's issues," and reaffirmed that responses are "100% anonymous."   The recipient told N.M. to send the survey and N.M. responded with a survey that included the following questions:

3.) Have you ever been a victim of any type of sexual abuse?

4.) Have any of your close friends or family members ever told you they have been a victim of sexual abuse?

The recipient did not immediately respond to the questions.   Thus, on August 10th, N.M. wrote to say responses were due in 48 hours and the recipient should also provide an email address to receive their gift card.   On August 11th, after receiving no response, N.M. wrote the recipient again to check in.   On August 12th, after again receiving no response, N.M. wrote to see if the recipient was still interested—saying that N.M. only needed "short (one sentence) answers to each question" and that the "$100 Visa e-gift cards are ready to go out immediately."   On August 14th, after again receiving no response, N.M. wrote offering "an extra gift card ($100 and $50)" for a response.

On August 15th, N.M. wrote again saying that the last day of the survey was today and that responses received by midnight will get their gift card by Sunday.   The recipient then responded by asking where he/she could do the survey.   N.M. said the survey responses could be done by text message and sent the survey questions again.   The recipient then responded

to the survey questions.    The recipient answered "No" to the question about ever having been a victim of sexual abuse, but answered "Yes" to the question about whether "any of your close friends or family members ever told you they have been a victim of sexual abuse?"

N.M. then replied thanking the recipient for their response but asking the recipient to "please provide 1-3 sentences per question" as stated in the original instructions.    N.M. also asked to recipient to provide an email address so they could "deliver your gift card."    No additional messages appear in the documents provided by the defendant.

### 2.    The Survey Responses Do Not Warrant a New Trial

At the outset, the government notes it has serious concerns about the defendant's use of these text messages.    The defendant's possession of these text messages suggests that the so-called "survey" was a targeted ruse by someone acting on the defendant's behalf to elicit information that could be used to undermine the juror's service in court.    The information was elicited under (what appears to be) the completely false pretense that answers would be "100% Confidential" and anonymous.    N.M. also appears to have overcome the recipient's reluctance to respond by repeatedly messaging the recipient and offering money in exchange for a response.    Prospective jurors will be rightfully deterred from jury service if parties (or their proxies) are allowed to subject former jurors to deceitful tactics and false pretenses to undermine their service post-trial.    *See Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (noting that "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.").

The government also notes that—without any evidence of the source of these text messages—the Court has no basis to conclude they are authentic or attribute them to Juror #45.

Even setting those concerns aside, however, the messages do not warrant a new trial. The government understands the defendant's argument to be that the survey responses warrant a new trial because the recipient responded "Yes" to the survey question: "Have any of your close friends or family members ever told you they have been a victim of sexual abuse?"   The defendant alleges this response is inconsistent with Juror #45's negative response on the juror questionnaire to the question: "Have you or has anyone close to you ever been a victim of sexual abuse or other sexual misconduct of any kind?"

The defendant's argument fails because the survey response does not demonstrate that Juror #45 was both dishonest and motivated by partiality in her response to the juror questionnaire.   The survey question was broader than the juror questionnaire.   For example, the survey asks about whether any "close friends" or "family members" have told the juror they were a victim of sexual abuse.   The juror questionnaire, on the other hand, did not ask the jury about any and all of their "family members."   Rather, it asked if "anyone close" to the juror has been a victim, which was specifically defined as "a spouse or significant other, a parent or sibling, a child or grandchild, a very close friend, or someone with a similar relationship to you."[6]   The Juror may well have a "family member" who has reported being a victim of sexual abuse, but that family member may not fit within the juror's honest assessment of "anyone close" to them.   As this Court observed in denying the defendant's

---

[6] As this Court has previously noted, prospective jurors were told to use their "honest judgment in deciding whether someone is close to you."   Voir Dire Tr. 7.

first motion for a new trial, if the defendant cared about every family member of prospective jurors, "or was unwilling to rely on the jurors' honest judgments about who was 'close' to them, he could have addressed those concerns with the Court before or during voir dire. He did not." ECF No. 482, at 6.

The survey and juror questionnaire are also different in another respect—timing. The government's understanding is that the juror questionnaire was sent out around December 2022 or January 2023; while the survey did not occur until August 2025. It is eminently plausible that the juror learned of a close friend or family member being a victim of sexual abuse in the several intervening years between responding to the jury questionnaire and the survey. Relationships also change over time. It is similarly plausible that the juror became "close" to a victim of sexual abuse after trial but was not "close" to that person at the time she responded to the questions during voir dire.

Even if the defendant could prove that the juror incorrectly answered the question about anyone close to her being a victim of sexual abuse, he has not shown the juror's error in answering the question was a product of dishonesty and partiality. As this Court previously observed, the defendant "has not offered any evidence that the inaccuracy was due to a juror's bias—rather than, say, to the fact that the juror had a lapse of memory or attention, or was nervous, or misunderstood the question." ECF No. 482, at 9-10.

Finally, as with the other evidence the defendant relies on in his motion, he has failed to show that the juror's knowledge of "close friend" or "family member" being the victim of a sexual assault would have resulted in the juror being struck for cause. A different juror, for example, reported being a victim of sexual abuse but—like Juror #45—testified to her belief

she could be fair and impartial.   Voir Dire Tr. 96-98.   The Court did not strike that juror for cause, nor did the defendant ask for that juror to be struck for cause.   Voir Dire Tr. 98 (discussing Juror #14); *see also* Voir Dire Tr. 191-96 (discussing Juror #37 who had a niece who was abused as a child).   The fact that the defendant did not move to strike other jurors who had personal or familial connections to sexual abuse is strong evidence that Juror #45 also would not have been struck for cause had she disclosed having a "close friend" or "family member" who had been a victim of such abuse.   As with the defendant's other claims, the juror's "assurances that she could be fair or impartial effectively doom Lazzaro's claim." *Lazzaro*, 129 F.4th at 533.

Finally, to protect Juror #45 and other former jurors from being subjected to these kind of tactics to undermine their jury service, the government requests the Court order the parties not to have any contact (direct or indirect) with former jurors without prior approval of the Court.

## <u>CONCLUSION</u>

As this Court and the Eighth Circuit have already found, the defendant made no effort during the voir dire process to explore any of the alleged views he now finds objectionable. The social media posts on which his second new trial motion is based do not demonstrate that the juror was dishonest in her belief that she could be fair and impartial.   Even if those posts did show potential bias on the part of the juror, the juror's professed belief—under oath— that she could be fair and impartial is fatal to the defendant's claim.   Accordingly, the Court should deny the defendant's second motion for a new trial.

Dated:   October 6, 2025                    Respectfully Submitted,

JOSEPH H. THOMPSON
Acting United States Attorney

*s/ Nathan H. Nelson*

BY: NATHAN H. NELSON
Assistant United States Attorney
Attorney ID No. 388713