UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
Plaintiff,

v.

Civil No. _______________
Criminal No. 21-cr-173 (PJS/DTS)

ANTON JOSEPH LAZZARO,
Defendant.

MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

RECEIVED
SEP 24 2026
CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
SEP 24 2026
U.S. DISTRICT COURT MPLS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND REQUEST FOR A STAY .......... 1

INTRODUCTION .......... 3

I. THE SELECTIVE-PROSECUTION CLAIM WAS NOT PRESSED ON APPEAL .......... 5

A. Differential Treatment the Government Has Never Denied .......... 6

B. The *Eichorn* Prosecution Confirms the Pattern .......... 8

C. The Comparator Rule *Armstrong* Rejects and *Gonzalez* Forbids .......... 13

D. The Evidence of Discriminatory Purpose Was a Pattern .......... 18

E. The Omission Deprived Lazzaro of Appellate Review .......... 21

II. THE JURY WAS NOT INSTRUCTED ON THE CONTESTED ELEMENT .......... 24

A. The Case Turned on a Single Question .......... 24

B. The Instruction Defined the Element by Repeating It .......... 26

C. The Defense Was Argued but Never Placed in the Charge .......... 27

D. The Omission Affected the Outcome .......... 29

E. Where Is the Line? .......... 34

III. ADDITIONAL CLAIMS .......... 36

A. Restitution .......... 36

B. Forfeiture .......... 36

C. The Vehicle for These Claims .......... 37

CONCLUSION .......... 37

# TABLE OF AUTHORITIES

Cases

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .......... 36
*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) .......... 33
*Burton v. Ark. Sec'y of State*, 737 F.3d 1219 (8th Cir. 2013) .......... 13
*Castaneda v. Partida*, 430 U.S. 482 (1977) .......... 12
*Dubin v. United States*, 599 U.S. 110 (2023) .......... 32
*Ellingburg v. United States*, 607 U.S. 163 (2026) .......... 36
*Gonzalez v. Trevino*, 602 U.S. 653 (2024) .......... 4, 11, 13, 15, 16, 17, 18, 21, 38
*Gonzalez v. Trevino*, 42 F.4th 487 (5th Cir. 2022) .......... 15
*Hazelwood School District v. United States*, 433 U.S. 299 (1977) .......... 12
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .......... 12, 18
*Johnson v. United States*, 576 U.S. 591 (2015) .......... 32
*Jones v. Barnes*, 463 U.S. 745 (1983) .......... 22
*Jouppi v. Alaska*, No. 25-246 (cert. granted July 20, 2026) .......... 37
*Just v. City of St. Louis*, 7 F.4th 761 (8th Cir. 2021) .......... 16
*McDonnell v. United States*, 579 U.S. 550 (2016) .......... 34
*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) .......... 2
*Johnson v. Crooks*, 326 F.3d 995 (8th Cir. 2003) .......... 17
*Nieves v. Bartlett*, 587 U.S. 391 (2019) .......... 15, 17
*Slack v. McDaniel*, 529 U.S. 473 (2000) .......... 38
*Smith v. Robbins*, 528 U.S. 259 (2000) .......... 22
*Strickland v. Washington*, 466 U.S. 668 (1984) .......... 4, 22, 23, 28, 29
*United States v. Armstrong*, 517 U.S. 456 (1996) .......... 13, 17, 18
*United States v. Bernard*, 351 F.3d 360 (8th Cir. 2003) .......... 37
*United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974) .......... 5
*United States v. Bonestroo*, 702 F.3d 1066 (8th Cir. 2013) .......... 6
*United States v. Bradley*, 880 F. Supp. 271 (M.D. Pa. 1994) .......... 19
*United States v. Carron*, 541 F. Supp. 341 (W.D.N.Y. 1982) .......... 19
*United States v. Cook*, 782 F.3d 983 (8th Cir. 2015) .......... 33
*United States v. Correa-Gomez*, No. 01-32 (E.D. Ky. Aug. 31, 2001) .......... 19

*United States v. Eichorn*, No. 25-cr-117 (D. Minn.) .......................... 7, 8, 9, 10, 11, 12, 21
*United States v. Hirsch*, 360 F.3d 860 (8th Cir. 2004) .................................................. 23
*United States v. Johnson*, 577 F.2d 1304 (5th Cir. 1978) ................................................ 21
*United States v. Jungers*, 702 F.3d 1066 (8th Cir. 2013) .................................................. 6
*United States v. Koech*, No. 18-cr-18 (D. Minn.) ......................................... 6, 7, 8, 9, 25
*United States v. Larive*, 794 F.3d 1016 (8th Cir. 2015) ...................................................... 6
*United States v. Lazzaro*, 2022 WL 16948157 (D. Minn. Nov. 15, 2022) ..................... 21
*United States v. Leathers*, 354 F.3d 955 (8th Cir. 2004) ............................................. 19
*United States v. Lopez*, 415 F. Supp. 3d 422 (S.D.N.Y. 2019) ........................................ 19
*United States v. Mung*, 989 F.3d 639 (8th Cir. 2021) ....................................................... 6
*United States v. Ojala*, 544 F.2d 940 (8th Cir. 1976) .............................................. 20, 21
*United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975) ......................................................... 21
*United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012) ................................................ 32
*United States v. Siriprechapong*, 181 F.R.D. 416 (N.D. Cal. 1998) ................................ 19
*United States v. Slim*, 34 F.4th 642 (8th Cir. 2022) ........................................................... 6
*United States v. Snead*, No. 21-4333 (4th Cir. 2022) ........................................................ 6
*United States v. Tucker*, 137 F.3d 1016 (8th Cir. 1998) ..................................................... 2
*United States v. White*, 928 F.3d 734 (8th Cir. 2019) ........................................................ 5
*United States v. Wolff*, 796 F.3d 972 (8th Cir. 2015) ......................................................... 6
*Wayte v. United States*, 470 U.S. 598 (1985) .................................................................... 20

Statutes and Rules

18 U.S.C. § 1591 .......... 4, 6, 7, 8, 14, 16, 25, 28, 31
18 U.S.C. § 1594(e) .......... 36
18 U.S.C. § 2422(b) .......... 9
28 U.S.C. § 2253(c) .......... 38
28 U.S.C. § 2255 .......... 2, 37
Fed. R. App. P. 28(j) .......... 22
Fed. R. Civ. P. 15(c) .......... 3
Fed. R. Crim. P. 33 .......... 3
Minn. Stat. §§ 609.321–.324 .......... 7

PRELIMINARY STATEMENT AND REQUEST FOR A STAY

This motion is filed protectively, and Lazzaro asks that it be held in abeyance.

A motion for a new trial based on juror misconduct has been pending before this Court since August 25, 2025. ECF No. 594. Lazzaro does not wish this filing to disturb, delay, or complicate it in any way. In a post to the "Occupy Democrats" group, Juror 45 wrote of the President's supporters that "[a]lmost all of his followers are sexual predators or felons," and elsewhere repeatedly described his followers as mostly criminals and sex offenders. In another post she declared: "Believe ALL women." She was seated in a case the Court had already described to the venire as charging a prominent Republican donor with the sex trafficking of minors, in which every fact witness to the charged conduct was a woman and the defense case came from Lazzaro himself. She was the only member of the venire to write that she could be "very fair" on the juror questionnaire. No other prospective juror—among more than one hundred—wrote the same. She wrote afterward that she "was one of the lucky 12 to be picked for the Anton Lazzaro federal child sex trafficking case."

When the Court asked mid-trial whether a conversation in the jury room had affected her impartiality, she alone claimed to have heard nothing, cutting the Court off mid-sentence to say, "I don't know what's going on, actually, so—I'm just playing dumb." A digital survey she answered after trial revealed that she had responded falsely to a material question on the juror questionnaire concerning close friends and family members who are victims of sexual abuse.

At voir dire, she responded falsely again when asked whether any juror had "ever been involved in any type of civil litigation, whether as a

plaintiff, a defendant, or a witness"; she had been a party to at least four such actions. And falsely a third time when asked about her organizational involvement, describing herself as a former 4H leader who spends her free time on crafts—omitting a years-long Occupy Democratic Socialists political passion.

Under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), and *United States v. Tucker*, 137 F.3d 1016, 1026–27 (8th Cir. 1998), that showing entitles Lazzaro to a new trial. The point admits of no partisan gloss. A juror who had posted that "almost all blacks in Minneapolis are drug dealers," and then answered falsely three times to be seated on the jury of a Black man charged with dealing drugs, would be excused without a second thought—and a verdict she joined would not stand. Juror 45 is that juror. Only the group has changed. A juror who answers falsely on voir dire about matters bearing on her impartiality, and who holds the views this juror published, was not the impartial juror the Sixth Amendment guarantees. Nothing less than a new trial cures that, and the motion asks in the alternative for an evidentiary hearing.[1] The motion has been pending for more than a year without a ruling.[2]

Lazzaro files this motion now only because he must. His conviction became final on October 6, 2025, when the Supreme Court denied certiorari. The one-year limitation period of 28 U.S.C. § 2255(f)(1) therefore

[1] The full showing appears in ECF No. 594 and the materials filed with it, the interested party's sealed letter and exhibits at ECF No. 597, and the reply at ECF No. 604. The juror's statements to the Court appear at Trial Tr. 1364–65; her questionnaire and voir dire responses at Voir Dire Tr. 17 and 223. The four civil actions to which she had been a party are identified by case number in ECF No. 597.

[2] Lazzaro intends no criticism of the Court in noting the passage of time. He is aware that this District has absorbed an extraordinary influx of immigration matters, and that the burden on its judges and staff has been severe. *See* Fox 9, *After ICE Overwhelmed Federal Courts, Chief Judge Reflects on Emotional Toll*, https://www.fox9.com/news/after-ice-overwhelmed-federal-courts-chief-judge-reflects-emotional-toll. He notes the pendency of the motion only because it bears on the relief he requests here, and because the limitations period does not pause while the docket is congested.

expires on October 6, 2026, and the pendency of a Rule 33 motion does not toll it. Were he to await a ruling on the juror-misconduct motion, the claims raised here would be time-barred before that ruling issued. He is forced to choose between waiting and preserving, and the statute does not permit him to do both.

He therefore asks the Court to accept this filing as timely and to stay it pending resolution of the Rule 33 motion, with leave to amend thereafter. Amendments arising from the same core facts would relate back under Federal Rule of Civil Procedure 15(c). A stay costs the Government nothing, spares the Court from adjudicating claims that may be mooted by an order granting a new trial, and permits the juror-misconduct motion to be decided first and on its own terms.

There is a further reason for that sequence. Both claims raised here rest on omissions by Lazzaro's own counsel, who continues to represent him ably on the Rule 33 motion and whom Lazzaro has no wish to displace. Because a lawyer cannot be asked to litigate the consequences of his own omissions, these claims will require the appointment of conflict counsel for that limited purpose. That is a reason to hold this motion rather than to press it now: present counsel should be permitted to finish the juror-misconduct litigation he began, unencumbered, while separate counsel takes up the claims below if and when they become necessary.

What follows is pleaded to preserve.

## INTRODUCTION

Anton Lazzaro is serving 252 months following a prosecution brought on a theory no United States Attorney had ever charged before,

and resting on a single contested element the jury was never taught how to decide. He raises two claims under the Sixth Amendment.

Claim I concerns the appeal. Lazzaro litigated a selective-prosecution claim through a magistrate's recommendation, objections, an order, and a motion to reconsider, on a record the Government never answered. It was denied on the ground that he had not identified particular comparators and proved that they did not share his politics or his assets—a demand for "virtually identical and identifiable comparators" that the Supreme Court has since held "goes too far." *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam). The claim was preserved but not raised on appeal, although by the time the opening brief was filed the Supreme Court had already granted certiorari to decide that very question.

Claim II concerns the jury charge. This Court told the parties before trial that a defense of generosity rather than commerce "would be a perfectly legitimate defense." Pretrial Conf. Tr. 12. That defense was argued to the jury in closing. No instruction embodying it was ever requested or given. The jury received the bare statutory phrase—a "commercial sex act" is one "on account of which anything of value is given," 18 U.S.C. § 1591(e)(3) —was told to supply its "ordinary meaning," and was left to convict on sequence rather than exchange.

A word at the outset about what these claims are not. Lazzaro was represented at trial and on appeal by counsel he respects, who litigated this case with skill and continues to represent him. Nothing here impugns counsel's competence, diligence, or good faith, and Lazzaro continues to rely on him. The Sixth Amendment inquiry is narrow: it asks whether a particular omission fell below an objective standard of reasonableness and whether it altered the result. *Strickland v. Washington*, 466 U.S. 668, 687–

88, 694 (1984). Able lawyers make omissions that satisfy that standard, and the two identified here are of that kind. Lazzaro raises them because the law requires that they be raised now or not at all.

Each claim is independent. Either warrants relief. A third section identifies two further matters—restitution and forfeiture—that Lazzaro preserves but does not present for decision.

## I. THE SELECTIVE-PROSECUTION CLAIM WAS NOT PRESSED ON APPEAL, AND THE RULING THAT DEFEATED IT HAS SINCE BEEN UNDERMINED.

For fifty years courts have recognized that a prosecutor who selects his targets by their politics has abandoned law enforcement for something else. "Selective prosecution then can become a weapon used to discipline political foes and dissidents," diverting the prosecutor's objective "from the public interest to the punishment of those harboring beliefs with which the administration in power may disagree." *United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974). To prevail, Lazzaro must show "that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct," and that the singling out "was based on an impermissible motive such as race, religion, or the exercise of constitutional rights." *United States v. White*, 928 F.3d 734, 742–43 (8th Cir. 2019). He made both showings before this Court. The claim was preserved, developed, and never answered on the merits. It was not among the issues presented on appeal.

A. The Record Established Differential Treatment That the Government Has Never Denied.

Start with the docket, because it is not disputed.

The last sex-trafficking indictment this District returned before Lazzaro's was *United States v. Stennis*, No. 20-cr-19 (D. Minn.)—an organized online prostitution enterprise—about two years earlier. Over the preceding near-decade the office averaged roughly one such case a year, and every one charged force, fraud, threats, or coercion under § 1591(b)(1), organized overt prostitution advertising, child pornography, or all three.[3] Each falls within what the Fourth Circuit calls the statute's "legitimate sweep"—the conviction of "individuals who have forced minors into prostitution and maintained them through varied means." *United States v. Snead*, No. 21-4333 (4th Cir. 2022). Not one resembles this case.

The pattern holds across this Circuit. Every § 1591 purchaser prosecution this Circuit has reviewed has involved at least one of three features, none of which is present here: a third party supervising the transaction; force, fraud, threats, or coercion; or the overt advertising of the minor for prostitution.[4] The point is not that any of these is an element

[3] *United States v. Zavala* & *United States v. Rangel-Torres*, No. 19-cr-319 (D. Minn.) (organized prostitution to construction workers); *United States v. Taylor*, No. 18-cr-88 (D. Minn.) (massage-parlor front coercing Native American women); *United States v. Koech* & *United States v. Mathis*, No. 18-cr-18 (D. Minn.) (violent pimp selling a fifteen-year-old to purchasers); *United States v. Unpradit*, No. 17-cr-107 (D. Minn.) (Thai women held in bondage debt); *United States v. Charles*, No. 16-cr-065 (D. Minn.); *United States v. Loyd*, No. 15-cr-142 (D. Minn.); *United States v. Geddes*, No. 14-cr-394 (D. Minn.) (organized online prostitution enterprise).

[4] *United States v. Jungers*, 702 F.3d 1066, 1070 (8th Cir. 2013) (purchaser negotiated with pimp for an eleven-year-old); *United States v. Bonestroo*, 702 F.3d 1066 (8th Cir. 2013) ($200 for kidnapped fourteen-year-old twins); *United States v. Wolff*, 796 F.3d 972, 975 (8th Cir. 2015) ($150 arranged through a North Dakota pimp); *United States v. Larive*, 794 F.3d 1016 (8th Cir. 2015) (cell phone traded to pimp for sex with a fifteen-year-old); *United States v. Mung*, 989 F.3d 639, 641–42 (8th Cir. 2021) ($150 arranged with a stepfather at a motel); *United States v. Slim*, 34 F.4th 642, 648 (8th Cir. 2022) ($200 for an hour with a fifteen-year-old advertised by her pimp); *see also United States v. Lopez*, No. 22-3044 (8th Cir. July 20, 2023) (escort-website ad, negotiated price and duration—cited by this Court at sentencing, Sentencing Tr. 10, but still bearing the third feature, advertising, that is absent here).

the Government failed to prove; that question was resolved on direct appeal. The point is that no United States Attorney, in this District or elsewhere, has ever selected for federal prosecution a case in which none of them was present.

Narrow the frame from the Circuit to this District and the picture is starker. Before Lazzaro, this office had charged a commercial-sex purchaser under § 1591 exactly once. That was *United States v. Koech*, No. 18-cr-18(2) (D. Minn.)—and *Koech* existed only because *United States v. Mathis*, No. 18-cr-18(1) (D. Minn.), did. Koech was charged because he had purchased from Mathis, the violent pimp the office was already prosecuting for selling a fifteen-year-old girl. Koech was not an independent charging decision; he was charged as part of the prosecution of the man who sold to him. Then came Lazzaro, in 2021—charged with no pimp, no coercion, and no advertising. And after Lazzaro, the office charged no commercial-sex purchaser of any kind, under any statute, for nearly four years, until it charged a sitting Republican state senator in March 2025. That is the entire history of purchaser enforcement in this District: one man charged as an adjunct to a violent trafficker's prosecution, and two men charged standing alone. The two are Lazzaro and Eichorn.

That gap was not for lack of conduct to charge. Over the same period the Minnesota Sentencing Commission recorded 247 sentencings under the state commercial-sex statutes, Minn. Stat. §§ 609.321–.324, of which 187 resulted in stayed or probationary sentences. Ex. A.[5] They

[5]Exhibit A is the Minnesota Sentencing Guidelines Commission's statewide sentencing data for Minn. Stat. §§ 609.322 and 609.324, covering calendar years 2019 through 2023, obtained directly from the Commission. It records 247 sentencings, of which 187 received stayed or probationary dispositions. Those figures capture only cases reaching sentencing and therefore understate the number of chargeable offenders.

include mothers selling their own daughters and the organized prostitution of middle-school children. The Office of Justice Programs counted 345 American Indian women and girls trafficked in Minnesota over three years, and Minnesota residents placed 353 calls to the National Human Trafficking Hotline in 2020 alone.[6] Under the construction of § 1591 the Government pressed and obtained, every one of those state cases involving a person under eighteen was federally chargeable. And the Minnesota Human Trafficking Investigators Task Force that generated most of them is staffed by agents of the very office that indicted Lazzaro.

From that field—and setting aside Koech, who was charged only because the office was already prosecuting the trafficker who sold to him—the United States Attorney selected one man on his own account: an outspoken Republican whose forfeitable assets her agents had inventoried before she charged him. Four years later the office selected a second. Alleged commercial-sex purchasers are, in practice, exempt from federal prosecution in the District of Minnesota—unless the purchaser is a prominent Republican.

B. The *Eichorn* Prosecution Confirms the Pattern—and Shows How Far the Error Has Spread.

On March 19, 2025, this office charged Justin David Eichorn, a sitting Republican state senator, with attempted enticement of a minor under 18

[6] *Shattered Hearts: The Commercial Sexual Exploitation of American Indian Women and Girls in Minnesota*, https://www.niwrc.org/sites/default/files/images/resource/Shattered-Hearts-Full.pdf. Minnesota hotline data is compiled at National Human Trafficking Hotline, *Minnesota Statistics*, https://humantraffickinghotline.org/en/statistics/minnesota. Minnesota's prevalence of child sex trafficking is severe enough that a national anti-trafficking organization relocated operations to the State to address it. *See* Mikki Morrissette, *OUR Rescue Moving to Minnesota to Address High Sex Trafficking of Children*, Minn. Women's Press (Dec. 7, 2024), https://www.womenspress.com/our-rescue-moving-to-minnesota-to-address-high-sex-trafficking-of-children/.

U.S.C. § 2422(b).[7] In the entire history of this statute's use in this District, this office has made exactly two freestanding decisions to federalize a commercial-sex purchaser. Both were prominent Republicans. Even accounting for United States v. Koech—the one prior federal purchaser prosecution in this District, charged only because the office was already prosecuting the trafficker who sold to him—the office brought exactly two freestanding commercial-sex purchaser charges in the five years between Lazzaro's indictment in 2021 and Eichorn's in 2025. Both are Republicans.

The circumstances of that charge supply the cleanest comparator this record could offer, because it removes every variable at once. Eichorn was arrested in a single Bloomington sting operation that netted fourteen men.[8] Same operation. Same undercover premise. The same statutes available against every one of them. Of those arrested, one was charged federally and exposed to a ten-year mandatory minimum. The others were left to the state courts, where the ordinary disposition is probation. The one taken federally was the sitting Republican state senator, and the United States Attorney's office announced him by his office rather than his conduct. There is no enforcement rationale that distinguishes the one from the rest. There is only the difference the press release itself advertised.

What the office did next confirms the point, and the chronology is worth setting out precisely. Eichorn was charged on March 19, 2025. Two days later, the *Star Tribune* asked in print why he faced a far harsher potential sentence than others charged in the same sting. *Why Justin*

---

[7] *United States v. Eichorn*, No. 25-cr-117 (ECT/SGE) (D. Minn.); Press Release, U.S. Att'y's Off., D. Minn., *Minnesota State Senator Charged with Attempted Coercion and Enticement of a Minor* (Mar. 19, 2025), https://www.justice.gov/usao-mn/pr/minnesota-state-senator-charged-attempted-coercion-and-enticement-minor. The office announced the charge by the defendant's office, not his conduct.

[8] *14 Men Arrested in Bloomington Prostitution Sting*, Bring Me The News (Mar. 2025), https://bringmethenews.com/minnesota-news/14-men-arrested-in-bloomington-prostitution-sting.

*Eichorn Is Facing a Harsher Potential Sentence*, Star Tribune (Mar. 21, 2025), https://www.startribune.com/why-justin-eichorn-is-facing-a-harsher-sentence-than-others-caught-in-sex-sting/601241240. Just days later, the office returned its next indictment out of the same operation. *United States v. Cazhco-Inamagua*, No. 25-cr-128 (ECT/SGE) (D. Minn.) (filed Apr. 8, 2025). Two more followed. *United States v. Huerta-Sanchez*, No. 25-cr-129 (ECT/SGE) (D. Minn.); *United States v. Taweeleh*, No. 25-cr-139 (JMB/DTS) (D. Minn.). A category of case this office had declined to bring for a decade produced three federal indictments within days of a newspaper pointing out that it had brought exactly one, against a Republican legislator.[9]

That sequence is not exculpatory. It is an admission. A prosecutor who charges one man out of a group arrested together, and reaches back for three more only once the disparity has appeared in print, has confirmed both that the others were chargeable all along and that something other than their conduct explained why they had not been charged. The remedy for a selective prosecution is not to select a few more.

Nor does prominence itself explain the selection, because prominent men who did the same thing were left to the state courts. In May 2022—while Lazzaro's motion to dismiss was pending before this Court—Hennepin County charged Mohamed Ali Selim, the principal of a Burnsville-Eagan-Savage middle school, with attempting to hire a fifteen-year-old for prostitution after he responded to an advertisement and drove

[9]One further continuity between the two prosecutions bears note. The charging decision in *Eichorn* was made not by a United States Attorney appointed by the current administration, but by then-acting United States Attorney Lisa D. Kirkpatrick, a holdover from the prior administration. *See Eichorn*, ECF No. 73, at 6 (quoting her press statement). Ms. Kirkpatrick was also an Assistant United States Attorney on the prosecution team in Lazzaro's own case. *See* Trial Tr. Vol. VI (appearances). The two federal commercial-sex purchaser prosecutions this District has brought against prominent Republicans were charged by the same attorneys.

to St. Louis Park to meet her. He pleaded guilty and was sentenced on November 4, 2022—eleven days before this Court denied Lazzaro's motion —to thirty days in the county workhouse and three years of probation.[10] No federal charge followed.

The *Eichorn* litigation also carries a warning. Both Judge Elkins and Judge Tostrud denied Eichorn relief by applying the comparator framework of this Court's order, citing it by name. *Eichorn*, ECF Nos. 64–65, at 11–12; *United States v. Eichorn*, No. 25-cr-117, Opinion and Order, ECF No. 73, at 4–6 (D. Minn. Feb. 17, 2026). They adopted its three-part test—including the requirement that comparators be "outside the protected class," meaning persons who "did not share the trait or participate in the activity on which the prosecutor allegedly relied"—and its holding that fourteen unprosecuted state defendants are "not statistically significant" because they say "nothing about the total number of individuals who could have been prosecuted in federal court." *Id.* at 5 (quoting *United States v. Lazzaro*, No. 21-cr-173 (PJS/DTS), 2022 WL 16948157, at *2, *4–5 (D. Minn. Nov. 15, 2022)). Neither decision cites *Gonzalez v. Trevino*. Neither was asked to. The comparator rule stated in that order has become the working rule of this District, unexamined, because no one has yet brought the controlling authority to bear on it. This motion is the first occasion to do so.

The statistical objection will not bear the weight placed on it. Neither court identified how many comparators would suffice, what denominator it had in mind, or what test it was applying. "Not statistically significant" appears in both opinions not as the conclusion of an analysis but in place of one. It is an assertion wearing the clothes of a finding.

---

[10] Kim Hyatt, *Savage Middle School Principal Sentenced for Hiring Minor for Sex*, Star Tribune (Nov. 4, 2022), https://www.startribune.com/savage-middle-school-principal-sentenced-friday-for-hiring-a-minor-as-a-prostitute/600222023.

More fundamentally, the objection is answered by evidence Lazzaro possesses. Both courts reasoned that a handful of state defendants "says nothing about the total number of individuals who could have been prosecuted in federal court." *Eichorn*, ECF No. 73, at 5. That is a demand for the denominator. Neither Lazzaro's counsel nor Eichorn's presented the raw state sentencing data to the courts that ruled. Lazzaro presents it now: 247 state commercial-sex sentencings over five years, against zero federal purchaser prosecutions. Ex. A. That is not a sample from which inferences must be drawn. It is the whole field, and the federal share of it is nothing. Where the observed number is zero and the expected number is not, the disparity is itself the evidence. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977).

Nor is "statistically significant" a phrase without content. The Supreme Court has defined it. An inference of discrimination arises when "the difference between the expected value and the observed number is greater than two or three standard deviations"—that is, when the result would occur by chance less than roughly five times in a hundred. *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 308 n.14 (1977). Apply that measure here. The field of chargeable purchasers consists of the 247 state-sentenced offenders in Exhibit A together with Lazzaro and Eichorn: 249 men. From that field the office made two freestanding decisions to charge federally. If those two selections were made without regard to politics, the probability that both would fall on the only two prominent Republicans in the pool is one in 30,876—the number of ways two men can be drawn from 249. Expressed as a p-value, that is 0.00003, several times beyond the threshold *Hazelwood* describes. The Government may dispute whether every one of

the 247 is comparable; that is the argument answered in Part C. It cannot dispute the arithmetic. The order below called ten comparators "not statistically significant" without stating what test it applied. The test the Supreme Court applies, run on the whole field, yields the opposite result.

If more is required, the remainder lies with the Government. Declination decisions are not published; there is no docket of cases not brought. That asymmetry is why *Armstrong* contemplates discovery, and it is why the alternative relief Lazzaro requests is discovery and a hearing rather than dismissal alone.

C. The Comparator Rule Applied Here Is One *Armstrong* Rejects and *Gonzalez* Forbids.

Consider first what *Armstrong* says. The Court there identified state-court comparators as an appropriate means of demonstrating differential treatment, faulting those defendants for failing to investigate "whether similarly situated persons of other races were prosecuted by the State of California." 517 U.S. at 461, 470. State cases are not an inferior substitute for the required showing. They are the showing *Armstrong* describes. Neither *Armstrong* nor this Circuit requires identical comparators. Both ask only for persons "who could have been charged for the offenses for which the defendant[] w[as] charged, but were not so prosecuted." *Armstrong*, 517 U.S. at 469. In the equal-protection setting this Circuit has described the required similarity as one of "comparable seriousness." *Burton v. Martin*, 737 F.3d 1219, 1231 (8th Cir. 2013).

The state defendants satisfy that standard on the Government's own theory of the statute. A "commercial sex act" is any sex act "on account of which anything of value is given to or received by any person." 18 U.S.C. §

1591(e)(3). Each of the 247 gave or received a thing of value in connection with a sex act, and each whose conduct involved a person under eighteen was chargeable under § 1591 on precisely the reading the Government advanced here—more readily, in fact, because each had negotiated an explicit price, the element the Government has labored to establish in this case. The comparison does not turn on whether the relationships resembled one another. It turns on whether the same statute reached both. On the Government's reading, it reached both, and it reached the state defendants more comfortably. As to seriousness, the Government has never suggested that this "sugar daddy" case is as grave as the state cases it declined—cases involving violent pimps, prepubescent children, and mothers selling their own daughters.

The Court rejected the comparators, reasoning that the state defendants' conduct was "different," and "because it is different, the defendants who committed it are not comparators." *United States v. Lazzaro*, No. 21-cr-173, ECF No. 264, at 11 (D. Minn. Nov. 15, 2022). But different how? More violent. More organized. Younger victims. Different, that is, in the direction of greater culpability. A comparator rule under which the Government immunizes itself by prosecuting the *least* serious offender in the field is not equal protection. It is equal protection stood on its head.

Then came the requirement that cannot survive. It was not enough that hundreds of offenders went unprosecuted; Lazzaro was obliged to prove that those offenders "did not engage in similar political activism and did not possess similar forfeitable assets." *Ibid.* Read that again. To prove he was singled out for his politics, he first had to prove that everyone spared was apolitical.

There is no way that could possibly be the law. A homeowner ticketed for a code violation his neighbors commit more flagrantly could never allege selective enforcement unless he first established that his neighbors' yards displayed opposing political signs. A Black defendant could not challenge a racially selective prosecution without first proving the race of each unprosecuted offender, one by one. A rule of that kind does not filter weak claims. It abolishes the doctrine.

The Supreme Court held as much in *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam)—a case in which certiorari was granted on October 13, 2023, and which was decided on June 20, 2024, while this appeal was pending. The plaintiff, a city councilmember, alleged she had been arrested in retaliation for protected speech. The Fifth Circuit held that her claim could fall within the exception only if she proffered "comparative evidence" of "otherwise similarly situated individuals who engaged in the same criminal conduct but were not arrested." *Gonzalez v. Trevino*, 42 F.4th 487, 493 (5th Cir. 2022). It demanded, as the Supreme Court described it, "very specific comparator evidence—that is, examples of identifiable people who 'mishandled a government petition' in the same way Gonzalez did but were not arrested." The Supreme Court vacated that judgment. The Fifth Circuit had taken "an overly cramped view" of the governing standard: "Although the *Nieves* exception is slim, the demand for virtually identical and identifiable comparators goes too far." What suffices instead is "objective evidence" that the plaintiff was proceeded against "when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Gonzalez*, 602 U.S. 653 (per curiam) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019)).

The evidence the Court held sufficient mirrors this record. Gonzalez had reviewed "the past decade's misdemeanor and felony data" for her county and found the statute had never been used there to charge anyone for conduct like hers. That, the Court held, was "a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer has declined to arrest someone for engaging in such conduct in the past." *Gonzalez*, 602 U.S. 653 (per curiam). Lazzaro reviewed the entire history of this statute's use in this District and found § 1591 had never been used to charge a purchaser on facts resembling his. The prohibition is longstanding; the conduct is not novel; the enforcement is absent. That is the same showing, in the same form, on a larger scale. And the evidence the Court approved was not drawn from a single incident or a single operation. It was a review of a decade of county charging data. Lazzaro's showing is of the same character, and on the federal side it spans longer: the entire history of this statute's use in this District, alongside five years and 247 sentencings of the state records available to him.

The rule applied here went further than the one the Fifth Circuit applied in *Gonzalez*. It required not merely identifiable comparators, but comparators affirmatively proven to lack Lazzaro's politics and Lazzaro's assets. If the demand in *Gonzalez* went "too far," the demand here went considerably further. Nor was this Circuit's law ever otherwise. It has long asked for "[o]bjective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Just v. City of St. Louis*, 7 F.4th 761 (8th Cir. 2021).

The Government will answer that *Gonzalez* is a § 1983 retaliatory-arrest case and does not govern a criminal selective-prosecution claim. The answer is that *Gonzalez* construes a standard this Court borrowed from selective-prosecution law in the first place.

When *Nieves v. Bartlett* created the exception at issue—that probable cause does not defeat a claim where the plaintiff offers "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been"—it cited a single authority: *United States v. Armstrong*. 587 U.S. 391, 407 (2019) (citing *Armstrong*, 517 U.S. at 465). Justice Thomas said plainly what the Court had done: "The majority today imports its 'qualification' from our jurisprudence on selective-prosecution claims." *Id.* at 413 (Thomas, J., concurring in part) (citing *Armstrong*). Justice Gorsuch read it the same way, observing that "the Court today seems to indicate that something like *Armstrong*'s standard might govern a retaliatory arrest claim," and noting that several courts of appeals—including this one—"have already applied *Armstrong* to claims alleging selective arrest." *Id.* at 425–26 (Gorsuch, J., concurring in part and dissenting in part) (citing, *inter alia*, *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003)). Justice Sotomayor, dissenting, described the majority opinion as seeking "kinship with *Armstrong*." *Id.* at 434 n.9.

The comparator requirement *Gonzalez* addressed is therefore not a rule from a neighboring field. It is *Armstrong*'s requirement, borrowed into the arrest setting and then construed. When the Court held that "the demand for virtually identical and identifiable comparators goes too far," 602 U.S. 653 (per curiam), it was telling the lower courts what that borrowed standard does not require. A rule that goes too far when applied

to a civil plaintiff does not become permissible when applied to a man facing a ten-year mandatory minimum.

Two further points make the objection immaterial. It would be a strange asymmetry if a civil plaintiff seeking damages could establish differential treatment through objective enforcement data while a criminal defendant could not. And in any event Lazzaro does not need *Gonzalez* to displace *Armstrong*. *Armstrong* itself endorses state-court comparators and requires only persons who could have been charged and were not. 517 U.S. at 461, 469–70. Nothing in *Armstrong*, and nothing in this Circuit's cases, has ever required a defendant to prove that the unprosecuted lacked his politics. That requirement appears in no decision of the Supreme Court or of this Circuit.

The Court also observed that "all that Lazzaro has demonstrated is that the government did not prosecute every single person who was suspected of committing crimes similar to his," which it thought "hardly breaking news." ECF No. 264, at 11. But that is not what the record showed. Had this been a firearms, narcotics, child-pornography, or fraud prosecution—offenses this office charges dozens of times a year—the claim would be meritless. What the record showed was a category in which the office charged no one at all. That is the "inexorable zero." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977).

### D. The Evidence of Discriminatory Purpose Was Dismissed as "Coincidence." It Was a Pattern.

Under *Armstrong*, the comparator data alone would compel discovery. But Lazzaro offered more. Intent is proved as intent is always proved—circumstantially. "Improper motive may be proved either by direct

or circumstantial evidence." *United States v. Leathers*, 354 F.3d 955 (8th Cir. 2004). No selective-prosecution case has ever turned on a confession, and courts have ordered dismissal, discovery, or hearings on far less than this record.[11]

The lead prosecutor had given more to political candidates—all Democrats—than every other Assistant United States Attorney in Minnesota combined.[12] Her agents subpoenaed the web hosts and bank records of Lazzaro's political action committee, material with no conceivable bearing on a sex-trafficking investigation; those materials are in the Government's discovery. She ordered the cancellation of a scheduled meeting between the FBI and that political action committee concerning evidence of felony fraud by a sitting Democratic congresswoman—evidence Lazzaro had spent more than $300,000 developing, and the subject of national reporting days after his arrest.[13]Agents interrogating the co-defendant in her freshman dormitory returned repeatedly to Lazzaro's political activity, to photographs of him with the President, and to the contents of the safe they intended to seize.[14] At the detention hearing the prosecutor asked a witness whether he knew Lazzaro "as Tony GOP," and whether the two followed each other on Twitter. Det. Hr'g Tr. 66. And at a trial about commercial sex acts, the name "Trump" was placed before the

[11] *United States v. Correa-Gomez*, No. 01-32 (E.D. Ky. Aug. 31, 2001); *United States v. Lopez*, 415 F. Supp. 3d 422 (S.D.N.Y. 2019); *United States v. Siriprechapong*, 181 F.R.D. 416 (N.D. Cal. 1998); *United States v. Bradley*, 880 F. Supp. 271 (M.D. Pa. 1994); *United States v. McDonald*, 553 F. Supp. 1003, 1011 (S.D. Tex. 1983); *United States v. Carron*, 541 F. Supp. 341 (W.D.N.Y. 1982).

[12] Federal Election Commission records of the Assistant United States Attorney's contributions are publicly available; Lazzaro's own political contributions are documented at OpenSecrets.org. *See* https://www.opensecrets.org/search?q=anton+lazzaro&type=donors.

[13] Miranda Devine, *FBI Dodged Ilhan Omar-'Bro' Wed Probe*, N.Y. Post (Aug. 15, 2021), https://nypost.com/2021/08/15/fbi-dodged-ilhan-omar-bro-wed-probe-devine/. The recorded call to the Minneapolis Field Office is available at www.IlhanOmarDNA.com.

[14] The interrogation was conducted by Minnesota Human Trafficking Investigators Task Force Commander Bobbi Jo Pazdernik and FBI Special Agent Bob Blackmore in December 2020. The transcript is in the Government's discovery; the agents' questioning concerning the safe appears at pages 15 and 84.

jury on nine separate occasions, in lines of questioning bearing on nothing the Government had to prove.[15]

The manner in which the charge was publicized deserves separate mention, because it reveals the intended audience. A Minnesota indictment of a Minnesota defendant, arising from a Minnesota investigation, did not break in Minnesota. It broke in *The Daily Beast*—a New York-based national political publication—under the headline "GOP Strategist Anton Lazzaro Arrested for Underage Sex Trafficking." The Daily Beast (Aug. 2021).[16] Its author has acknowledged that he was in contact with an Assistant United States Attorney in the prosecuting office. The local press followed. Of all the outlets in the country, the story was placed first with the one whose readership would find the defendant's party affiliation the most interesting fact about him—and the headline duly led with it.

Each of these, in isolation, is a coincidence. Assembled, they are a practice. And they answer the question *Wayte* asks: whether the Government acted "because of" the defendant's protected status rather than "in spite of" it. *Wayte v. United States*, 470 U.S. 598, 610 (1985). "An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." *United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972).

Reliance on *United States v. Ojala*, 544 F.2d 940 (8th Cir. 1976), and the tax-protester and Selective Service cases is also misplaced. Those decisions tolerate targeting the vocal offender because there the vocal

[15] *E.g.*, Trial Tr. Vol. I at 166; Vol. II at 324–25, 346; Vol. III at 573, 616, 681.

[16] GOP *Strategist Anton Lazzaro Arrested for Underage Sex Trafficking*, The Daily Beast (Aug. 2021), https://www.thedailybeast.com/gop-strategist-anton-lazzaro-arrested-for-underage-sex-trafficking/.

defiance *is* the offense—the protest and the crime are one act, and the Government retains a legitimate interest in "punishing flagrant violators and deterring violations by others." *United States v. Johnson*, 577 F.2d 1304, 1309 (5th Cir. 1978).[17] Lazzaro's politics had nothing whatever to do with his alleged conduct. If prominence alone justified selection, the defense would be unavailable to every federal defendant who ever spoke publicly. That is the whole difference between deterrence and retaliation.

E. The Omission Deprived Lazzaro of the Appellate Review to Which He Was Entitled.

The claim arrived on appeal fully preserved. It had been litigated through a magistrate's recommendation, objections, an order, and a motion to reconsider.[18] Facing a word limit and five other issues, counsel elected not to press it, noting in a footnote: "Mr. Lazzaro does not press that issue here." Appellant's Br. at 30 n.10, *United States v. Lazzaro*, No. 23-3098 (8th Cir. Jan. 29, 2024).

The difficulty is one of timing. On October 13, 2023—more than three months before the opening brief was filed—the Supreme Court granted certiorari in *Gonzalez v. Trevino*. The questions presented were whether the comparator requirement "can be satisfied by objective evidence other than specific examples" of enforcement that never occurred, and whether that requirement is confined to the arrest setting. Pet. for Cert. at i, *Gonzalez v. Trevino*, No. 22-1025. Those were the precise questions on which this claim had failed. A defendant whose selective-

[17] The *Eichorn* courts relied on *Ojala*, 544 F.2d at 944–45, and on *United States v. Peskin*, 527 F.2d 71, 86 (7th Cir. 1975), which *Ojala* quotes. *See Eichorn*, ECF Nos. 64–65, at 12; *Eichorn*, ECF No. 73, at 7–8. Both involved public officials prosecuted for offenses connected to their offices. Lazzaro held no office.

[18] *See* ECF Nos. 236 (amended motion to dismiss), 261 (objections to report and recommendation), 264 (order denying motion), 274 (order denying reconsideration).

prosecution claim has just been rejected for want of individually identified comparators, and who learns that the Supreme Court has agreed to decide whether such comparators may be required, is holding a claim whose governing rule is about to be reexamined by the only court that can change it.

That grant was a matter of public record when the brief was written. Preserving the claim would have cost a portion of a word limit that was then being spent on five other issues, none of which prevailed. Federal Rule of Appellate Procedure 28(j) would then have permitted the intervening decision to be brought to the panel's attention at no cost in space whatever —but only if the claim had been preserved in the opening brief. Because the claim was not carried forward, the decision issued on June 20, 2024 with nothing before the panel to which it could attach.

Winnowing is the hallmark of competent appellate advocacy, and such judgments receive deference. *Jones v. Barnes*, 463 U.S. 745 (1983). The choice made here is understandable in isolation: facing a word limit and five other issues, counsel pressed the claims he judged strongest and folded the selective-prosecution facts into the vagueness argument instead. Lazzaro does not suggest that choice was made carelessly, or that counsel served him poorly in this case generally. But the question under *Strickland* is not whether a choice is understandable; it is whether it was objectively reasonable in light of the information then available.

The difficulty is what happened after the choice was made. Deference under *Barnes* protects the decision to trade a weaker claim for a stronger one, measured against the information available. Where the omitted issue was "clearly stronger" than those presented, the presumption of strategy yields. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Measured against the information available in January 2024, however, a claim with a complete record, an unrebutted showing, and a pending Supreme Court case addressing the very rule that had defeated it was clearly stronger than issues a unanimous panel would go on to reject in full. That comparison is not made with hindsight; the cert grant preceded the brief by more than three months.

The prejudice requires no speculation. Lazzaro need show only a reasonable probability of a different result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). He had cleared this Circuit's threshold for discovery —"at least some credible showing of different treatment of similarly situated persons"—many times over, on facts the Government never contested. *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). The ruling against him rested on a comparator requirement the Supreme Court disapproved while his appeal was pending, and on a purpose finding the Government's own subsequent conduct has undone. Had the claim been pressed, there is a reasonable probability the court of appeals would have reversed or remanded for the discovery and hearing plainly warranted.

A man is serving 252 months following a prosecution the Government has never once been willing to defend on its merits. The argument that would have said so was preserved and available. It was set aside for reasons that were sound when the brief was written, and that no longer held after June 20, 2024.

## II. THE JURY WAS NOT INSTRUCTED ON THE ONLY CONTESTED ELEMENT.

Before a witness was sworn, this Court identified the defense this case would turn on. Addressing trial counsel at the pretrial conference, the Court said:

> "I assume you're going to—one potential defense would be, and there's some reference to this in your papers, this isn't commercial sex. It's just two people hooking up. And one of them happens to be generous and is generous to the other person, and that's not commercial sex. And that would be a perfectly legitimate defense."

Pretrial Conf. Tr. 12.

The court was not speaking loosely, because it returned to the same distinction minutes later, unprompted and in its own words: "one of the defenses would seem to be that this was just two folks hooking up, and it was just a date that involved sex and I was generous to my date. It wasn't commercial sex." *Id.* at 17. Twice in a single conference, before any evidence was heard, the Court identified the line between a commercial sex act and a generous date, and twice it described the defense on the lawful side of that line as one the law permitted Lazzaro to make.

The jury was never told about it.

### A. The Case Turned on a Single Question, and Every Participant Knew It.

The Government did not contend that Lazzaro used force, threats, or fraud. It did not contend that a trafficker delivered the girls, that anyone advertised them, or that anyone supervised them. Its own expert had told a jury in this District what separates the two offenses: prostitution involves

"two people"—one "performing a commercial sex act, which would be sex in exchange for money," and "a buyer or a purchaser"—while sex trafficking requires "a third person involved, and that's going to be the trafficker," who is "doing the advertising, transporting, housing, recruiting, maintaining that person for the purposes of that commercial sex act." Trial Tr. 163, *United States v. Koech*, No. 18-cr-00018 (DWF/LIB) (D. Minn.), ECF No. 236, at 66. There was no such person here.

What remained was a single question: were the gifts the price of the sex, or did they merely accompany it? The statute makes that question dispositive, because a "commercial sex act" is one "on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Those three words do work. They require a nexus—the value must be the reason for the act, not its sequel. A gift that follows sex has not bought it, any more than a dinner check paid afterward purchases the conversation.

This Court saw the difficulty as it unfolded. Settling the instructions, it said: "this is the problem that we've had run throughout the trial, which is there can be certain evidence that's relevant to consent, which is not a defense, but it's also relevant to what's going on here. Is this a commercial sex act, or is this just a date with generous gifts?" Trial Tr. Vol. VII at 1569.

At sentencing, explaining why the defense had failed, the Court sorted the same evidence into two categories. Lazzaro "used money and other things of value for two purposes. First, he used them to groom the girls, such as when he bought Estella that purse. And, second, he used them to pay the girls for sex, such as when he would pay cash to Gabbie after each sex act." Sentencing Tr. 9. A $1,300 purse bought minutes after meeting was grooming. Cash handed over following a sex act was payment.

The categories are different, and the difference between them is the element.

But the Court did not say what placed a given gift in one category rather than the other. It sorted without stating the principle of sorting. That was not an oversight, and no criticism is intended in observing it: the Court had no occasion to articulate the standard, because it had assigned the question to the jury. The difficulty is that the jury had been given no standard either. The distinction the Court identified before trial, and applied after trial, was never delivered to the only body required to apply it during trial.

The Court then said the thing that decides this motion: "Ultimately, it was up to the jury to decide whether when Mr. Lazzaro handed hundred dollar bills to a girl, he was engaging, to quote his attorney, in 'courtship behavior' or whether he was instead paying for sex." *Ibid.*

That was exactly right. It was up to the jury. The jury was given nothing to decide it with.

B. The Instruction Defined the Element by Repeating It.

The jury received the bare words of the statute: a "commercial sex act" means "any sex act on account of which anything of value is given to or received by any person." Trial Tr. Vol. VIII at 1668. It was told that "[u]nless I defined a term in this or another instruction, give the ordinary meaning to terms in the elements of a crime." *Ibid.* "Sex act" was never defined. "On account of" was never explained. No instruction distinguished a payment from a present, an inducement from an afterthought, courtship from purchase.

Consider what that charge permitted. A juror who believed every word of the defense—that Lazzaro gave freely, that nothing was negotiated, that no girl was ever told sex was the price of anything—was still obliged to convict. Gifts were given. Sex occurred. The instruction asked for nothing more. The "perfectly legitimate defense" the Court had described weeks earlier was, on this charge, not a defense at all. It was a concession.

Every purchaser prosecution in this Circuit confirms what the missing instruction would have required, because each involved an actual bargain. That includes the one case this Court cited at sentencing as proof that no trafficker is necessary. The defendant in *Lopez* answered an advertisement on an escort website, "negotiate[d] a price for sexual acts directly with the undercover officer who had placed the ad," and drove to the arranged meeting place. Sentencing Tr. 10; *see United States v. Lopez*, No. 22-3044 (8th Cir. July 20, 2023). That is a purchase—an offer, a price, an agreement. Whatever else *Lopez* establishes, it does not establish that a gift given afterward is one. Lazzaro's case has no trafficker, no coercion, and no bargain. It falls below the floor of every case in which this statute has ever been applied to a purchaser.

### C. The Defense Was Argued to the Jury but Never Placed in the Charge.

The defense understood all of this. In closing the jury was told that "on account of" means the thing of value must be given *for* the act, and that what the girls came to expect afterward could not make a completed act commercial. Trial Tr. Vol. VIII at 1639–40.

But the Court was never asked to instruct on it. At the charge conference no objection was stated to Instruction 14, none to Instruction

15—which defined "commercial sex act"—and none to Instruction 16. Trial Tr. Vol. VII at 1554–71. Asked whether there was anything further on the final instructions, the defense requested an instruction concerning the credibility of witnesses who abuse drugs and alcohol. *Id.* at 1571. No nexus instruction was tendered. No definition of "sex act" was proposed. Nothing was submitted that would have told the jury the distinction on which the defense depended.

The omission is difficult to attribute to strategy, because no strategy is served by it. An instruction requiring the Government to prove that the thing of value induced the sex act would have burdened the prosecution and aided the defense in every respect; there was nothing to be gained by its absence and a great deal to lose. The right defense was identified and it was argued well. The single step not taken was to ask that the jury be told it was the law. Under *Strickland*, the question is not whether counsel performed capably overall—he did—but whether one particular omission fell below an objective standard of reasonableness and altered the outcome. *Strickland v. Washington*, 466 U.S. 668, 687–88, 690 (1984). Where a defense depends entirely on a distinction, the jury must be given the means to draw it.

The Government itself articulated the standard the jury never received. Confronted after trial with a hypothetical drawn from *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523 (S.D.N.Y. 2018)—a man who treats a person to a free dinner and a movie, promises future outings and gifts, and then engages in what he construes as consensual sexual activity—the Government explained why that would not be a § 1591 offense. It lacked force, fraud, or coercion. It did not mention the victim's age. And, "[m]ore importantly, it does not specify whether the gifts were conditional on

performance of the sex act." That fact, the Government wrote, "is essential in establishing that the parties engaged in commercial sex." ECF No. 386, at 10 n.6. The Government thus ranked conditionality above the absence of force and above the age of the participant, and called it essential. That is the distinction on which this case turned. It appears nowhere in the instructions.

The Government's own answer illustrates the difficulty. It asserted that "evidence presented at trial showed that Defendant conditioned these payments on the receipt of sex," and pointed in part to an inference that Lazzaro "implied" the purse he purchased "was prepayment for sex." ECF No. 386, at 10 (citing Trial Tr. Vol. IV at 1000). This Court, considering the same purse, described it not as payment but as grooming. Sentencing Tr. 9. If the prosecutor and the Court drew opposite conclusions from the same gift, a jury given no standard at all was being asked to do something neither of them could do unaided.

D. The Omission Affected the Outcome.

Prejudice requires not certainty of acquittal but a probability sufficient to undermine confidence in the verdict. *Strickland*, 466 U.S. at 694. Three features of this record supply it.

*First*, the element was genuinely contested—so contested that this Court called it "the problem that we've had run throughout the trial," Trial Tr. Vol. VII at 1569, and assigned its resolution to the jury.

*Second*, the Government's proof on that element rested on a single witness. Of the young women who testified, exactly one described an offer of money conditioned in advance on intercourse. Trial Tr. Vol. III at 693–95. Every other witness who was asked said the opposite.

Her own sister, present on the same nights, was asked by the Government on direct examination whether "there [was] an explicit discussion of sex for money." She answered: "No." The discussion, she explained, concerned "taking clothes off for money." *Id.* at 632–33. Asked whether it had been "100 percent clear" to her "the entire time that this was sex in exchange for money," she again answered "No," saying that understanding came only "[a]fter a few nights." *Id.* at 642. She repeated it on cross. *Id.* at 651.

Estella was asked directly: "He never offered you any money to kiss or take your clothes off or anything like that?" She answered: "No." Trial Tr. Vol. IV at 965. She had been given a purse worth roughly $1,300 at the Mall of America before any sexual encounter occurred, with nothing asked in return, and she testified that when she wanted money she asked for it—sending Lazzaro photographs of shoes she wanted. *Id.* at 938, 947. Emily, asked whether Lazzaro "sa[id] anything about money or getting paid or anything like that," answered: "Not that I remember." Trial Tr. Vol. I at 230. She and another young woman received identical gifts on the same evening —the same cash in the same envelopes—though only one of them had any sexual contact with Lazzaro at all. *Id.* at 211. And confronted on cross with her own earlier statement that "[i]t sounds bad, but it wasn't. It wasn't bad. It wasn't like prostitution or anything," Emily did not retreat from it. She said it "sounds like something that I agree with right now," confirmed that she agreed with it, and when asked directly—"It was not prostitution?"— answered: "I—no." *Id.* at 227.

Other witnesses did testify that they would not have gone but for the money, or that they were paid after sex. That testimony is not the same thing, and the difference is the one the missing instruction would have

drawn. A witness who says she did something for money is describing her own motive. A witness who says the defendant told her the money was for a sex act is describing an exchange. Only the second bears on what § 1591 makes criminal, because the statute punishes what the defendant did and knew, not what the other participant privately concluded. A defendant cannot be convicted on the basis of an understanding formed in someone else's mind and never communicated to him. Trial counsel argued exactly this to the jury. Trial Tr. Vol. VIII at 1639–40. No instruction told the jury it was the law, and the charge as given permitted conviction on either kind of proof, without distinguishing between them.

The Government's answer is that everyone understood what was happening—he wanted sex, they wanted the gifts, and each knew it of the other. Assume all of it. That still is not an exchange. Two people can each want something from the other, and each know what the other wants, without either making the thing conditional. What converts mutual awareness into a commercial transaction is a price: an understanding that the sex is what the money is for, and that without the one the other would not be given. The charge required no such finding. It permitted conviction on mutual awareness alone—on a finding that he hoped, that they hoped, and that both hopes were satisfied.

That is the shape of the Government's case on the element that mattered. One witness, intoxicated by her own account on the night in question, described a bargain proposed in advance. The others described motives, sequences, and gifts—asked for, sometimes; unsolicited, often; given before sex, after sex, and to women with whom there was no sex. A properly instructed jury, told that the thing of value must have been the reason for the sex act rather than its accompaniment or its aftermath,

could readily have found that the Government had not carried its burden. The jury was told no such thing.

*Third*, the element as the jury received it had no discernible limit. The court of appeals has since described "commercial sex act" as "extremely broad," and held that "paying [minors] in cash or valuables after sex could 'cause'" a commercial sex act. Op. 13, 15. If that is so, then on the charge given, the giving of any gift in the vicinity of any sexual encounter suffices. "[N]o boundary separates conduct that gives rise to liability from conduct that does not." *Dubin v. United States*, 599 U.S. 110 (2023). Lazzaro made the point himself at sentencing: if courtship behavior suffices, "then I suppose anyone who gives someone a gift, whether it be, you know, a cheap gift or a million dollars, is grooming their companion for sex. . . . If that's the standard that we're going to apply, then I don't know how there is any standard to apply." Sentencing Tr. 42.

It is no answer that Lazzaro's conduct was unattractive, or that a properly instructed jury might have convicted him anyway. The Supreme Court has "squarely contradict[ed] the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015). The same principle governs an instruction that supplies no standard: the question is not whether this defendant could have been convicted under a correct charge, but whether the jury was given one. It was not. And the difference is not academic. The statute reaches the trafficker. On the instruction given, it reached everyone.

The element has no natural stopping point, and this Circuit has said so. "Anything of value" is a term of art that courts "generally construe to envelop[] both tangibles and intangibles," *United States v. Petrovic*, 701 F.3d

849, 858 (8th Cir. 2012), and the intangibles held to qualify under federal law include amusement, the time and attention of a younger woman, a candidate's agreement not to run for office, photographs, and a promise to do virtually anything another person might value. "[C]ommercial sex act" is itself "extremely broad." *United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015). A federal court applying the identical statutory definition put the consequence plainly: if "something of value" means anything tradeable—"a bottle of wine, a nice dinner, or a promise to do the dishes"—then the definition of a commercial sex act "encompasses vast swaths of legal, consensual, non-commercial sexual activity." *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281 (W.D. Wash. 2012).

On that understanding, the $1,300 purse cannot be what makes this case criminal. A purse is a thing of value; so is a ride home, a concert ticket, and a case of beer bought by a twenty-one-year-old for a group of high-school girls in hopes of the same lawful encounter. If the giving of a valuable thing were enough, the statute would reach all of them, and the only difference between Lazzaro and the twenty-one-year-old would be his age and the price tag. Neither is an element. What separates the criminal case from the lawful one cannot be the value of the gift. It can only be whether the gift bought the act. That is the finding the jury was never asked to make.

Consider a defendant the charge would reach as easily. An eighteen-year-old with a large following meets two seventeen-year-olds who admire him. He reposts their videos to his audience, which is to say he gives them the thing they want most and the thing hardest to come by—attention, reach, the possibility of being seen. Social-media exposure is not a trivial inducement. It is among the most valuable currencies available to a

teenager, and there is no serious dispute that it draws them. The relationships turn sexual, as relationships between a barely-adult and a near-adult lawfully may under the age-of-consent laws of most States. And because he has money and they do not, he buys them dinners, clothes, a weekend away. On the reasoning applied here, every element is present. The reposts are enticement, for displaying desirable things to a minor entices. The gifts are the commercial component, for value given after sex may "cause" the act it followed. He knew their ages. That is a ten-year mandatory minimum, and the young man is a sex trafficker.

The response will be that no prosecutor would bring such a case. But that is not an answer; it is the concession. "[W]e cannot construe a criminal statute on the assumption that the Government will use it responsibly." *McDonnell v. United States*, 579 U.S. 550, 576 (2016). When nothing but prosecutorial forbearance separates ordinary conduct from a decade in prison, the jury has been given no standard at all—which is precisely what an instruction on inducement would have supplied.

Where a statute's reach is uncertain, the remedy is a narrowing construction delivered to the jury, not a conviction and an assurance of restraint. The instruction that was never requested was that construction.

E. Where Is the Line?

The Court said one existed. Before trial it told counsel that a man who is simply "generous to the other person" has not committed a commercial sex act, and that saying so "would be a perfectly legitimate defense." Pretrial Conf. Tr. 12. At the charge conference it returned to the same question—"Is this a commercial sex act, or is this just a date with generous gifts?"—and called it the problem that had "run throughout the

trial." Trial Tr. Vol. VII at 1569. At sentencing it sorted the very same evidence into two piles, grooming on one side and payment on the other, a $1,300 purse in the first and cash after sex in the second. Sentencing Tr. 9.

Three times the Court identified the line. Not once did it say where the line is.

It did not have to. It had given the question to the jury: "Ultimately, it was up to the jury to decide whether when Mr. Lazzaro handed hundred dollar bills to a girl, he was engaging . . . in 'courtship behavior' or whether he was instead paying for sex." *Ibid.* But the jury was handed the bare words of the statute and told to give them their ordinary meaning. It was never told that "on account of" requires the money to have bought the act rather than followed it. It was told nothing at all about how to tell a gift from a price.

So the question returns, and it has only two answers. If buying a seventeen-year-old expensive things and later sleeping with her is sex trafficking, then there was never a legitimate defense—not a weak one, not a hard one, but none, on any facts, and the assurance given before trial was empty. If instead the defense was real, then a line exists between the generous date and the commercial transaction, and a jury asked to find one and not the other had to be told where it falls.

Lazzaro does not pretend the line is easy to draw. He says only this: a defendant told he has a perfectly legitimate defense is entitled to a jury told the same thing, in terms it can apply. This one was not. Confidence in the verdict does not survive that.

III. ADDITIONAL CLAIMS.

Claims I and II are Lazzaro's primary claims. Two further components of the judgment rest on legal premises that are presently unsettled, and he raises them here as well.

A. Restitution.

By amended judgment entered in October 2023, the Court ordered Lazzaro to pay more than $400,000 in restitution. No jury found the facts underlying that award. At the time, this Circuit held that criminal restitution is not punishment but a civil, compensatory remedy, and on that reasoning concluded that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), has no application to it. That reasoning is no longer available. In *Ellingburg v. United States*, 607 U.S. 163 (2026), a unanimous Court reversed the Eighth Circuit and held that restitution under the Mandatory Victims Restitution Act "is plainly criminal punishment." Whether it follows that the facts supporting a restitution award must be found by a jury is a question *Ellingburg* did not decide and that the courts of appeals have not yet addressed in its wake. Lazzaro preserves the contention that it does.

B. Forfeiture.

The Court ordered forfeiture of Lazzaro's residence under 18 U.S.C. § 1594(e) and rejected his Eighth Amendment challenge, applying the standard that a forfeiture offends the Excessive Fines Clause only if it is "grossly disproportional to the gravity of the defendant's offense." Sentencing Tr. 25–26. The Supreme Court has granted certiorari to decide whether that inquiry may be conducted in the abstract or must instead be measured against the gravity of the particular defendant's own conduct.

*Jouppi v. Alaska*, No. 25-246 (cert. granted July 20, 2026). That question is squarely presented by this forfeiture, and Lazzaro preserves it.

C. The Vehicle for These Claims.

This Circuit has held that a federal prisoner may not use § 2255 to challenge the restitution component of his sentence, because the statute reaches only a prisoner "claiming the right to be released." *United States v. Bernard*, 351 F.3d 360, 361 (8th Cir. 2003). That limitation applies equally where the challenge is framed as one of ineffective assistance. *Shephard v. United States*, 735 F.3d 797, 798 (8th Cir. 2013) (per curiam). The same reasoning governs a challenge to forfeiture, which likewise seeks relief from a property consequence rather than from custody.

Lazzaro therefore raises these claims subject to that limitation. To the extent the Court concludes that § 2255 does not reach them, he asks that they be denied without prejudice to their assertion by whatever vehicle proves appropriate, and that the denial not be treated as a waiver or an abandonment of the underlying contentions.

CONCLUSION

Claim I relief. The conviction should be vacated. In the alternative, this Court should order discovery and an evidentiary hearing on the selective-prosecution claim.

Claim II relief. The conviction should be vacated and a new trial ordered. In the alternative, this Court should conduct an evidentiary hearing on this claim.

Should the Court deny relief on either claim, Lazzaro respectfully requests a certificate of appealability. Reasonable jurists could at minimum

debate whether a comparator rule requiring a defendant to prove that the unprosecuted did not share his politics survives *Gonzalez v. Trevino*, and whether a jury instructed only in the statute's bare words was equipped to decide the sole contested element. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(2).

Dated: September 24, 2026

Respectfully submitted,

Anton J. Lazzaro, 59637-509, K3
FCI Sandstone
P.O. Box 1000
Sandstone, MN 55072

*Defendant, pro se*